### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**PIONEER HEALTH SERVICES, INC.**                **CHAPTER 11**
       **Debtor**                                  **CASE NO. 16-01119-NPO**

### EMERGENCY MOTION FOR AUTHORITY TO USE
### CASH COLLATERAL AND FOR GRANTING ADEQUATE PROTECTION

COMES NOW Pioneer Health Services, Inc. ("Movant" or "Debtor") and files this its Emergency Motion for Authority to Use Cash Collateral and for Granting Adequate Protection (the "Motion"), and in support thereof would respectfully show as follows, to-wit:

### Introduction

1.      On March 30, 2016 (the "Petition Date"), the Movant filed with this Court its Voluntary Petition (the "Petition") for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). The Movant is the Debtor and Debtor-in-Possession in this Chapter 11 case, and it remains in possession of his assets and properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

### Jurisdiction and Venue

2.      This Honorable Court has jurisdiction of the subject matter herein and the parties hereto pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105, 363, 541, 1107, related statutes, related rules and various orders of reference. This is a core proceeding.

### Background

3.      Pioneer Health Services has been in the hospital business since 1997 and Medicomp has been providing physical therapy services since 1980. These businesses have thrived under the ownership and direction of their sole owner, Joe McNulty, who is passionate about this business. Medicomp and Pioneer have grown over the past 20-30 years. Pioneer has branched out into several affiliated companies with several hospitals under its umbrella. Medicomp now has 25 locations across the Southeast portion of our nation. The companies have had prosperous times as well as

meagre times. But over the past 4-5 years, unfortunately we have had more major setbacks and troubles than times of prosperity.

Medicomp started providing physical therapy services in a few clinics in Mississippi, and now Medicomp locations in 6 states. Medicomp provides physical therapy services to some hospitals that Pioneer owns and/or manages. Pioneer Health Services, Inc., along with each of its affiliates, is all about rural health care. Pioneer is the parent company and provides hospital management services to critical access hospitals around the Southeast as well as billing and collection services to other rural hospitals throughout the United States. Pioneer obtained the first critical access designation in Mississippi with its first hospital, Lackey Memorial Hospital, and continued to be a leader in rural health care for over a decade.

Pioneer Health Services wholly owns all of the other companies who have filed in this bankruptcy; Pioneer Health Services of Monroe County, Inc., Pioneer Health Services of Newton County, LLC, Pioneer Health Services of Patrick County, Inc., Pioneer Health Services of Oneida, LLC, Pioneer Health Services of Choctaw County, LLC, Pioneer Health Services of Stokes County, Inc., and Medicomp, Inc. Each of the affiliates/subsidiaries, excluding Medicomp, has a hospital, and some have a nursing home as well. As mentioned, Pioneer Health Services, Inc., is a management company for not only our affiliated facilities, but also to third-party rural hospitals. The management services provided by Pioneer to those unaffiliated facilities include billing and collections for patient accounts, geriatric psychiatric services for both inpatient and outpatient, to encompass total rural hospital management.

The companies have been and continue to be a large, if not the largest, force in the economy in the rural communities where they are located. Currently, the company employs approximately 2,000 employees. This number does not include the contract workers. Additionally, the revenue brought to the area through the service vendors the companies use has been tremendous. The Pioneer corporate office could have been located in any metropolitan city in the Southwest, but Joe McNulty

decided to stay with the value of the rural healthcare vision and remain rooted in the small town of Magee, Mississippi.

Pioneer, through each of its subsidiaries, is responsible for the care of approximately 10,000 hospital patients per month and the same amount of physical therapy patients per month. Those patients come through our hospital's emergency room, inpatient, outpatient, nursing homes, and physical therapy clinics and are able to receive a wide array of services in rural areas.

As with any bankruptcy there were several causation factors leading to the companies having to file and reorganize. Its hospitals are Critical Access Hospitals. This is a designation applied for and carried by the state in which the hospital resides. Through the Critical Access Hospital designation, its hospitals are paid (reimbursed) by Medicare and Medicaid on a cost basis for services provided to Medicare and Medicaid patients. These patients make up the vast majority of its patient base due to the rural communities we proudly serve. The importance of this fact is that many times the costs at the hospitals, clinics, and nursing homes are reimbursed by Medicare and Medicaid at a much later date than the date in which the services were actually incurred due to the timing of the cost reimbursement by the State and Federal Governments. Also, the reimbursements, as is the case with many other companies in the healthcare business these days, have been plagued by recoupments and setoffs from Medicaid and Medicare, which drastically lower the payments to the Debtor based solely on the discretion of Medicaid and Medicare. The administrative remedies are fruitless to say the least. Another challenge we have faced for some time is our bad debt and charity care at our hospitals average about 10% of gross revenue on an annual basis and represent free healthcare services to residents in our area.

There has also been legislative action which has hindered the ability of our companies to thrive as desired. Specifically, there were two recent governmental actions that greatly affected our ability to operate. One is the American Recovery and Reinvestment Act of 2009 that included a provision calling for Electronic Health Records (EHR). This Act required us to install a new

software program at each of our hospitals. This was a system-wide capital expenditure of over $13 million dollars and increased our annual operating costs over $5 million dollars. Another legislative action was when a sequestration order was issued on March 1, 2013 that reduced our Medicare reimbursement payments by 2% across the board to cut the national healthcare budget. This resulted in a traumatic reduction in our system-wide annual receipts of approximate $6 million dollars beginning in 2013 that has continued to this day. Keep in mind, our facilities are paid based on cost at 101%, so the 2% loss forced our facilities to attempt to restructure in a way to provide healthcare *below* cost.

Obviously, these were unforeseen circumstances, not in the ordinary course of business that impacted our business ominously. We have taken significant measures to reduce costs at several of our facilities by implementing no raises in the last four years, staff reductions, reductions of benefits that included not matching the 401K plan, contract evaluations and reductions, new inventory and supply ordering systems, cutback on services provided at facilities, reconfigured provider compensation schedules, revised policies and procedure on expenses and other financial-related matters, and reduced budgets across the board.

Another major financial hit for our companies comes at the most delicate financial time in our common business transactions. This is when we acquire a hospital to manage the operations, and in some cases prevent the hospital from closing completely. We have had up to 10 months of waiting on the states and CMS (the Centers for Medicare and Medicaid Services) to approve licensure for our hospital. That lag time between the hospital doors being open to provide healthcare to patients and receiving our licensure to enable us to bill CMS for our services causes huge debt that we never recover. The alternative is to leave a rural community without access to healthcare.

Although our companies have been wrought with many challenges over the past several years, we have and continue to strive to make our business work. We have wonderful employees, a great service that we provide, and a vision that we believe in. We hope that with the help and

protection of this Chapter 11 Reorganization, our companies will be stronger on the other side, learn from our mistakes, and be the leader in rural healthcare once again.

### The Debtor's Secured Debt in Connection with the Use of Cash Collateral

4.     Prior to the filing of the Petition, the Debtor borrowed money from Capital One Bank (the "Lender"). The Lender apparently received liens and security interests in and upon the Debtor's accounts and account proceeds, among other items of collateral (the "Collateral").

5.     Generally, under the Debtor's cash management system, the Debtor uses a depository bank (Peoples Bank) ("Peoples") to receive its collections. Once the collections are received, the depository account at Peoples is "swept" on a daily basis and the funds contained therein are transmitted by Peoples to the Lender. From time to time thereafter, the Lender makes cash advances to the Debtor for operating expenses. Certain funds have been collected by Peoples, post-petition, and have been transmitted to the Lender. The Lender has apparently advanced, post-petition, funds to be used by the Debtor in its operations.

### Adequate Protection and Uses of Cash Collateral

6.     Debtor is in urgent need of the use of cash collateral (assuming the cash Debtor receives post-petition is cash collateral of some party or parties) in order to pay its operating expenses, and to provide patient care. Attached hereto as Exhibit "A" and incorporated by reference is a budget from April 1, 2016, through April 8, 2016. The expense items of the budget are for absolutely essential costs to provide patient care and to provide irreparable harm.

7.     The Debtor proposes to provide adequate protection to the Lender by continuing to remain in business, provide adequate patient care, create accounts receivable and collect accounts receivable, and operating in the ordinary course of business. As adequate protection, the Debtor proposes to grant post-petition liens to the Lender upon the same Collateral that it held security interest in before this case was filed. As further adequate protection, for the Lender, to the extent of any diminution of the value of the Collateral from and after the Petition Date for the Debtor's use

thereof, the Lender shall receive a replacement first priority perfected security interest pursuant to §361(2) of the Bankruptcy Code in all collateral generated post petition as to which the Lender held properly perfected liens and security interests on the Petition Date and to the extent that such stay, use, sale, lease or grant result in a decrease of the value of such entity's interest in such property from the Petition Date.

8.      The Debtor believes the value of the Collateral pledged to the Lender exceeds the amount of the Lender's indebtedness. The Lender's equity cushion in the Collateral also provides the Lender with adequate protection, in the interim, while the Debtor and the Lender negotiate possible post-petition financing.

### Argument and Authorization

9.      The Debtor is unable in the ordinary course of business or otherwise, to obtain unsecured credit allowable pursuant to section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to sections 363 or 364(a) or (b) of the Bankruptcy Code in an amount necessary for the maintenance and preservation of assets and operation of business, or secured indebtedness pursuant to section 364(c) of the Bankruptcy Code.

10.     Good cause exists for the entry of an Order granting the Motion. Among other things, entry of an Order will minimize the disruption of the winding down of the existing business, will increase the possibility for a higher and better bid to be received from a prospective purchaser, will maintain the value of the Debtor's Collateral, and is in the best interests of the Debtor, its creditors and other parties-in-interest.

11.     The terms of the use of cash collateral outlined herein are for reasonably equivalent value and fair consideration.

12.     A debtor's use of property of the estate is governed by Bankruptcy Code 363. Section 363(c)(1) provides that a debtor-in-possession may use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1), Section 363(c)(2), however, permits a debtor in possession to use, sell or lease "cash collateral" under subsection (c)(1) only if the entity with an interest in the cash collateral consents or the Court authorizes such use. 11 U.S.C. § 363(c)(2). Debtor has sought consensual use of cash collateral but has not yet received a final response. Whether such use may be authorized by a court depends on whether there is adequate protection of the entity's interest in the cash collateral. Section 361 of the Bankruptcy Code does not provide a definition of adequate protection. However, it is clear that under case law considering adequate protection in similar circumstances, the Lender is adequately protected in this case.

13.     The Bankruptcy Code protects a secured creditor only to the extent that a debtor's use of the collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see United Savs. Ass 'n v. Timbers of lnwood Forest Ass'n Ltd.,* 484 U.S. 365, 369-73, 108 S. Ct. 626 (1988) ("Timbers") (Supreme Court holds that the "interest in property" entitled to protection is "the value of the collateral, as of the time of the commencement of the bankruptcy case" that secures such claim). *See also Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources,* Inc.) 54 F.3d 722, 730 (11th' Cir.). *cert. denied* 116 S. Ct. 488 (1995). Here, the interests of the Lender are adequately protected by the agreement to use cash collateral that is only devoted to the needs of the Debtor, maintenance of the status quo with respect to the Collateral and the Lender's equity cushion therein.

14.     In addition, the Lender is adequately protected by the Debtor's maintaining the value of the existing business as much as is possible, which will preserve the value of the collateral securing the claims of the Lender.

15.     The orderly continuation of the business will help to preserve the value of the enterprise and its assets.

16.     Applying the foregoing, courts have often allowed the use of cash collateral where such use would enhance or preserve the debtor's reorganization value. Thus, for example, in *Stein v. United States Farmers Home Administration (In re Stein),* 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was unsecured, finding that the use of cash collateral was necessary to the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]". *Id.* At 19 B.R. 460; *see also Dynaco,* 162 B.R. at 396 (finding that the alternative to the debtor's use of cash collateral, a forced termination of his business, would doom reorganization and any chance to maximize value for all creditors): *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on post-petition property acquired by debtor; the debtor can use cash collateral "in the normal operation of their business").

17.     If the Debtor is denied the use of cash collateral, in all likelihood it will be forced to make drastic decisions regarding the closing of operations. Such a cessation, even temporarily, would cause the Debtor significant losses with respect to the value of its assets, and, obviously, adversely impact patient care. It may also result in a forced liquidation of all of the Debtor's assets, and a consequent loss to creditors of value. The Debtor's assets (especially its accounts receivable) would be worth substantially less in a forced liquidation setting.

### Notice

18.     Notice of this Motion is being to (i) the known relevant secured parties (the Lender), (ii) governmental entities, (iii) the United States Trustee, and (iv) persons having entered an appearance in the case, by telephone and by ECF filing or by email transmission in accordance with the Court's instructions. The Debtor submits that notice is appropriate and proper under the circumstances and that no further notice is required.

19.     An emergency hearing on this Motion is necessary and essential for the continued

operations of the Debtor.  The Court should permit this Motion to go forward on an expedited basis and shorten notice of such hearing under the Federal Rules of Bankruptcy Procedure.  The Debtor submits that such notice would be appropriate and proper under the circumstances and that no further notice would be required.

20.     Other grounds to be assigned upon a hearing hereof.

WHEREFORE, PREMISES CONSIDERED the Debtor respectfully prays that upon a hearing hereof this Honorable Court will enter its order granting, on an interim basis, the Motion and then, upon a final hearing, the Court will enter its order granting the Motion on a final basis.  The Debtor prays for general relief.

This, the 1st day of April, 2016.

Respectfully submitted,

PIONEER HEALTH SERVICES, INC.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____
        Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jarret P. Nichols; MSB No. 99426
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile

N:\Firm Data\Users\Bankrupt\Pioneer Health\Pleadings\Cash Collateral\Motion.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via email transmission and/or Notice of Electronic Filing, a true and correct copy of the above and foregoing instrument to:

Ronald H. McAlpin, Esq.
ronald.mcalpin@usdoj.gov

THIS, the 1st day of April, 2016.

Craig M. Geno

Pioneer Health Services Group of Companies
Statement of Projected Cashflows
April 1, 2016 - April 8, 2016

| | PHS | Medicomp | PHS Monroe County | PHS Patrick County | PHS Newton County | PHS Stokes County | PHS Choctaw County | PHS Oneida LLC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 11,500 | 161,233 | 78,573 | 115,061 | | 58,975 | | 101,930 | 527,273 |
| Revenue: | | | | | | | | | |
| Hospital | | 213,437 | 361,898 | 262,450 | | 225,203 | | 210,419 | 1,273,407 |
| NH | | | | | | 135,000 | | | 135,000 |
| Clinic Revenue | | | 57,062 | 22,173 | | 71,962 | | 3,156 | 164,383 |
| Rehab | | 161,136 | | | | | | | 161,136 |
| 3rd Party | 61,857 | | | | | | | | 61,857 |
| Mgmt Fees | 270,911 | | | | | | | | 270,911 |
| Misc | | | 30,000 | | | | | | 30,000 |
| Gross Receipts | 332,768 | 374,573 | 458,960 | 284,623 | - | 432,165 | - | 213,575 | 2,096,694 |
| Selling, General, and Administrative Expenses: | | | | | | | | | |
| Salary and Wages | 456,483 | 359,827 | 309,681 | 190,865 | | 300,111 | | 194,146 | 1,811,113 |
| Employee Benefits | 34,921 | 27,527 | 23,691 | 14,600 | | 22,958 | | 14,852 | 138,550 |
| Education and Employee Expense | | | | | | | | | |
| Contract Labor and Professional Fees | | | 52,600 | 30,962 | | 46,645 | | 37,514 | 167,721 |
| Travel and Entertainment | | | | | | | | | |
| Advertising and Marketing | | | | | | | | | |
| Supplies and Other Expenses | 8,279 | 4,126 | 62,320 | 32,731 | | 40,939 | | 35,923 | 184,319 |
| Rent Expense | | | | | | | | | |
| Telephone and Utility Expense | | | | | | | | | |
| Repair and Maintenance | | | | | | | | | |
| Service Contracts | | | 40,604 | 70,296 | | 39,340 | | 11,736 | 161,967 |
| Bank Charges | | | | | | | | | |
| Dues and Subscriptions | | | | | | | | | |
| Equipment Rent | | | | | | | | | |
| Tax & Licenses | | | | | | | | | |
| Insurance | | | | | | | | | |
| Interest and Penalties | | | | | | | | | |
| Miscellaneous | | | | | | | | | |
| Total SG&A Expenditures | 495,683 | 391,480 | 488,906 | 339,435 | - | 449,994 | - | 294,172 | 2,463,670 |
| Ending Cash Balance | (155,415) | 144,325 | 48,627 | 60,249 | - | 41,177 | - | 21,333 | 160,297 |



EXHIBIT

A

tabbies