___



**SO ORDERED,**

*[signature]*

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: April 6, 2016**

The Order of the Court is set forth below. The docket reflects the date entered.
___

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

   **PIONEER HEALTH SERVICES, INC.**[1]    NO. 16-01119-NPO

   **MEDICOMP, INC.**    NO. 16-01126-NPO

**SECOND EMERGENCY ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL OF CERTAIN PREPETITION SECURED PARTIES; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; AND (IV) GRANTING RELATED RELIEF**

Upon the Emergency Motion for Authority to Use Cash Collateral and for Granting Adequate Protection (the "Emergency Cash Collateral Motion") filed in the United States Bankruptcy Court for the Southern District of Mississippi by each of Pioneer Health Systems, Inc. ("Systems"), Pioneer Health Services of Patrick County, Inc. ("Patrick"), Pioneer Health Services of Newton County, LLC ("Newton"), Pioneer Health Services of Stokes County, LLC ("Stokes"), Pioneer Health Services of Choctaw County, LLC ("Choctaw"), Pioneer Health Services of Oneida, County LLC ("Oneida"), Pioneer Health Services of Monroe County, LLC ("Monroe"), and Medicomp, Inc. ("Medicomp" and collectively with Systems, Patrick, Newton,

---

[1] On April 6, 2016, the bankruptcy cases of *Pioneer Health Services of Patrick County, Inc.*, No. 16-01220-NPO; *Pioneer Health Service of Newton County, LLC*, No. 16-01121-NPO; *Pioneer Health Services of Stokes County, Inc.*, No. 16-01122-NPO; *Pioneer Health Services of Choctaw County, LLC*, No. 16-01123-NPO; *Pioneer Health Services of Oneida, LLC*, No. 16-01124-NPO; and *Pioneer Health Services of Monroe County, Inc.*, No. 16-01125-NPO were administratively consolidated into the bankruptcy case of *Pioneer Health Services, Inc.*, No. 16-01119-NPO.

Stokes, Choctaw, Oneida, and Monroe, the "Debtors") each a debtor and a debtor-in-possession in the above-referenced chapter 11 cases (the "Cases"), for entry of an emergency order authorizing the use of cash collateral and granting adequate protection (this "Order"), under sections 361, 362, 363(c), and 363(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Mississippi (the "Local Rules"), seeking, *inter alia*:

(i) authorization for the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) constituting Collateral (as such term is defined in the Revolving Credit Agreement and Term Loan Credit Agreement (as each is hereafter defined) (as so defined, the "Cash Collateral") on the terms and conditions set forth in this Order;

(ii) adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Lender Liens") of the Revolving Loan Lender (as hereafter defined) under the Revolving Credit Agreement and the Term Loan Lender (as hereafter defined) under the Term Loan Agreement and adequate protection of the Prepetition Tax Liens;

(iii) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the Revolving Loan Lender and Term Loan Lender to implement the terms of this Order; and

(iv) the granting of certain related relief.

The Court having held an hearing on the Emergency Cash Collateral Motion on April 4, 2016, having on April 4, 2016, entered an emergency order [Docket No. 29] (the "First Emergency Order") granting the Emergency Cash Collateral Motion, and having held a further

hearing on the Emergency Cash Collateral Motion on April 6, 2016; and the Court having considered the arguments of counsel for the Debtors, counsel for the Revolving Loan Lender and the Term Loan Lender and counsel for the IRS (as hereafter defined) and all pleadings related thereto including the record made at the hearing on Emergency Cash Collateral Motion; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

### THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:[2]

A. On March 30, 2016 (the "Commencement Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C. On April 4, 2016, the Debtors provided notice of the Emergency Cash Collateral Motion, the entry of the First Emergency Order and the Court's April 6, 2016, hearing on the Emergency Cash Collateral Motion to the known secured creditors of the Debtors, applicable governmental entities (including the United States Attorney for the Southern District of Mississippi), all persons having at that time entered an appearance, the Office of the United States Trustee, and each Debtor's 20 largest unsecured creditors.

---

[2] The findings and conclusions set forth in this Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.  No official committee of unsecured creditors (upon the appointment thereof, the "<u>Committee</u>"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in the Cases.

E.  The Revolving Loan Lender alleges that:

(1)  Pursuant to that certain Credit Agreement dated as of August 7, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Revolving Credit Agreement</u>") by and among the Capital One, National Association[3] (the "<u>Revolving Loan Lender</u>"), and Patrick, Newton, Stokes, Oneida, and Monroe[4] and certain other persons designated as "Credit Parties" thereunder (collectively, the "<u>Revolving Loan Borrowers</u>"), the Revolving Loan Lender extended a revolving credit facility to, and agreed to issue letters of credit[5] for, the Revolving Loan Borrowers from time to time, in an aggregate principal committed amount of $8,500,000.00 (the "<u>Revolving Loans</u>"). The Revolving Credit Agreement, along with any other agreements, instruments, notes, guaranties and other documents executed in connection therewith, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms thereof, are collectively referred to herein as the "<u>Revolving Credit Documents</u>" and are available upon request from counsel to the Debtors or counsel to the Revolving Loan Lender. All obligations of the Debtors arising under the Revolving Credit Agreement or any other Revolving Credit Document, including all loans,

---

[3]  For ease of reference, several defined terms are used herein to refer to Capital One, National Association, with each term referring to Capital One, National Association, in a particular capacity. The use of such defined terms shall not diminish, impair or prejudice any protection provided under this Order to Capital One, National Association, in any capacity.

[4]  Non-debtor Pioneer Health of Early County, Inc. ("<u>Early</u>") is a borrower under the Revolving Loan Credit Agreement. Debtors Services, Choctaw, and Medicomp are not borrowers under Revolving Loan Credit Agreement. Debtor Choctaw was released as a borrower under the Revolving Loan Credit Agreement. Debtor Services executed a certain guaranty in connection with the Revolving Loan Credit Agreement.

[5]  There were no outstanding letters of credit issued under the Revolving Loan Agreement as of the Commencement Date.

4

76854405_8

advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Revolving Credit Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Revolving Loan Lender by the Revolving Loan Borrowers or the Debtors, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "Revolving Loan Obligations."

(2) Pursuant to certain Collateral Documents (as such term is defined in the Revolving Credit Agreement and referred to in this Order as the "Revolving Loan Collateral Documents"), including that certain Security Agreement, dated as of August 7, 2012, and entered into by and among the Revolving Loan Lender and the Revolving Loan Borrowers, (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Revolving Loan Security Agreement"), each Revolving Loan Borrower granted to the Revolving Loan Lender, to secure the Revolving Loan Borrowers' obligations under the Revolving Credit Documents, a security interest in and continuing lien on substantially all of the Revolving Loan Borrowers' assets and all proceeds thereof. All collateral granted or pledged by the Revolving Loan Borrowers pursuant to the Revolving Loan Collateral Documents shall collectively be referred to herein as the "Prepetition Revolving Collateral."

F. The Term Loan Lender alleges that:

(1) Pursuant to that certain Term Loan Agreement, dated as of February 27, 2015 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Term Loan Agreement"), Capital One, National Association (the "Term Loan Lender") extend a term loan to Stokes in the amount of $1,750,000 (collectively, the "Term

Loan"). The Term Loan Agreement, along with any other agreements, instruments, notes, guaranties and other documents executed in connection therewith, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms thereof, are collectively referred to herein as the "Term Loan Credit Documents" and are available upon request from counsel to the Debtors or counsel to the Term Loan Lender. All obligations of Stokes arising under the Term Loan Agreement or any other Term Loan Credit Document, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Term Loan Lender by Stokes, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "Term Loan Obligations." The Term Loan Obligations of Stokes under the Term Loan Agreement are guaranteed by Monroe, Oneida, Early, Patrick, and Newton (collectively, the "Term Loan Guarantors").

(2) Pursuant to certain security documents (referred to in this Order as the "Term Loan Collateral Documents"), Stokes and each of the Term Loan Guarantors granted to the Term Loan Lender, a security interest in and lien on the substantially all of Stokes' and the Term Loan Guarantors' assets and all proceeds thereof (the "Prepetition Term Loan Collateral" and together with the Prepetition Revolving Loan Collateral the "Prepetition Lender Collateral"), to secure the obligations of Stokes and the Term Loan Guarantors under the Term Loan Credit Documents.

G. The Revolving Loan Lender alleges that all Revolving Credit Documents executed and delivered by the Revolving Loan Borrowers to the Revolving Loan Lender are valid and enforceable by the Revolving Loan Lender against each of the Revolving Loan Borrowers. The Revolving Loan Lender duly perfected its liens upon and security interests in the

76854405_8

Prepetition Lender Collateral by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possession of relevant instruments, certificates, or other property. All of such financing statements were validly authorized or executed by authorized representatives of the Revolving Loan Borrowers. Pursuant to the Revolving Credit Documents, the Revolving Lender alleges that it has perfected first-priority security interests in and liens on all of the Prepetition Lender Collateral, including all cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code).

H. The Term Loan Lender alleges that all Term Credit Documents executed and delivered by Stokes and the Term Loan Guarantors to the Term Loan Lender are valid and enforceable by the Term Loan Lender against each of Stokes and Term Loan Guarantors (whether as a borrower or a guarantor). The Term Loan Lender duly perfected its liens upon and security interests in the Prepetition Lender Collateral by, among other things, filing financing statements.[6] All of such financing statements were validly authorized or executed by authorized representatives of Stokes or the Term Loan Guarantors. Pursuant to the Term Credit Documents, the Term Loan Lender has security interests in and liens on all of the Prepetition Lender Collateral, including all cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) and thus the repayment of the Term Loan Obligations is cross-collateralized with the repayment of the Revolving Loan Obligations.

I. The United States of America, acting through the Internal Revenue Service (the "IRS"), alleges that certain of the Debtors have failed to pay certain of the Debtors' tax liabilities incurred prior to the Commencement Date (the "Unpaid Tax Liabilities") and that the repayment by the Debtors of the Unpaid Tax Liabilities is secured by various liens (the "Prepetition Tax

---

[6] In addition, the Term Loan Lender holds (and has duly and properly filed) a mortgage with respect to certain real property owned by Stokes located in King, North Carolina.

Liens") on all property and rights to property of the Debtors (the "Prepetition Tax Lien Collateral") evidenced by various Notices of Federal Tax Lien filed by the IRS (collectively, the "Notices"). The Prepetition Tax Lien Collateral includes the Cash Collateral. A copy of the Notices is available upon request from counsel to the Debtors or counsel to the IRS. The IRS alleges that it has perfected security interests in and liens on all of (including certain first-priority security interests in and liens upon) the Prepetition Tax Lien Collateral, including all cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code).

J.  On March 31, 2016, the Debtors drew a revolving loan in the amount of $260,431.85 (the "March 31 Advance"), ostensibly under the Revolving Credit Agreement, without approval or authorization from the Court. The Revolving Loan Lender and the Term Loan Lender allege that the Debtors did not provide notice of the commencement of the Cases prior to making such draw.

K.  The Debtors have an immediate and critical need to use Cash Collateral in order to make post-petition payroll payments and to make expenditures necessary to provide essential patient care services. The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing via the use of Cash Collateral under the terms of this Order is vital to the preservation and maintenance of the going concern value of the Debtors' estates, the orderly operation of the Debtors' businesses and, ultimately, the success of the Cases. Consequently, without access to the use of Cash Collateral, to the extent authorized pursuant to this Order, the Debtors and their estates would suffer immediate and irreparable harm.

L.  The Debtors require the use of Cash Collateral under the terms of this Order in order to satisfy their immediate liquidity needs.

M.     Solely on the terms and conditions set forth in this Order, the Revolving Loan Lender, the Term Loan Lender and the IRS are prepared to consent to the Debtors' use of, as applicable, the Prepetition Lender Collateral and the Prepetition Tax Lien Collateral (including, in each instance, the Cash Collateral) provided that the Court authorizes the Debtors, pursuant to sections 361 and 363 of the Bankruptcy Code, to grant to (XX) the Revolving Loan Lender and the Term Loan Lender, as and for adequate protection, (1)(a) a replacement security interest in and lien and mortgage upon the Prepetition Lender Collateral in favor of each of the Revolving Loan Lender and the Term Loan Lender in each case with the same validity, extent and priority as the Prepetition Lender Liens; and (b) a security interest in and lien and mortgage upon any and all assets of the Debtors (including, without limitation, Cash Collateral and any other proceeds of the Prepetition Lender Collateral) generated or acquired after the Commencement Date with the same, validity, extent and priority as the Prepetition Lender Liens (collectively, the "Replacement Lender Lien"), (2) superpriority administrative expense claims under section 507(b) of the Bankruptcy Code (collectively, the "Lender Adequate Protection Priority Claims", and (3) to continue all reporting to the Revolving Loan Lender and the Term Loan Lender as required by the Revolving Loan Credit Documents and Term Loan Credit Documents; and (YY) the IRS, as and for adequate protection, (1)(a) a replacement security interest in and lien and mortgage upon the Prepetition Tax Lien Collateral in favor of the IRS with the same validity, extent and priority as the Prepetition Tax Liens; and (b) a security interest in and lien and mortgage upon any and all assets of the Debtors (including, without limitation, Cash Collateral and any other proceeds of the Prepetition Tax Lien Collateral) generated or acquired after the Commencement Date with the same, validity, extent and priority as the Prepetition Tax Liens (collectively, the "Replacement IRS Lien"), (2) superpriority administrative expense

9

claims under section 507(b) of the Bankruptcy Code (collectively, the "IRS Adequate Protection Priority Claims", and (3) to provide to the IRS a copy of any written report delivered to the Revolving Loan Lender and the Term Loan Lender under clause (XX)(3) of this sentence. The Replacement Lender Lien, the Lender Adequate Protection Priority Claims, the Replacement IRS Lien and the IRS Adequate Protection Priority Claims shall secure or provide a claim for, as applicable, the repayment of, as applicable, the Revolving Loan Obligations, Term Loan Obligations or the Unpaid Tax Liabilities in an amount equal to the diminution in the value of, as applicable the Revolving Loan Lender's and Term Loan Lender's interests in the Prepetition Lender Collateral or the IRS' interests in the Prepetition Tax Lien Collateral from and after the Commencement Date including, without limitation, any such diminution resulting from (in each case, as and to the extent applicable): (A) the use by the Debtors of such Prepetition Lender Collateral or Prepetition Tax Lien Collateral and cash constituting proceeds of such collateral, (B) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, (C) the use by the Debtors (other than Services and Medicomp) of the Prepetition Lender Collateral and/or the Cash Collateral to pay management or similar fees to Services and/or Medicomp, and/or (D) any other reason (as applicable, the "Lender Adequate Protection Obligations" or the "IRS Adequate Protection Obligations").  Except as expressly set forth in Paragraph 5 below, for the avoidance of doubt, nothing in this Order shall constitute, or be deemed to constitute, a stipulation or admission by any party, person or entity with respect to the validity, extent or priority of the Prepetition Lender Liens or the Prepetition Tax Liens or the validity of any claim.  In addition, nothing in this Order shall constitute, or be deemed to constitute, a waiver by the Debtors of the right to contest any claim with respect to the Lender Adequate Protection Obligations or the IRS Adequate Protection Obligations.

10

76854405_8

N.Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-1. In particular, the authorization granted herein for the Debtors to use Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Entry of this Order is in the best interest of the Debtors, their estates and creditors. The terms of this Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

O.The Debtors, the Revolving Loan Lender, the Term Loan Lender and the IRS have negotiated the terms and conditions of the this Order in good faith and at arm's length, and therefore any credit extended and loans made to the Debtors pursuant to this Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

P.Based on the foregoing, and upon the record made before this Court at the hearing on the Emergency Cash Collateral Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

(1)*Approval of Motion*. The Emergency Cash Collateral Motion is granted on the terms and conditions set forth in this Order. Any objections or responses to the relief requested in the Emergency Cash Collateral Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied. This Order shall become effective immediately upon its entry.

(2)*March 31 Advance*. Any and all proceeds of the March 31 Advance in the possession or under the control of the Debtors as of the entry of this Order are, and for all purposes of this Order, shall be deemed to be Cash Collateral.

11

(3) *Use of Cash Collateral*. Through and including April 30, 2016 (the "Expiration Date"), the each Debtor is hereby authorized to use Cash Collateral solely in accordance with the Budget (including that aspect of the Budget by which expenditures of Cash Collateral are made only a Debtor-by-Debtor basis) and this Order. For the avoidance of doubt, no assets, property or interests in property of Newton or Choctaw shall constitute Cash Collateral for purposes of this Order; to the extent that the proceeds of any assets, property or interests in property of Newton or Choctaw are received by and person or entity, such person or entity shall hold such proceeds subject to further order of the Court.

(4) *Use of Cash Collateral Only in Conformity with Budget*. Subject to and in accordance with the terms this Order and through and including the Expiration Date, each Debtor may use the Cash Collateral solely for the purposes and up to the amounts, in each instance on a Debtor-by-Debtor basis, set forth in the Budget attached hereto as **Exhibit A**. Payment by any Debtor of any expense other than for the items and up to the limits set forth in the Budget, in each instance on a Debtor-by-Debtor basis, shall constitute a violation of this Order and an Event of Default (as defined below). Notwithstanding anything in this Order to the contrary, in the event that a Debtor other than Services or Medicomp uses Cash Collateral other than in accordance with the Budget by making (or providing the funds to make) an expenditure of or on behalf of or to Services or Medicomp, (i) the priority of the Lender Adequate Protection Priority Claims (and the lien that secures it) with respect to such expenditure (and only such expenditure) shall be senior and prior to the IRS Adequate Protection Priority Claims (and the lien that secures it) with respect to such expenditure (and only such expenditure); and (ii) such expenditure (and only such expenditure) shall not constitute an Event of Default.

76854405_8

(5) *Automatic Effectiveness of Liens*. Except as expressly set forth herein, the liens granted pursuant to this Order shall not be (a) subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (b) subordinated to or made *pari passu* with any other lien under sections 363 and 364 of the Bankruptcy Code. Neither the Replacement Lender Lien nor the Replacement IRS Lien shall be subject to challenge and each of the Replacement Lender Lien and the Replacement IRS Lien shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Commencement Date without any further action by the Debtors, the Revolving Loan Lender, the Term Loan Lender or the IRS, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents or the taking of any other actions. If the Revolving Loan Lender, the Term Loan Lender or the IRS hereafter requests that the Debtors execute and deliver to the Revolving Loan Lender, the Term Loan Lender or the IRS financing statements, security agreements, collateral assignments, mortgages or other instruments and documents considered by the Revolving Loan Lender, the Term Loan Lender or the IRS to be reasonably necessary or desirable to further evidence the perfection of, as applicable, the Replacement Lender Lien or the Replacement IRS Lien, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments and documents, and the Revolving Loan Lender, the Term Loan Lender or the IRS is hereby authorized to file or record such documents in its respective discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.

(6) *Cash Management System*.  Except as expressly set forth in this Paragraph 6, the Debtors shall maintain the cash management system described in the Revolving Credit Agreement and all accounts established in connection therewith; failure to do so shall result in an Event of Default under this Order.  Until the earlier of the Expiration Date or an Event of Default under this Order, the Debtors, the Revolving Loan Lender, the Term Loan Lender and Peoples Bank agree to suspend Peoples Bank's remittances to the Revolving Loan Lender of funds of the Debtors, and such remittances shall be, and hereby are, suspended; provided, however, that the suspension of remittances shall not apply to (X) any transfers in accordance with this Order of funds from government payor lockbox accounts to other accounts maintained by the Debtors; or (Y) remittances of funds of Early and any other non-debtor entity. Notwithstanding anything in the description of the cash management system in the Revolving Credit Agreement to the contrary, during (and only during) the suspension of remittances to the Revolving Loan Lender set forth in the preceding sentence, each Debtor may instruct Peoples Bank to make daily transfers from the Debtors' concentration account to that Debtor's (and only that Debtor's) operating and/or payroll account (such operating and/or payroll accounts, collectively, the "Disbursement Accounts") for use by such Debtor (and only such Debtor) in compliance with the Budget (as compliance with the Budget is described in Paragraphs 3 and 4 of this Order); any and all funds so transferred into the Disbursement Accounts shall be, and hereby are, Cash Collateral.  The suspension of remittances and the modification to the cash management system described in the Revolving Credit Agreement contemplated, respectively, under the prior two sentences shall terminate, and such remittances and maintenance of the cash management system described in the Revolving Credit Agreement shall resume, upon the earlier of the Expiration Date or an Event of Default under this Order (the Revolving Loan Lender is authorized to

14

76854405_8

provide written notice to Peoples Bank, with a copy to counsel for the Debtors and the IRS, of an Event of Default under this Order).  Neither the Revolving Loan Lender and the Term Loan Lender's agreement to such suspension of remittances nor their agreement to the modification of the cash management system described in the Revolving Credit Agreement shall limit, prejudice or impair in any way their liens and security interests in the Cash Collateral or any other asset of the Debtors or their right and interests under control agreements or other agreements regarding the Debtors' or Early's accounts with the Debtors, Early and/or Peoples Bank.  In furtherance of the preceding sentence, the Revolving Loan Lender and the Term Loan Lender's liens and security interests and their rights and interests under control agreements and other agreements regarding the Debtors' accounts shall be, and hereby are, deemed to apply to the Disbursement Accounts.  The Debtors and Peoples Bank shall continue to provide to the Revolving Loan Lender the same reporting regarding the Debtors' accounts (and Early's accounts) as they provided prior to the Commencement Date.  Nothing in this Paragraph 6 shall constitute, or be deemed to constitute, a waiver of the guidelines of the Office of the United States Trustee with respect to authorized depositories or the debtors' depository accounts.

    (7)    *Adequate Protection for Revolving Loan Lender, Term Loan Lender and IRS*.

As adequate protection for the payment of the Lender Adequate Protection Obligations, each of the Revolving Loan Lender and the Term Loan Lender, shall be, and hereby is, granted the Replacement Lender Lien and the Lender Adequate Protection Priority Claims (each as defined in paragraph M, above). With respect to adequate protection claims arising from any diminution in the value of the Revolving Loan Lender's and/or the Term Loan Lender's interests in the Prepetition Lender Collateral, the Lender Adequate Protection Priority Claims shall be senior in priority to all adequate protection claims other than the IRS Adequate

15

76854405_8

Protection Priority Claims and shall have such priority as to the IRS Adequate Protection Priority Claims as is ordered by the Court. In addition, the Debtors shall continue all reporting to the Revolving Loan Lender and the Term Loan Lender as required by the Revolving Loan Credit Documents and Term Loan Credit Documents.  As adequate protection for the payment of the IRS Adequate Protection Obligations, the IRS, shall be, and hereby is, granted the IRS Replacement Lien and the IRS Adequate Protection Priority Claims (each as defined in paragraph M, above). With respect to adequate protection claims arising from any diminution in the value of the IRS' interests in the Prepetition Tax Lien Collateral, the IRS Adequate Protection Priority Claims shall be senior in priority to all adequate protection claims other than the Lender Adequate Protection Priority Claims and shall have such priority as to the Lender Adequate Protection Priority Claims as is ordered by the Court. In addition, the Debtors shall provide to the IRS a copy of any written report delivered to the Revolving Loan Lender and the Term Loan Lender under this Order.

(8) *Binding Nature of Order*. The provisions of this Order shall be binding upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property).

(9) *Survival of Order*. The provisions of this Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Cases; (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Order shall maintain their priority as provided by this Order.

(10) *Additional Protection of Revolving Loan Lender, Term Loan Lender and IRS in Connection with Debtors' Use of Cash Collateral*. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (a) the validity of any adequate protection obligations owing to the Revolving Loan Lender, the Term Loan Lender or the IRS incurred prior to the actual receipt by the Revolving Loan Lender, the Term Loan Lender or the IRS, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (b) the validity or enforceability of any claim, lien, security interest or priority authorized or created with respect to any adequate protection obligations owing to the Revolving Loan Lender, the Term Loan Lender or the IRS. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or adequate protection obligations owing to the Revolving Loan Lender, the Term Loan Lender or the IRS by the Debtors prior to the actual receipt the Revolving Loan Lender, the Term Loan Lender or the IRS, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Order, and the Revolving Loan Lender, the Term Loan and the IRS shall be entitled to all of the rights, remedies, protections and benefits granted under this Order with respect to all uses of Cash Collateral and adequate protection obligations owing to the Revolving Loan Lender, the Term Loan Lender or the IRS.  The Revolving Loan Lender, the Term Loan :Lender and the IRS reserve the right to seek adequate protection in addition to the adequate protection provided in this Order; the Debtors and, as applicable, the Revolving Loan Lender, the Term Loan Lender and the IRS reserve the right to object to any such request.

(11) *Retention of Financial Advisor*. On or before April 7, 2016, the Debtors (i) shall retain (subject to approval of the Court), and (ii) shall submit to the Court an application to

17

76854405_8

retain, a financial advisor acceptable to the Revolving Loan Lender and the Term Loan Lender (the Revolving Loan Lender and the Term Loan Lender having confirmed that the Debtors' selection of Michael Morgan of Healthcare Management Partners as their financial advisor is acceptable to them) on terms acceptable to the Revolving Loan Lender and the Term Loan Lender. The financial advisor and representatives of the Debtors and their counsel shall conduct on or before April 25, 2016, an in-person meeting with representatives of the Revolving Loan Lender and the Term Loan Lender to present (i) the financial advisor's initial impressions and initial assessment of the Debtors' business, operations, internal accounting and financial controls, and the direction, course and purposes of the Cases and (ii) the financial advisor's assessment of any continued consensual use of cash collateral or debtor-in-possession financing proposed by the Debtors.

(12) *Field Examination*. The Debtors shall continue to allow agents and representatives of the Revolving Loan Lender and Term Loan Lender full and unrestricted access to the Debtors' premises, management, employees and books and records.

(13) *Events of Default*. Except as otherwise provided in this Order or to the extent the Revolving Loan Lender, the Term Loan Lender or the IRS may otherwise agree in writing, (i) any violation by the Debtors of any of the terms of this Order, (ii) any failure to comply with the Budget (as compliance with the Budget is described in Paragraphs 3 and 4 of this Order); or (iii) conversion to chapter 7 of the Bankruptcy Code or dismissal of any of the Cases shall constitute an event of default (each, an "Event of Default"). Upon the occurrence of an Event of Default, the Debtors shall have no further right to use the Cash Collateral.

### END OF ORDER ###

**PREPARED, AGREED TO, AND SUBMITTED BY:**

/s/ Brian I. Swett
*An attorney for Capital One*

**AGREED TO AND APPROVED FOR ENTRY BY:**

/s/ Craig M. Geno
*Counsel for the Debtors*

/s/ J. Walter Newman, IV
*Counsel for Peoples Bank*

/s/ David N. Usry
*Counsel for the Internal Revenue Service*

/s/ Ronald McAlpin
*Assistant United States Trustee*

76854405_8

Pioneer Health Services Group of Companies
Statement of Projected Cashflows
April 9, 2016 - April 30, 2016

| | PHS | Medicomp | PHS Monroe County | PHS Patrick County | PHS Early County | PHS Newton County | PHS Stokes County | PHS Choctaw County | PHS Oneida LLC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | (155,415) | 144,325 | 48,627 | 80,249 | 226,441 | | 41,177 | | 21,333 | 366,737 |
| Revenue: | | | | | | | | | | |
| Hospital | | | | | | | | | | |
| NH | | 339,598 | 966,220 | 721,738 | 544,871 | | 619,306 | | 578,652 | 3,769,385 |
| Clinic Revenue | | | | | 108,824 | | 123,646 | | | 232,270 |
| Rehab | | 443,124 | 184,421 | 60,978 | 88,816 | | 197,978 | | 8,679 | 540,869 |
| 3rd Party | | | | | | | | | | |
| Mgmt Fees | 396,522 | | | | | | | | | 396,522 |
| Misc | 745,006 | | | | | | | | | 745,006 |
| Gross Receipts | | | (5,801) | | | | | | | (5,801) |
| | 1,141,528 | 782,722 | 1,173,839 | 782,713 | 742,311 | | 940,932 | | 587,331 | 6,151,376 |
| Selling, General, and Administrative Expenses: | | | | | | | | | | |
| Salary and Wages | 574,983 | 719,655 | 309,891 | 386,979 | 605,332 | | 331,083 | | 388,292 | 3,317,014 |
| Employee Benefits | 158,149 | 123,078 | 112,901 | 70,023 | 48,142 | | 76,980 | | 64,006 | 651,279 |
| Education and Employee Expense | | | | | | | | | | |
| Contract Labor and Professional Fees | 55,600 | 89,851 | 218,177 | 164,387 | 120,767 | | 172,691 | | 111,924 | 903,367 |
| Travel and Entertainment | | | | | | | | | | |
| Advertising and Marketing | | | | | | | | | | |
| Supplies and Other Expenses | 22,768 | 11,347 | 171,380 | 90,011 | 110,816 | | 112,583 | | 98,789 | 617,694 |
| Rent Expense | | | | | | | | | | |
| Telephone and Utility Expense | 56,835 | 12,115 | 52,498 | 24,140 | | | 52,501 | | 24,248 | 222,334 |
| Repair and Maintenance | | | | | | | | | | |
| Service Contracts | | | | | | | | | | |
| Bank Charges | | | | | | | | | | |
| Dues and Subscriptions | | | | | | | | | | |
| Equipment Rent | | | | | | | | | | |
| Tax & Licenses | | | | | | | | | | |
| Insurance | | | | | | | | | | |
| Interest and Penalties | | | | | | | | | | |
| Miscellaneous | | 11,489 | 14,633 | 25,940 | | | 15,213 | | 13,285 | 80,770 |
| Total SG&A Expenditures | 866,334 | 947,535 | 879,478 | 761,480 | 886,047 | | 761,051 | | 700,552 | 5,792,457 |
| Ending Cash Balance | 119,779 | (20,488) | 342,987 | 91,503 | 82,705 | | 221,068 | | (91,888) | 745,856 |


EXHIBIT