# IN THE UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
PIONEER HEALTH SERVICES, INC., ET AL.[1]              CHAPTER 11
Debtor                                                        CASE NO. 16-01119-NPO

## APPLICATION TO EMPLOY FINANCIAL ADVISORS, TO PROVIDE FOR PAYMENT THEREOF, AND FOR EXPEDITED HEARING HEREON

COMES NOW the Debtor-in-Possession, Pioneer Health Services, Inc., et al.[1] (the "Debtor" or "Movant"), and files this its Application to Employ Financial Advisors, to Provide for Payment Thereof, and for Expedited Hearing Hereon (the "Application"), and in support thereof, would show unto the Court the following, to-wit:

1. On March 30, 2016 (the "Petition Date"), the Debtor filed with this Court its Voluntary Petition (the "Petition") for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). The Debtor remains in possession of its assets and properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2. To date, no trustee or examiner has been appointed in this case.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (M). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are § 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

---

[1] On April 6, 2016, the bankruptcy cases of *Pioneer Health Services of Patrick County, Inc.*, No. 16-01120-NPO; *Pioneer Health Services of Newton County, LLC*, No. 16-01121-NPO; *Pioneer Health Services of Stokes County, Inc.*, No. 16-01122-NPO; *Pioneer Health Services of Choctaw County, LLC*, No. 16-01123-NPO; *Pioneer Health Services of Oneida, LLC*, No. 16-01124-NPO; and *Pioneer Health Services of Monroe County, Inc.* were administratively consolidated into the bankruptcy case of *Pioneer Health Services, Inc.*, No. 16-01119-NPO. Those cases are hereinafter referred to collectively as "the Debtor".

## Background

4.  Pioneer Health Services has been in the hospital business since 1997 and Medicomp has been providing physical therapy services since 1980. These businesses have thrived under the ownership and direction of their sole owner, Joe McNulty, who is passionate about this business. Medicomp and Pioneer have grown over the past 20-30 years. Pioneer has branched out into several affiliated companies with several hospitals under its umbrella. Medicomp now has 25 locations across the Southeast portion of our nation. The companies have had prosperous times as well as meager times. But over the past 4-5 years, unfortunately we have had more major setbacks and troubles than times of prosperity.

5.  Medicomp started providing physical therapy services in a few clinics in Mississippi, and now Medicomp locations in 6 states. Medicomp provides physical therapy services to some hospitals that Pioneer owns and/or manages. Pioneer Health Services, Inc., along with each of its affiliates, is all about rural health care. Pioneer is the parent company and provides hospital management services to critical access hospitals around the Southeast as well as billing and collection services to other rural hospitals throughout the United States. Pioneer obtained the first critical access designation in Mississippi with its first hospital, Lackey Memorial Hospital, and continued to be a leader in rural health care for over a decade.

6.  Pioneer Health Services wholly owns all of the other companies who have filed in this bankruptcy; Pioneer Health Services of Monroe County, Inc., Pioneer Health Services of Newton County, LLC, Pioneer Health Services of Patrick County, Inc., Pioneer Health Services of Oneida, LLC, Pioneer Health Services of Choctaw County, LLC, Pioneer Health Services of Stokes County, Inc., and Medicomp, Inc. Each of the affiliates/subsidiaries, excluding Medicomp, has a hospital, and some have a nursing home as well. As mentioned, Pioneer Health Services, Inc., is a

management company for not only our affiliated facilities, but also to third-party rural hospitals. The management services provided by Pioneer to those unaffiliated facilities include billing and collections for patient accounts, geriatric psychiatric services for both inpatient and outpatient, to encompass total rural hospital management.

7. The companies have been and continue to be a large, if not the largest, force in the economy in the rural communities where they are located. Currently, the company employs approximately 2,000 employees. This number does not include the contract workers. Additionally, the revenue brought to the area through the service vendors the companies use has been tremendous. The Pioneer corporate office could have been located in any metropolitan city in the Southwest, but Joe McNulty decided to stay with the value of the rural healthcare vision and remain rooted in the small town of Magee, Mississippi.

8. Pioneer, through each of its subsidiaries, is responsible for the care of approximately 10,000 hospital patients per month and the same amount of physical therapy patients per month. Those patients come through our hospital's emergency room, inpatient, outpatient, nursing homes, and physical therapy clinics and are able to receive a wide array of services in rural areas.

9. As with any bankruptcy there were several causation factors leading to the companies having to file and reorganize. Its hospitals are Critical Access Hospitals. This is a designation applied for and carried by the state in which the hospital resides. Through the Critical Access Hospital designation, its hospitals are paid (reimbursed) by Medicare and Medicaid on a cost basis for services provided to Medicare and Medicaid patients. These patients make up the vast majority of its patient base due to the rural communities we proudly serve. The importance of this fact is that many times the costs at the hospitals, clinics, and nursing homes are reimbursed by Medicare and

Medicaid at a much later date than the date in which the services were actually incurred due to the timing of the cost reimbursement by the State and Federal Governments. Also, the reimbursements, as is the case with many other companies in the healthcare business these days, have been plagued by recoupments and setoffs from Medicaid and Medicare, which drastically lower the payments to the Debtor based solely on the discretion of Medicaid and Medicare. The administrative remedies are fruitless to say the least. Another challenge we have faced for some time is our bad debt and charity care at our hospitals average about 10% of gross revenue on an annual basis and represent free healthcare services to residents in our area.

10. There has also been legislative action which has hindered the ability of our companies to thrive as desired. Specifically, there were two recent governmental actions that greatly affected our ability to operate. One is the American Recovery and Reinvestment Act of 2009 that included a provision calling for Electronic Health Records (EHR). This Act required us to install a new software program at each of our hospitals. This was a system-wide capital expenditure of over $13 million dollars and increased our annual operating costs over $5 million dollars. Another legislative action was when a sequestration order was issued on March 1, 2013 that reduced our Medicare reimbursement payments by 2% across the board to cut the national healthcare budget. This resulted in a traumatic reduction in our system-wide annual receipts of approximate $6 million dollars beginning in 2013 that has continued to this day. Keep in mind, our facilities are paid based on cost at 101%, so the 2% loss forced our facilities to attempt to restructure in a way to provide healthcare *below* cost.

11. Obviously, these were unforeseen circumstances, not in the ordinary course of business that impacted our business ominously. We have taken significant measures to reduce costs

at several of our facilities by implementing no raises in the last four years, staff reductions, reductions of benefits that included not matching the 401K plan, contract evaluations and reductions, new inventory and supply ordering systems, cutback on services provided at facilities, reconfigured provider compensation schedules, revised policies and procedure on expenses and other financial-related matters, and reduced budgets across the board.

12. Another major financial hit for our companies comes at the most delicate financial time in our common business transactions. This is when we acquire a hospital to manage the operations, and in some cases prevent the hospital from closing completely. We have had up to 10 months of waiting on the states and CMS (the Centers for Medicare and Medicaid Services) to approve licensure for our hospital. That lag time between the hospital doors being open to provide healthcare to patients and receiving our licensure to enable us to bill CMS for our services causes huge debt that we never recover. The alternative is to leave a rural community without access to healthcare.

13. Although our companies have been wrought with many challenges over the past several years, we have and continue to strive to make our business work. We have wonderful employees, a great service that we provide, and a vision that we believe in. We hope that with the help and protection of this Chapter 11 Reorganization, our companies will be stronger on the other side, learn from our mistakes, and be the leader in rural healthcare once again.

14. On April 6, 2016, the Court entered that certain "Second Emergency Order (i) Authorizing the Debtors to Use Cash Collateral of Certain Prepetition Secured Parties; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; and (IV) Granting Related Relief **[DK #45]** (the "Cash Collateral Order"). Pursuant to the Cash Collateral Order, the Debtor is

obligated to seek the assistance of a financial advisor to evaluate and implement strategic and tactical options to the restructuring process and provide administrative support during the Chapter 11 case.

### Request to Employ Healthcare Management Partners, LLC

15. The Debtor wishes to employ Healthcare Management Partners, LLC ("HMP") as outlined in Paragraph 14 above.

16. As will be set forth in a forthcoming engagement agreement, which will supplement this Application, HMP will assist in performing a financial/clinical/operational review of the Debtor, assist in the identification and implementation of financial, clinical, strategic and operations improvement opportunities, will assist the Chief Executive Officer in developing and reviewing possible restructuring plans or strategic alternatives, will work with local and city government to help assure the availability of health care services, will work with the State Medicaid office and with Medicare (and supporting entities) on reimbursement of shortfalls and related matters and will provide appropriate reports to the Court and related matters.

17. The Debtor has selected HMP based on the fact that it has had considerable experience in the health care/restructuring field in which it is being employed.

18. HMP represents no interests adverse to the Debtor or the estate and matters upon which it is to be engaged. The employment of HMP would be in the best interest of this estate.

19. To the best of Debtor's knowledge, HMP has no connections with the creditors herein or any other party-in-interest or their respective attorneys and accountants, or with the Office of the United States Trustee, or any employees of the Office of the United States Trustee, which are

prohibited, which would interfere with or hinder the performance of HMP's duties herein, or which need to be described herein. An affidavit of disinterestedness will be filed upon execution.

20. HMP's fees are as follows:

| | |
|---|---|
| Managing Director | $550 p/h |
| Director | $420 p/h |
| Senior Associate | $340 p/h |
| Associate | $240 p/h |
| Data Analyst | $180 p/h |

21. The source or sources of payment of HMP's fees and/or its retainer, have not yet been finalized but will be before HMP begins its work.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully prays that it be authorized to employ HMP, *nunc pro tunc* to March 30, 2016, to serve as the Debtor's financial advisors, and that the Debtor's decision to employ HMP be approved by the Court. The Debtor prays for other such general and specific relief as the Court may deem just.

DATED, this the 6th day of April, 2016.

Respectfully submitted,

PIONEER HEALTH SERVICES, INC., ET AL.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: /s/ *Craig M. Geno*
Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jarret P. Nichols; MSB No. 99426
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile

N:\Firm Data\Users\Bankrupt\Pioneer Health\Pleadings\Employ\Morgan\Application.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission, a true and correct copy of the above and foregoing to the following:

Christopher J. Steiskal, Esq.
Office of the United States Trustee
christopher.j.steiskal@usdoj.gov

THIS, the 6th day of April, 2016.

/s/ *Craig M. Geno*
Craig M. Geno