## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
**PIONEER HEALTH SERVICES, INC.[1]**
    **DEBTOR**

         **NO. 16-01119-NPO**
         **CHAPTER 11**

## MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 363, 365, 503 AND 507, BANKRUPTCY RULES 2002, 3007, 6004, 6006, 9007 AND 9014 FOR ENTRY OF (I) ORDER APPROVING AND AUTHORIZING THE SALE OF MEMBERSHIP INTERESTS IN RURAL SOLUTIONS, LLC (F/K/A PIONEER HEALTH ALLIANCE, LLC), A MISSISSIPPI LIMITED LIABILITY COMPANY, (II) ORDER APPROVING FORM AND MANNER OF NOTICE, (III) SCHEDULING AUCTION AND SALE HEARING, OBJECTIONS AND OVERBID DEADLINES AND (IV) GRANTING RELATED RELIEF

COMES NOW Pioneer Health Services, Inc. (the "Movant" or the "Debtor") and files this, its *Motion Pursuant to Bankruptcy Code Sections 105(A), 363, 503, and 507, and Bankruptcy Rules 2002, 3007, 6004, 9007 and 9014 for Entry of (I) Order Approving and Authorizing the Sale of Membership Interests in Rural Solutions, LLC (f/k/a Pioneer Health Alliance, LLC), a Mississippi Limited Liability Company, (II) Order Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, Objections and Overbid Deadlines and (IV) Granting Related Relief* (the "Sale Motion"), and in support thereof would respectfully show as follows, to-wit:

---

[1] On April 6, 2016, the bankruptcy cases of Pioneer Health Services of Patrick County, Inc., No. 16-01120-NPO; Pioneer Health Services of Newton County, LLC, No. 16-01121-NPO; Pioneer Health Services of Stokes County, Inc., No. 16-01122-NPO; Pioneer Health Services of Choctaw County, LLC, No. 16-01123-NPO; Pioneer Health Services of Oneida, LLC, No. 16-01124-NPO; and Pioneer Health Services of Monroe County, Inc., No. 16-01125-NPO were administratively consolidated into the bankruptcy case of Pioneer Health Services, Inc., No. 16-01119-NPO. Debtor Pioneer Health Services of Early County, LLC, No. 16-01243-NPO, filed its Chapter 11 bankruptcy case on April 8, 2016, and was administratively consolidated into the "main" case of Pioneer Health Services, Inc., No. 16-01119-NPO, on April 15, 2016. Debtor Medicomp, Inc., No. 16-01126, filed its Chapter 11 bankruptcy case on March 30, 2016, and was administratively consolidated into the "main" case of Pioneer Health Services, Inc., No. 16-01119-NPO, on June 29, 2016. All of these cases are hereinafter referred to collectively as "the Debtor".

## BACKGROUND FACTS

1.      The Debtor initiated this case by the filing of Voluntary Petition under Chapter 11 of the Bankruptcy Code on the 30th day of March, 2016. Subsequent thereto, the Debtor has been, and is, the duly qualified, and acting Debtor-in-Possession in this Chapter **11** case. The Debtor is in control of and is managing and operating the Debtor-in-Possession's businesses.

2.      By Order dated June 28, 2016 [Dkt 552], this Court appointed Healthcare Management Partners, LLC ("HMP") as Chief Restructuring Officer ("CRO") of the Debtor.

3.      This Court has jurisdiction of the subject matter herein and the parties hereto pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 105, 363, 365, 503, 507, 1107, related statutes, related rules and various orders of reference. This is a core proceeding.

4.      The Debtor is the sole owner of the issued and outstanding membership interests (the "Membership Interests") in Rural Solutions, LLC (f/k/a Pioneer Health Alliance, LLC), a Mississippi limited liability company ("Rural Solutions"). Rural Solutions, along with its subsidiaries, operates an Accountable Care Organization ("ACO"). An ACO is a group of Medicare providers and suppliers (e.g., hospitals, physicians, and others involved in patient care) that coordinate care for the Medicare Fee-For-Service patients they serve.

5.      SOLIC Capital Advisors, upon being retained as financial advisor on July 1, 2016, began compiling an electronic dataroom for Rural Solutions containing historical operating, financial, legal and regulatory related information. The Debtor, with .SOLIC, has diligently and in good faith marketed the assets of Rural Solutions and/or the Membership Interests to the "market," generally, and specifically to all parties known to have a past or present interest in acquiring the Membership Interests to secure the highest and best offer therefore by, among other things, (1) giving a notice that the Membership Interests of Rural Solutions were available for sale to the "market" and

to each of the persons or entities that previously had expressed an interest in the Debtor's assets, (2) providing relevant due diligence information to potential purchasers, and (3) providing potential purchasers with access to management.

6.     SOLIC then began working with Pioneer's CRO and legal counsel to negotiate a final membership interest purchase agreement with Rush Health Systems, Inc., a Mississippi non-stock, non-profit corporation ("Rush").

7.     The Sale Motion seeks an Order scheduling an Auction, approving Rush as a Stalking Horse Bidder, pursuant to the Membership Interest Purchase Agreement (the "MIPA"), attached hereto Exhibit "A" and incorporated herein by reference, and scheduling the hearing for the approval of the Sale.

8.     This Sale Motion also moves for authorization and approval of the sale of the Membership Interests to Rush or the Winning Bidder (the "Approval Order").

9.     The Sale Motion seeks an Approval Order which contains to the fullest extent possible the representations contained in Schedule 4 to the MIPA and among other things: (i) determines that MIPA was proposed by Rush and the Debtor in good faith and represents the highest and best offer for the Membership Interests and should be approved, if Rush is the Winning Bidder; (ii) determines that the Rush is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by the Buyer and are not applicable; (iii) approves Rush as the Stalking Horse Bidder and approves the sale of all of the Membership Interests to Rush or the Winning Bidder free and clear of any and all encumbrances of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by Rush or the Winning Bidder under the MIPA); (iv) authorizes the Debtor pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code to convey to Rush or the Winning Bidder all of its

right, title, and interest in and to all of the Membership Interests free and clear of any such encumbrances; (v) provides that all encumbrances with respect to the Membership Interests shall attach solely to the proceeds of the sale under Section 363 of the Bankruptcy Code; (vi) authorizes the Debtor, through its Chief Restructuring Officer, Scott Phillips, to execute, deliver, perform, consummate, and implement the MIPA and all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) reserves and retains jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Approval Order and this Agreement, and to resolve any disputes arising thereunder upon motion by any party; (viii) provide that the Approval Order is self-executing and effective immediately upon entry, and waives the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure; (ix) approves the assumption by the Seller of the Excluded Liabilities; (x) provides that Rush or the Winning Bidder does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of the Debtor of any nature whatsoever that is not expressly assumed by Winning Bidder in writing pursuant to the MIPA and the Approval Order; (x) determines that Rush or the Winning Bidder is not liable for any of the Excluded Liabilities; and (xi) contains such other provisions as are reasonably satisfactory to Rush or the Winning Bidder.

## THE REQUESTED AUCTION AND BID PROCEDURES

10.     Following arm's length negotiations, the Debtor and Rush (the "Stalking Horse Bidder") agreed to the MIPA, which provides for a Stalking Horse Bid in the amount of $1,300,000.00, subject to the terms and conditions of the MIPA (the "Stalking Horse Bid"). The sale transaction described therein is subject to higher or otherwise better offers through an Auction process pursuant to the Motion, as set forth herein.

11.     At this time, the Stalking Horse Bid represents the highest bid received for the Membership Interests with both Pioneer and Rush in mutual agreement on the terms of the MIPA. Good and sufficient reasons exist for approving the sale of the Membership Interests free and clear of

all liens, claims, encumbrances, and interests, to Rush or the Winning Bidder. The MIPA, with the opportunity for overbids, represents the best opportunity for the maximization of the value of the Membership Interests to the Debtor's estate.

12.     As set forth in the MIPA, the Debtor has agreed to provide the Stalking Horse Bidder with a fee (the "Purchase Termination Fee") of $50,000.00 upon the certain terms and conditions set forth in the MIPA. The Debtor has further agreed to entertain offers for the Membership Interests that are to be transferred pursuant to the MIPA and Approval Order only in amounts that are in excess of the purchase price offered by the Stalking Horse Bidder as set forth in the MIPA, which is a material inducement to the Stalking Horse Bidder's agreement to submit its bid.

13.     The sale of the Membership Interests pursuant to the MIPA is subject to higher or otherwise better offers. To the extent there are other interested bidders, for the sale of Membership Interests, their higher and better offers for the Membership Interests must be received by the Movant no later than 5:00 p.m., Central Standard Time, February 8, 2017.  Such competing bidders must submit to the Debtor, the Official Committee of Unsecured Creditors (the "Committee"), Capital One, National Association ("Capital One"), and the Internal Revenue Service (the "IRS") a Membership Interest Purchase Agreement that is "marked up" to reflect any revisions that the Qualified Bidder has made to the MIPA for submission of Qualified Bids (the "Competing MIPA"). The offer shall:

    a)      provide that the bidder offers to purchase the Membership Interests or assets of Rural Solutions upon terms stated in the offer;

    b)      clearly delineate all components of the proposed purchase price; including, but not limited to, a precise and complete list of all executory contracts and unexpired leases which the bidder proposes to have the Debtor assume and assign to the bidder, as well as the cure amounts for each executory contract and unexpired lease the bidder is willing to pay toward cure costs;[2]

---

[2] Nothing contained in this Motion shall constitute a determination as to whether any contracts or leases are executory contracts or leases or should be treated as financing arrangements.

c)    provide that the bidder's offer is irrevocable upon acceptance by the Debtor at the Auction;

d)    disclose the relationship, if any, between the bidder and the Debtor and its insiders or affiliates;

e)    provide that the bidder's offer is subject to no, or minimal, due diligence contingencies, and if any contingencies, that they be removed by the Bid Deadline, and is not subject to board approval or financing contingency; and

f)    does not contain any other material conditions to closing.

(I)    <u>Bid Deadline.</u> Bids must be received by the parties listed below on or before Wednesday, February 8, 2017, a date set by the Court (the "Bid Deadline"). A Qualified Bidder that desires to make a bid shall submit via electronic mail, U.S. Mail, facsimile or other delivery service, written copies of its bid to the following:

<u>Counsel for the Committee:</u>
Darryl S. Laddin, Esq.
Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, GA 30363
Fax: 404-873-8121
Email: dladdin@agg.com

<u>Counsel for Rush:</u>
Jeffrey S. Moore
Phelps Dunbar LLP
One Mississippi Plaza
201 S. Spring Street, Seventh Floor
Tupelo, MS 38804
Fax: 662-842-3873
Email: jeff.moore@phelps.com

Counsel for Capital One:
William Leech, Esq.
Copeland, Cook, Taylor & Bush, PA

600 Concourse, Suite 100
Ridgeland, MS 39157
Fax: 601-856-7626
bleech@cctb.com

A.     **Auction Process**

(i)     <u>Bid Negotiations</u>. Upon the receipt of Qualified Bids, the Debtor, in consultation with the Committee, Capital One and the IRS, may negotiate with one or more Qualified Bidders regarding the terms of the applicable Qualified Bids.

(ii)    <u>Auction</u>. If there are any Qualified Bidders other than the Stalking Horse Bidder, an auction for the sale of the Membership interests or assets of Rural Solutions (the "Auction") will commence at 8:30 a.m., Friday, February 10, 2017, a date set by the Court, at the U. S. Bankruptcy Court, Southern District of Mississippi, 501 E. Court Street, Jackson, MS 39201.  Bids must exceed the offer of the Stalking Horse Bidder by at least $75,000.00, with subsequent bidding increments of not less than $50,000.00 greater than that of the then-highest or otherwise best Qualified Bid.

14.     A hearing with respect to approve the Sale of the Membership Interests (the "Sale Hearing") will take place at the Bankruptcy Court commencing at 9:00 a.m. on February 10, 2017. The deadline for any party in interest to file objections to the Sale Motion will be established as 5:00 p.m. Central Standard Time, February 8, 2017 (the "Objection Deadline").  If any Winning Bidder is selected by the Debtor, in consultation with the Committee, Capital One and the IRS, the Debtor, in its discretion, will seek the entry of a final order from the Bankruptcy Court at the Sale Hearing approving and authorizing the proposed sale to the Winning Bidder on the terms and conditions substantially consistent with and in accordance with these Bid Procedures and the MIPA.  The Debtor will also seek to have the bid (the "Backup Bid") of the second-highest bidder (the "Back-up Bidder") approved in the event the Winning Bidder is unable or unwilling to close.

15.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling membership interests or other assets from the estate.

16.     The Sale Motion will promote active bidding from seriously interested parties and

will dispel any doubt as to the best or otherwise highest offer reasonably available at this time for the purchase of the Membership interests. Moreover, the Sale Motion allows the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

17.    The anticipated result of the Sale Motion - namely the sale of the Membership interests to a Winning Bidder - is in the best interest of the Debtor's estate and its creditors. While the sale of the Membership interests is in the best interest of the estate, until the process has played out, the Debtor cannot predict the final outcome. However, the Sale Motion should be permitted to proceed in order to flush out the highest or otherwise best offers of any and all prospective bidders.

18.    The Debtor shall keep its major creditors, Capital One Commercial Banking ("Capital One"), and the Internal Revenue Service ("IRS") informed of, and shall provide them with, parallel insight and input into, developments regarding all elements of the bidding and sale process, including without limitation being notified of entities that express interest in purchasing the Membership Interests and any bids that are received, as well as an express right to object to unqualified bids. Capital One and the IRS shall have the same informational and input rights as the Committee in the bidding and sale process for the Membership Interests.

19.    A copy of the Order approving the Bid Deadline, Objection Deadline, dates and times of the Auction and the Sale Hearing will be provided to all parties and all creditors in interest on the Reduced Service List maintained by this Court, all counter-parties to contracts or unexpired leases with Rural Solutions, all creditors of Rural Solutions, all federal, state and county taxing authorities in all locations in which any of the Membership Interests are located and all other parties as determined by this Court, including, all known bidders or prospective bidders having previously expressed an interest in the Membership Interests.

8

20.     Given the Debtor's current financial and business condition, the Stalking Horse Bidder is only willing to proceed to acquire the Membership Interests if the Sale can be closed no later than February 28, 2017.  The timing of the Auction is of importance to all such prospective purchasers.

21.     The disposition of the Membership Interests at this time pursuant to Section 363(b) of the Bankruptcy Code, is the only viable alternative to preserve the enterprise value of the Rural Solutions ACO and maximize the realizable cash value of the Membership Interests for the benefit of the Debtor's estate and all interested constituencies. Delaying the disposition of the Membership Interests will result in a diminution in the value of the Membership Interests. Further, any delay of the disposition of the Membership Interests may result in an alternative outcome that will achieve far less value for creditors and be less beneficial to interested parties.

22.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein will be afforded to all interested persons and entities entitled to receive notice pursuant to the Bankruptcy Rules and this Court's local rules, if known (or, in lieu thereof, to their counsel), including, without limitation, service upon: (i) the Office of the United States Trustee for the Southern District of Mississippi; (ii) the Office of the United States Attorney General; (iii) the Purchaser; (iv) each of the Debtor's twenty (20) largest unsecured creditors; (v) The Centers for Medicare and Medicaid Services ("CMS"); (vi) any known creditor that may claim an interest in the Membership Interests; (vii) any party who has entered an appearance and request for service of papers; (viii) the Internal Revenue Service; (ix) the Reduced Service List; (x) all know equity security holders of the Debtor; and (xi) counsel for the committee formed pursuant to section 1102 of the Bankruptcy Code.

## SALE FREE AND CLEAR OF INTERESTS TO THE WINNING BIDDER

23.     Rush and the Debtor, with Waller Lansden Dortch & Davis, LLP's ("Waller")

guidance and advice of counsel, negotiated, proposed, and entered into the MIPA without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor nor Rush has engaged in any conduct that would cause or permit the MIPA to be avoided under Section 363(n) of the Bankruptcy Code.

24.     Rush is a good faith purchaser under Section 363(m) of the Bankruptcy Code and, as such, shall be entitled to all of the protections afforded under said section of the Bankruptcy Code. The Purchaser will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in consummating the transactions contemplated by the MIPA and any Order or Orders approving some or all of this Motion.

25.     Upon conclusion of the Auction, the consideration provided by Winning Bidder for the Membership Interests pursuant to the MIPA (i) will be fair and reasonable, (ii) will be the highest and best offer for the Membership Interests, (iii) will provide a greater recovery for the Sellers' creditors than would be provided by any other practicable alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the state of Mississippi.

26.     The sale of the Membership Interests to Rush or the Winning Bidder will be a legal, valid, and effective transfer of the Membership Interests, and will vest the Winning Bidder with all right, title, and interest of the Debtor to the Membership Interests free and clear of all mortgages, security interests, conditional sale, or other title retention agreements, pledges, liens (as defined in 11 U.S.C. § 101(37)), claims (as defined in 11 U.S.C. § 101(5)), judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, interests, or restrictions of any kind (collectively, "Interests") (except those expressly assumed, pursuant to and as described in the MIPA), including, without limitation, Interests (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the

10

Winning Bidder's interest in the Membership Interests, or any similar rights, and (ii) relating to taxes arising under, out of, or in connection with the transfer of the Membership Interests or in any way relating to the operation of the Rural Solutions ACO prior to the date (the "Closing Date") of the consummation of the MIPA (the "Closing").

27.     Rush would not have entered into the MIPA and shall not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the sale of the Membership Interests to the Winning Bidder is not free and clear of all Interests of any kind or nature whatsoever or if the Winning Bidder would, or in the future could, be liable for any of the Interests.

28.     The sale of the Membership Interests shall be free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who do not object, or who withdraw their objections, to the Auction, to the Sale or to the Motion, will be deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.

29.     The transfer of the Membership Interests to the Winning Bidder shall not subject the Winning Bidder to any liability whatsoever with respect to the operation of the Rural Solutions ACO prior to the Closing Date or by reason of such transfer based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability. The transfer of the Membership Interests to the Winning Bidder will comply with all applicable laws and regulations.

30.     The Debtor has either complied with all of the requirements of Section 333 of the Bankruptcy Code, or this Court shall determine, under separate Order, that such compliance is not required in this case.

31.    The Debtor requests that its representative be authorized and directed to execute and deliver, and to be empowered to perform under, consummate, and implement, the Auction, the MIPA with the Winning Bidder, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the MIPA, and to take all further actions as may be requested by the Winning Bidder for the purpose of assigning, transferring, granting, conveying, leasing, and conferring to the Winning Bidder the Membership Interests, or as may be necessary or appropriate to the performance of the obligations as contemplated by the MIPA.

32.    An Order approving the Sale (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Membership Interests prior to the Closing have been unconditionally released, discharged, and terminated (other than the Assumed Liabilities), if any, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Membership Interests.

33.    All entities who are presently, or on the Closing Date may be, in possession of some or all of any documents relating to the Membership Interests no matter where located shall be directed to surrender possession of the documents to the Winning Bidder on the Closing Date.

34.    Except as otherwise specifically provided in the Approval Order or in the MIPA, the Winning Bidder shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Membership Interests. Without limiting the generality of the

foregoing, and except as otherwise specifically provided herein and in the MIPA, the Winning Bidder shall not be liable for any claims against the Debtor, or any of its predecessors or affiliates, except as set forth in the MIPA, and the Winning Bidder shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the transfer of the Membership Interests or the operation of the Debtor' business prior to the Closing Date.

35.     Upon entry of the Approval Order, under no circumstances shall the Winning Bidder be deemed a successor of or to the Debtor for any claim or Interest in or against the Debtor or the Membership Interests, of any kind or nature whatsoever. The sale, transfer, assignment, and delivery of the Membership Interests shall not be subject to any claims or Interests, and claims and interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor. All persons holding claims or Interests in or against the Debtor or the Membership Interests, of any kind or nature whatsoever, shall be and hereby are forever barred and estopped from asserting, prosecuting, or otherwise pursuing such claim or Interests against the Winning Bidder, its property, its successors and assigns, or the Membership Interests with respect to any claim or Interest of any kind or nature whatsoever such person or entity had, has, or may have in or against the Debtor, its estate, officers, directors, shareholders, or the Membership Interests. Following the Closing Date, no holder of any claim or Interest in or against the Debtor shall interfere with the Winning Bidder's title to, or use and enjoyment of, the Membership Interests based on or related to such claim or Interest.

36.     Upon entry of the Approval Order, under no circumstances shall any holder of an

Excluded Liability, as defined in the MIPA, be able to commence, continue, or otherwise pursue or enforce any remedy, claim, or cause of action against the Winning Bidder, and each holder of an Excluded Liability is barred and estopped from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, or cause of action against Rush or the Winning Bidder with respect to such Excluded Liability or in connection with or on account of the Transaction or the Winning Bidder's acquisition of the Membership Interests.

37.     Upon entry of the Approval Order, this Honorable Court shall retain jurisdiction to enforce and implement the terms and provisions of an Order approving the Sale Motion, the MIPA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction (a) to compel delivery of the Membership Interests to the Winning Bidder, (b) to resolve any disputes arising under or related to the MIPA, except as otherwise provided therein, (c) to interpret, implement, and enforce the provisions of any Order approving this Sale Motion, and (d) to protect the Winning Bidder (i) against assertion of any of the Excluded Liabilities, and (ii) against any claims or Interests in or against the Debtor or the Membership Interests, of any kind or nature whatsoever.

38.     Nothing contained in any plan of liquidation confirmed in this case or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the MIPA or the terms of Motion, or any Order approving the Bid Procedures or the Sale of Membership Interests.

39.     The transactions contemplated by the MIPA are undertaken by the Winning Bidder in good faith, as that term is used in Section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions shall not affect the validity of the Transaction to the Winning Bidder, unless the Closing of the transactions is duly stayed pending such appeal. The Winning Bidder is a purchaser in good

faith of the Membership Interests, and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

40.     The terms and provisions of the MIPA and any Order approving the Sale of Membership Interests shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors and equity security holders, the Winning Bidder, and its respective affiliates, designees, successors, and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Membership Interests to be sold to the Winning Bidder pursuant to the MIPA. The transfer of the Assets to the Winning Bidder, pursuant to the MIPA and any Order approving this Motion, is not contrary to any applicable law or regulation.

41.     The failure specifically to include any particular provisions of the MIPA in any Order approving this Sale Motion shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Debtor be authorized to enter into MIPA in its entirety.

42.     The MIPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

43.     To the extent there are any proceeds of the Membership Interests (and to the extent any damages described in the prior paragraph are determined to be proceeds) all liens and interests in the Membership Interests shall attach to the proceeds of the Membership Interests and the priority of such liens and interests shall be the same as the priority in such Membership Interests immediately before the sale.

44.     In the event the Court sees fit to approve the contemplated transactions, the net sale

proceeds shall be delivered to the trust account of counsel to the Debtor. Once those funds are received, they shall then be transferred to an interest bearing, Debtor in Possession account established under the guidelines of the Office of the United States Trustee. The funds contained therein shall not be disbursed except upon further order of the Court after notice and a hearing.

45.     Other grounds to be assigned upon a hearing hereof.

WHEREFORE, PREMISES CONSIDERED, the Debtor prays this Honorable Court will hold a hearing on the approval of the sale of the Membership Interests to the Winning Bidder and enter the Approval Order.

The Debtor prays for general relief.

DATED, this the 23rd day of January, 2017.

Respectfully submitted,

PIONEER HEALTH SERVICES, INC.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____

Craig M. Geno

OF COUNSEL:
Craig M. Geno; MSB No. 4793
Jarret P. Nichols; MSB No. 99426
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com
jnichols@cmgenolaw.com

N:\Firm Data\Users\Bankrupt\Pioneer Health\Pleadings\CMG - Pioneer Rush Sale and Bid Procedure Motion 2.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission, a true and correct copy of the above and foregoing to all creditors and parties in interest, all creditors of the Debtor, and to the following:

Ronald H. McAlpin, Esq.
ronald.mcalpin@usdoj.gov

Christopher J. Steiskal, Esq.
christopher.j.steiskal@usdoj.gov

Sean C. Kulka, Esq.
sean.kulka@agg.com

Matt P. Weiner, Esq.
mattweiner@parkerpoe.com

Brian I. Swett, Esq.
bswett@mcguirewoods.com

Matthew M. Brohm, Esq.
Matt.Brohm@agg.com

William H. Leech, Esq.
bleech@cctb.com

Darryl S. Laddin, Esq.
dladdin@agg.com

James A. McCullough, II
jmccullough@brunini.com

Robert Dozier, Esq.
robert.e.dozier@usdoj.gov

David N. Usry, Esq.
David.Usry@usdoj.gov

Adam M. Walters, Esq.
awalters@walterslawpc.com

THIS, the 22nd day of January, 2017.

_____
Craig M. Geno

### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
**PIONEER HEALTH SERVICES, INC.**
**DEBTOR**

**NO. 16-01119-NPO**
**CHAPTER 11**

# EXHIBIT "A"

Execution Version

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____, 2016 by and between Pioneer Health Services, Inc., a Mississippi corporation ("PHS" or "Seller") and Rush Health Systems, Inc., a Mississippi non-stock, non-profit corporation ("Buyer").

WITNESSETH:

WHEREAS, PHS is the sole owner of the issued and outstanding membership interests in Rural Solutions, LLC (f/k/a Pioneer Health Alliance, LLC), a Mississippi limited liability company ("Rural Solutions") (the "Membership Interests"); and

WHEREAS, Rural Solutions owns all of the equity interests issued by PH Alliance, LLC, a Mississippi limited liability company ("PH Alliance"), Rural Solutions of Arkansas, LLC , a Mississippi limited liability company, ("RS Arkansas"), Rural Solutions of Florida and Georgia, LLC, a Mississippi limited liability company, ("RS-FL/GA"), Rural Solutions of Mississippi, LLC, a Mississippi limited liability company, ("RS Mississippi"), Rural Solutions of Tennessee, LLC, a Mississippi limited liability company, ("RS Tennessee") and Rural Solutions of Texas, LLC, a Mississippi limited liability company, ("RS Texas") (collectively, PH Alliance, Rural Solutions, RS-Arkansas, RS-FL/GA, RS-Mississippi, RS-Tennessee and RS-Texas, the "RS Entities"); and

WHEREAS, PHS is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code") and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 30, 2016 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court") (jointly administered pursuant to Case No. 16 01126 NPO) (the "Bankruptcy Case"); and

WHEREAS, the RS Entities are engaged in the business of providing healthcare services in certain states in the Southeast; and

WHEREAS, pursuant to the terms and conditions hereof, Seller desires to sell to Buyer and Buyer desires to purchase from Seller the Membership Interests; and

WHEREAS, the RS Entities execute this Agreement for the sole purpose of making the representations and warranties contained in Article 4.

NOW, THEREFORE, in consideration of the foregoing premises and the agreements, covenants, representations and warranties set forth herein and other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged, the parties hereto agree as follows:

Article 1.        Purchase and Sale.

Section 1.1.    <u>Sale of Membership Interests</u>.    On and subject to the terms and conditions set forth in this Agreement, at the Closing (as hereinafter defined), Seller shall sell, assign, transfer and deliver to Buyer and Buyer shall purchase from Seller, the Membership Interests free and clear of any and all liens, claims and encumbrances.



EXHIBIT
"A"

4843-9346-0029.17

Execution Version

Section 1.2.     Excluded Assets.  Pursuant to a bill of sale in substantially the form attached hereto as Exhibit 1.2 (the "Bill of Sale"), immediately prior to the Closing, the following assets of the RS Entities shall be distributed to Seller (the "Excluded Assets"):

(i)      Accounts receivable owed by any subsidiary or affiliate of PHS to any RS Entity; and

(ii)     Cash and cash equivalents of each RS Entity.

Section 1.3.     Excluded Liabilities.   Pursuant to an assignment and assumption agreement in substantially the form attached hereto as Exhibit 1.3 (the "Assignment and Assumption Agreement"), immediately prior to the Closing, Seller shall cause the RS Entities to assign and Seller shall assume, the following liabilities of the RS Entities (collectively, the "Excluded Liabilities"):

(a)      all accounts payable due by the RS Entities to any party, except as follows: all accounts payable owed to Pioneer Health Services, Inc. and Eclinical Works that relate to goods or services provided prior to December 31, 2016 up to an aggregate amount of $211,000 (such aggregate amount shall be referred to as the "AP Obligation"); and

(b)      all obligations of the RS Entities under that certain employment agreement dated as of August 16, 2016 between Morgan Dunn and the Seller.

Section 1.4.     Purchase Price.   The consideration to be paid by the Buyer for the Membership Interests (the "Purchase Price") shall be an aggregate amount equal to One Million Three Hundred Thousand Dollars ($1,300,000). The Purchase Price shall be remitted to Seller at Closing.  At the Closing Seller shall mark all invoices owed by Buyer and/or any RS Entity to Seller and/or Eclinical Works that relate to goods or services provided prior to December 31, 2016 as "paid in full", except to the extent of the AP Obligation, it being the intent of the Buyer and Seller that a portion of the Purchase Price is paying such obligations owed by Buyer and/or the RS Entities to Seller and/or Eclinical Works.

Article 2.     Closing.

Section 2.1.     Closing.  The consummation of the purchase and sale of the Membership Interests (the "Closing") shall take place in Meridian, Mississippi at Rush Foundation Hospital, or other agreed upon location at 10:00 a.m. local time on or before February 28, 2017 or such other date and time as the parties hereto agree in writing (the "Closing Date").  The Closing shall be effective as of 12:01 a.m. on March 1, 2017.

Article 3.     Deliveries at Closing.

Section 3.1.     Action of Seller at Closing.  At the Closing, Seller shall deliver to Buyer the following:

(a)      the Bill of Sale transferring the Excluded Assets from the RS Entities to Seller duly executed by Seller and the RS Entities;

(b)      the Assignment and Assumption Agreement transferring the Excluded Liabilities from the RS Entities to Seller duly executed by Seller and the RS Entities;

(c)      an Assignment of Membership Interests substantially in the form attached hereto as Exhibit 3.1(c) duly executed by PHS;

Execution Version

(d)     a certificate executed by a duly authorized officer of Seller certifying the satisfaction of the conditions set forth in Section 9.1.

(e)     certificates of existence and qualification to do business as foreign entities regarding each RS Entity dated within five (5) business days prior to Closing;

(f)     resolutions adopted by the governing board of and sole member of Seller approving the execution, delivery and performance of the Bill of Sale, the Assignment and Assumption Agreement, and this Agreement to which it is a party and the consummation of the transactions contemplated hereby and thereby, certified by an officer of Seller;

(g)     incumbency certificates certifying the identity of the officers of Seller executing any of the documents to be executed and delivered on behalf of Seller in connection with the Closing;

(h)     final order of the Bankruptcy Court approving the sale of the Membership Interests to Buyer and other transactions contemplated hereby free and clear of all liens, claims and encumbrances in form and substance reasonably satisfactory to Buyer (the "Approval Order"); and

(i)     such other documents as may be reasonably requested by Buyer.

Section 3.2.     Action of Buyer at Closing.  At the Closing, Buyer shall deliver to Seller the following:

(a)     the Purchase Price in immediately available funds to an account designated in writing by Seller;

(b)     a certificate executed by a duly authorized officer of Buyer certifying the satisfaction of the conditions set forth in Section 10.1;

(c)     a certificate of existence regarding the Buyer within five (5) business days prior to Closing;

(d)     resolutions adopted by the Board of Directors of Buyer approving the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by an officer of Buyer;

(e)     an incumbency certificate certifying the identity of the officers of Buyer executing any of the documents to be executed and delivered on behalf of Buyer in connection with the Closing; and

(f)     such other documents as may be reasonably requested by Seller.

Article 4.     Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows for the period from June 28, 2016 to the date hereof and as of the Closing (the "Time Period"):

Section 4.1.     Capacity and Organization.

4843-9346-0029.17

Execution Version

(a)     Each RS Entity is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Mississippi. Each RS Entity has all requisite power and authority to own, operate and/or lease its properties and to carry on its business as now being conducted. Each RS Entity is duly qualified to do business and is in good standing in the jurisdictions set forth in Schedule 4.1(a), which jurisdictions constitute as of the date hereof the only jurisdictions in which the character of the properties it owns, operates or leases or the nature of its activities makes such qualification necessary or advisable.

(b)     The Membership Interests constitute 100% of the outstanding membership interests in Rural Solutions and have been duly authorized and are validly issued and outstanding. Seller owns and has good title to the Membership Interests, beneficially and of record, free and clear of all liens, claims, and encumbrances of any nature whatsoever. Seller has full voting power over, and all rights from whatever source arising, including financial and voting and other governance rights, to the Membership Interests, subject to no proxy, voting trust or other agreement relating to the voting of the Membership Interests. Other than this Agreement, there is no agreement between Seller and any other person with respect to the disposition of the Membership Interests.

(c)     Rural Solutions owns 100% of the outstanding membership interests of PH Alliance, RS-Arkansas, RS-FL/GA, RS-Mississippi, RS-Tennessee, and RS-Texas (the "Subsidiary Membership Interests"). All of the Subsidiary Membership Interests have been duly authorized and are validly issued and outstanding. Rural Solutions has good title to the Subsidiary Membership Interests, beneficially and of record. The transfer of the Membership Interests, pursuant to the Approval Order, will be free and clear of all liens, claims, and encumbrances of any nature whatsoever. Rural Solutions has full voting power over, and all rights from whatever source arising, including financial and voting and other governance rights, to the Subsidiary Membership Interests, subject to no proxy, voting trust or other agreement relating to the voting of the Subsidiary Membership Interests. There is no agreement between Seller, Rural Solutions, and any other person with respect to the disposition of the Subsidiary Membership Interests.

(d)     True and complete copies of the Certificate of Formation, Operating Agreement (or other governing documents) of each RS Entity have been delivered to Buyer, and the books of account, minute books, membership interest records, and other records of each RS Entity (to the extent they exist) have been made available to Buyer (collectively, the "Organizational Documents"). There has not been any violation of the Organizational Documents, and none of the RS Entities has taken any action that is inconsistent with the Organizational Documents. The books of account, membership interest records, and other records of each of the RS Entities are accurate and complete in all material respects, and have been maintained in accordance with all applicable laws. There has been no material amendment to the Organizational Documents.

Section 4.2.     Subsidiaries and Investments.     Other than the Subsidiary Membership Interests owned by Rural Solutions, the RS Entities do not own any capital stock or other equity, ownership or proprietary interest in any corporation, partnership, limited liability company or other entity.

Section 4.3.     Authorization, Validity and Conflicts.

(a)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Seller have been duly authorized and approved by all necessary corporate or limited liability company action, as applicable. Subject to the entry of the Approval Order, this Agreement is and, as of the Closing, the other agreements and instruments contemplated hereby to be executed and delivered by Seller (including without limitation the Bill of Sale and the Assignment and Assumption Agreement), will be duly and validly executed and delivered by

Execution Version

Seller and RS Entities.  Subject to the entry of the Approval Order, this Agreement and the other agreements and instruments contemplated hereby to be executed and delivered by Seller, when each is executed and delivered, will constitute the valid, legal and binding obligations of Seller, enforceable against Seller in accordance with their terms.

(b)     The execution, delivery and performance by Seller of this Agreement and the other documents to be executed and delivered by PHS pursuant to the terms hereof (i) will not conflict with any provision of Seller's or RS Entities' Articles of Incorporation, Certificate of Formation, Bylaws or Operating Agreement, as applicable, or other governing documents; and (ii) following entry of the Approval Order, will not conflict with or result in a violation of any law, ordinance, regulation, ruling, judgment, order or injunction of any court or governmental instrumentality to which Seller or any RS Entity is a party to or by which Seller or any RS Entity is bound.

Section 4.4.     Capitalization.

(a)     As of the date hereof and as of the Closing, the outstanding equity interests of the RS Entities consists of the number of units of membership interests shown on Schedule 4.4.  All of the Membership Interests and the Subsidiary Membership Interests have been duly authorized, are validly issued and are fully paid and non-assessable.  All of the Membership Interests are owned by the Seller and the Subsidiary Membership Interests are owned by Rural Solutions.  Other than this Agreement, there are no rights, agreements or commitments that obligate the Seller to issue, transfer or sell any Membership Interests or Subsidiary Membership Interests.

(b)     Seller is the legal and beneficial owner of and has good and marketable title to the Membership Interests, free and clear of any options and contractual restrictions whatsoever. Rural Solutions is the legal and beneficial owner of and has good and marketable title to the Subsidiary Membership Interests, free and clear of any options and contractual restrictions whatsoever.

Section 4.5.     Financial Statements.  Attached as Schedule 4.5 are the most recent unaudited balance sheet and unaudited income statement of the RS Entities (collectively, the "Financial Statements").  The Financial Statements are complete and have been prepared from the books and records of the RS Entities.  Except as otherwise set forth on Schedule 4.5, the Financial Statements fairly present in all material respects the financial condition and the results of operations of the RS Entities at the respective dates of and for the periods referred to in the Financial Statements, all in accordance with generally accepted accounting principles ("GAAP").  There has not been any increase in, or acceleration of, compensation, bonus or other amounts payable to any contractor of any RS Entity.

Section 4.6.     Insurance.  Schedule 4.6 is a list of all insurance policies or binders currently in force insuring the RS Entities against risks arising from or in connection with the operation of the business of the RS Entities (the "Business"). All such policies are in full force and effect on an occurrence basis, with no premium arrearages, and will continue in full force and effect following the completion of the Closing.  Except as set forth on Schedule 4.6, there are no pending claims against such insurance by the RS Entities as to which insurers are defending under reservation of rights or have denied liability.

Section 4.7.     Employees.  The RS Entities do not have any employees, nor do they have any payment obligation or other liability with respect to any employee benefit plan.

Section 4.8.     Legal Compliance.  Each RS Entity is in compliance in all material respects with all applicable federal, state, local, and municipal laws, statutes, ordinances, rules, and regulations in all material respects (collectively, the "Laws").

Execution Version

Section 4.9.    Tax Matters.  At all times since the date of their formation, each RS Entity has been treated as a "disregarded entity" for federal income tax purposes. No RS Entity has made an election to be subject to federal income tax as an association taxable as a corporation pursuant to Treasury Regulation Section 301.7701-3. All tax returns due to have been filed by each RS Entity (if any) through the date hereof in accordance with all applicable Laws (pursuant to an extension of time or otherwise) have been duly filed.

Section 4.10.    Business Operations.  No RS Entity has entered into any transaction or taken any other action outside the ordinary course of business or inconsistent with its past practices, other than the agreements and transactions contemplated hereby.

Section 4.11.    Real Estate.  No RS Entity owns or leases, or has owned or leased during the Time Period, any real property.

Section 4.12.    Tangible Personal Property.  All items of tangible personal property and assets of each RS Entity (i) are free of material defects and in good operating condition and in a state of good maintenance and repair, subject to ordinary wear and tear and (ii) if acquired during the Time Period, were acquired and are usable in the regular and ordinary course of business.

Section 4.13.    Contracts.  All written, oral or other agreements, contracts, subcontracts, leases, licenses, sublicenses, or other legally binding commitments or undertakings of Rural Solutions and/or PH Alliance that are material to the operation of the business conducted by the RS Entities, including, without limitation, contracts with governmental entities and third party payors, (each, a "Contract", and collectively, the "Contracts") are currently valid and in full force and effect, and are enforceable by the applicable RS Entity in accordance with its terms.  After the Closing, each Contract will continue to be legal, valid, binding and enforceable on identical terms, free and clear of all liens, claims and encumbrances, and the counterparty to each such Contract shall have no right to terminate such Contract based upon action or inaction of the Seller.

Section 4.14.    Membership Interests. The Membership Interests and Assets of the RS Entities are free and clear of all material liabilities or obligations of any of the RS Entities of any kind whatsoever (absolute, accrued, contingent, determined, determinable or otherwise), including the existence of any condition, situation or set of circumstances that could result in such a material liability or obligation, except such liabilities or obligations (i) that are fully reflected or provided for in the Financial Statements or the notes thereto, or (ii) that have arisen in the ordinary course of business, consistent with past practice, since the date of the Financial Statements and of a type reflected or provided for in the Financial Statements.

Section 4.15.    Insurance.  Each RS Entity maintains, and has maintained, without interruption during its existence, policies of insurance covering risks and events in amounts that are adequate, in light of prevailing industry practices, for its business and operations.

Section 4.16.    Material Adverse Effect.  Since the most recent date of the Financial Statements, no material adverse effect has occurred, and, to the knowledge of Seller, no event, occurrence, development or state of circumstances or facts has occurred that will, or could reasonably be expected to have a material adverse effect with respect to the business, financial condition, prospects, assets, or operations of any of the RS Entities.

Section 4.17.    Distributions.  Other than the transfers contemplated under the Bill of Sale and Assignment and Assumption Agreement, none of the RS Entities has declared, set aside or paid

Execution Version

any distribution or made any other distribution or payment other than the payment of company expenses in the ordinary course of business and consistent with past practice.

Section 4.18.   <u>Indebtedness</u>. No RS Entity has lent money, incurred or guaranteed any indebtedness, or pledged of any of its assets or otherwise permitted any of its assets to become subject to any encumbrance.

Section 4.19.   <u>Marketable Title</u>. Each RS Entity has good, valid, transferable and marketable title to, or valid leasehold interests in, all of its properties and assets (the "Property"), and that the transfer of such Property shall be free and clear of all encumbrances. The Property of each RS Entity or used under enforceable contracts constitute all of the properties and assets (whether real, personal or mixed and whether tangible or intangible) necessary and sufficient to permit such RS Entity to conduct its business after the Closing in accordance with its past practice.

Section 4.20.   <u>Intellectual Property</u>. Each RS Entity owns, or is licensed or otherwise has the right to use, all intellectual property used in connection with the operation and conduct of its respective business, including, without limitation, all proprietary information, know-how, software, technology, technical data and lists of customers, patients or referral sources, and all documentation relating to any of the foregoing.  To the extent there has been any infringement claim, asserted or unasserted, those claims shall remain with the Seller and the transfer of all intellectual property is free and clear of all such claims through the date of the acquisition. The Seller does not believe any other party has infringed upon or violated, or is infringing upon or violating, any intellectual property rights of any RS Entity.

Section 4.21.   <u>Contracts</u>. All written, oral or other agreements, contracts, subcontracts, leases, licenses, sublicenses, insurance policies, benefit plans or legally binding commitment or undertaking of any nature (each, a "Contract", and collectively, the "Contracts") are currently in force to which any RS Entity is a party or has continuing liabilities and/or obligations, including:

(i)   Any Contracts involving an annual payment to or from any RS Entity of more than $5,000.00;

(ii)   Contracts with governmental entities;

(iii)   Contracts with third party payors;

Section 4.22.   <u>Breaches</u>.  To the extent any RS Entity has violated or breached, or committed any default under, any material Contract, such breach or default shall be cured or be deemed cured.

Section 4.23.   <u>Liabilities on Properties</u>.  All taxes, deposits and other payments for which any RS Entity has liability (if any) have been paid in full or, if outstanding, such obligation is transferred to the Seller and the Assets and Property being conveyed hereunder are conveyed free and clear of all taxes and tax liabilities.

Section 4.24.   <u>Legal Proceedings</u>. Any legal proceedings against any RS Entity, or any unasserted claim against any RS Entity, shall have no effect on any Asset or Property being conveyed hereunder and that such legal proceedings or unasserted claims are to be pursued solely against the Seller, and that the Buyer shall have no liability for any such claims being asserted in any such legal proceedings, such claims attaching to the proceeds of any sale.

Execution Version

Section 4.25.    Taxes.  Any liability or obligation of any RS Entity or any Seller with respect to any federal, state, or local tax, fine, or penalty that is attributable to all or any portion of a tax period that precedes the Closing Date, shall be the sole liability of the Seller, along with any the Excluded Liabilities, all fees and expenses of all third parties engaged by the Seller or any RS Entity prior to the Closing Date that have been incurred or are expected to be incurred in providing the Seller or any RS Entity with services (including legal, accounting, tax, and broker services) in connection with the transactions contemplated by this Agreement; all Losses arising out of the ownership, operation or maintenance of the Seller's or any RS Entity's business prior to the Closing Date.

Article 5.    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows as of the date hereof and as of the Closing:

Section 5.1.    Organization.  Buyer is a corporation, validly existing and in good standing under the laws of the State of Mississippi and has all requisite power and authority to execute and deliver this Agreement and to conduct its business as it is now being conducted.

Section 5.2.    Authorization, Validity and Conflicts.

(a)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Buyer have been duly authorized and approved by all necessary corporate action. This Agreement and, as of the Closing, the other agreements and instruments contemplated hereby to be executed and delivered by Buyer, will be duly and validly executed and delivered by Buyer.  This Agreement and the other agreements and instruments contemplated hereby to be executed and delivered by Buyer, when each is executed and delivered, will constitute the valid, legal and binding obligations of Buyer, enforceable against it in accordance with their terms.

(b)    The execution, delivery and performance by Buyer of this Agreement and the other documents to be executed and delivered by it pursuant to the terms hereof (i) do not require the consent of or notice to any governmental or regulatory authority or any other third party; (ii) will not conflict with any provision of Buyer's Certificate of Formation or Limited Liability Company Agreement; (iii) will not conflict with or result in a violation of any law, ordinance, regulation, ruling, judgment, order or injunction of any court or governmental instrumentality to which Buyer is a party or by which Buyer or any of its properties are bound; and (iv) will not conflict with, constitute grounds for termination of, result in a breach of, constitute a default under or require any notice under any agreement, instrument, license or permit to which Buyer is a party or by which any of its properties are bound.

Section 5.3.    Investment Representations.  Buyer is acquiring the Membership Interests for its own account and not with a view to their distribution as such term is used in the 1933 Act. Buyer has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Membership Interests and understanding the risks of, and other considerations relating to, Buyer's acquisition of the Membership Interests.  Buyer understands and acknowledges that the Membership Interests have not been registered under the 1933 Act or any state securities laws.

Section 5.4.    Availability of Information.  As of the Closing, Buyer acknowledges and agrees that Seller has made available to Buyer, its agents and representatives information about the Business and financial condition of the Seller and RS Entities and has provided Buyer, its agents and representatives with the opportunity to ask questions of the officers of the Seller about the business and financial condition of the Seller.

4843-9346-0029.17

Execution Version

Article 6.        Covenants of Seller.  The Seller covenants and agree as follows between the date hereof and the Closing:

Section 6.1.        Access to Information.  The Seller shall cause RS Entities to accord to Buyer, its counsel, accountants and other representatives full access to all of the properties, books, records, licenses, applications and commitments of the RS Entities and furnish Buyer during such period with all such information concerning the business and properties of the RS Entities as Buyer and its representatives reasonably may request.  Such parties shall also be allowed access, upon reasonable notice, to consult with the officers, employees, accountants, counsel and agents of the RS Entities and Seller in connection with such investigation of the properties and business of the RS Entities.

Section 6.2.        Operations. Except as otherwise contemplated by this Agreement, Seller will cause RS Entities:

(a)        to carry on its business in substantially the same manner as the RS Entities has heretofore and in compliance in all material respects with all applicable Laws and not make any material change in personnel or operations or accounting policies;

(b)        to use commercially reasonable efforts to maintain the RS Entities' assets in substantially the same order and condition as at present, ordinary wear and tear excepted;

(c)        not to issue, sell, redeem, or otherwise acquire any membership interest or any securities convertible into any membership interest in the RS Entities, or declare or pay any dividend or make any other distribution in respect of the Membership Interests.

Section 6.3.        Efforts to Close.  Seller shall use its commercially reasonable efforts to proceed toward the Closing and to cause the conditions to Closing set forth in Article 10 to be met as soon as practicable and consistent with the other terms contained herein.  Seller shall notify Buyer as soon as practicable of any event or matter which comes to Seller's attention that may reasonably be expected to prevent the conditions to Buyer's obligations being met.

Section 6.4.        Consents.  Seller shall use its commercially reasonable efforts to obtain all permits, approvals, authorizations and consents of all third parties for Seller to consummate the transactions contemplated by this Agreement.

Section 6.5.        Notice; Efforts to Remedy.  Seller shall promptly give written notice to Buyer upon becoming aware of any prior or impending occurrence of any event which would cause or constitute a breach of any of the representations, warranties of covenants of Buyer or Seller in this Agreement.

Section 6.6.        Short Period Tax Returns.  Seller shall prepare at its sole expense a short period tax return(s) of the RS Entities for the period of time ending on the Closing Date. Seller shall provide Buyer with a copy of such returns prior to their filing with the applicable state and federal taxing authorities. The Seller shall file all such return(s) on behalf of the RS Entities and shall pay any and all amounts shown or otherwise due in connection with such returns.

Section 6.7.        Bankruptcy Court Approvals.

(a)        Within (2) business days of the last party to sign this Agreement, the Seller shall file a motion with the Bankruptcy Court (the "Sale Motion") requesting entry of an order in form and content reasonably satisfactory to the Buyer (the "Approval Order"), which order shall include

Execution Version

the representations contained in Schedule 4, to the fullest extent possible and, among other things: (i) determine that this Agreement was proposed by the Buyer and the Seller in good faith and represents the highest and best offer for the Membership Interests and should be approved; (ii) determine that the Buyer is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by the Buyer and are not applicable; (iii) approve the sale of all of the Membership Interests to the Buyer free and clear of any and all encumbrances of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by the Buyer under this Agreement); (iv) authorize the Seller pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code to convey to Buyer all of its right, title, and interest in and to all of the Membership Interests free and clear of any such encumbrances; and (v) provide that all encumbrances with respect to the Membership Interests shall attach solely to the proceeds of the sale under Section 363 of the Bankruptcy Code; (vi) authorize the Seller to execute, deliver, perform, consummate, and implement this Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) reserve and retain jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Approval Order and this Agreement, and to resolve any disputes arising thereunder upon motion by any party; (viii) provide that the Approval Order is self-executing and effective immediately upon entry, and waive the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure; (ix) approve the assumption by the Seller of the Excluded Liabilities; (x) provide that the Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of the Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this Agreement and the Approval Order; (x) determine that the Buyer is not liable for any of the Excluded Liabilities; and (xi) contain such other provisions as are reasonably satisfactory to the Buyer.

(b)     Following the filing of the Sale Motion, the Seller shall use reasonable efforts to obtain entry of the Approval Order, and to prevent any amendment, modification, or supplementation to the Approval Order without reasonable written consent of the Buyer.

(c)     The Seller's and the Buyer's respective obligations to consummate the transactions contemplated herein shall be conditioned upon the Bankruptcy Court's entry of the Approval Order and upon Buyer's reasonable consent to the form and content of the Approval Order and of any amendment, modification, or supplementation thereof.

(d)     The Seller, at its sole expense, shall promptly make any filings and take all actions to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Membership Interests, subject to its obligations to comply with any order of the Bankruptcy Court. In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, the Seller shall immediately notify the Buyer of such appeal or stay request and, upon the Buyer's request, shall provide to the Buyer within (2) two business days after the Seller's receipt thereof a copy of the related notice of appeal or order of stay. The Seller shall also provide the Buyer with written notice of any motion or application filed in connection with any appeal from any of such orders.

Section 6.8.     Competing Bids.

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid").

(b)  [Intentionally Omitted]

Execution Version

(c)   Until the Sale Order is entered, and subject to the bid procedures set forth in Section 6.8(d), Seller is permitted to cause its representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Buyer and its representatives) in connection with any sale or other disposition of all or any part of the Membership Interests, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, during such time period, the Seller has the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Membership Interests and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the business and the assets of Rural Solutions or the Seller to prospective Buyers.

(d)   Seller agrees to the following bid procedures and shall use its best efforts to cause such procedures to be adhered to and, if necessary, approved by the Bankruptcy Court:

(i)   initial minimum overbid by a Competing Bid of $75,000 (the Buyer Termination Fee of $50,000 plus the incremental bid of $25,000);

(ii)   subsequent incremental bids by qualified bidders of no less than $50,000;

(iii)   payment of the Buyer Termination Fee, if applicable, in accordance with Section 6.9;

(iv)   deadline to qualify Competing Bids of a date no later than February 10, 2017, or another date prior to the Closing as selected by the Bankruptcy Court;

(v)   conducting an auction in the event of any qualified Competing Bids no later than February 14, 2017, or another date prior to the Closing as selected by the bankruptcy judge; and

(vi)   commencement of a hearing before the Bankruptcy Court to approve the Transaction and seek entry of Sale Order no later than February 27, 2017, with such Sale Order to approve a closing on February 28, 2017.

Section 6.9.   Buyer Termination Fee. Seller agrees and acknowledges that Buyer's negotiation and execution of this Agreement have required a substantial investment of management time and significant commitment of financial and other resources of Buyer, and that the negotiation and execution of this Agreement have provided significant value to Seller. Therefore, if the Bankruptcy Court fails to approve this Agreement because another offer for the purchase of the Membership Interests or assets of the RS Entities has been received and is approved by the Bankruptcy Court, then, in such event, and if thereafter any Buyer Termination Event (as hereinafter defined) occurs, Seller will pay to Buyer a termination fee, which will include reimbursement of Buyer's costs and expenses in connection with the negotiation of and activities incident to this Agreement, in an amount equal to $50,000 (the "Buyer Termination Fee"). The Buyer Termination Fee will be paid upon the closing of the sale the Membership Interests or assets of any RS Entity to a third party. A "Buyer Termination Event" means the consummation of any alternative transaction including a sale of all or a substantial portion of the Membership Interests or assets of the RS Entities by a Competing Bid from a party other than the Buyer, or the confirmation of any Chapter 11 Plan, within 180 days of the execution of this Agreement. Seller shall pay the Buyer Termination Fee on the earlier of (a) the date of the consummation of any such alternative transaction or (b) on the effective date of the confirmation by the Bankruptcy Court of any Chapter 11 Plan, such date not to exceed fifteen (15) days from the date of such confirmation. Seller's obligation to pay the Buyer Termination Fee shall constitute and be treated as an administrative expense of Seller under Sections 503(b) and 507(a) of the Bankruptcy Code and paid in cash

Execution Version

immediately when due. The parties agree that such sum is a reasonable estimate of Buyer's costs, expenses, and loss, and is fair consideration to induce Buyer to enter into this Agreement

Article 7.    Covenants of Buyer.  Buyer covenants and agrees as follows:

Section 7.1.    Efforts to Close.  Buyer shall use commercially reasonable efforts to proceed toward the Closing and to cause the conditions to Closing set forth in Article 10 to be met as soon as practicable and consistent with the other terms contained herein.  Buyer shall notify Seller as soon as practicable of any event or matter which comes to Buyer's attention which may reasonably be expected to prevent the conditions to Seller' obligations being met.

Section 7.2.    Consents.  Buyer will use its commercially reasonable efforts to obtain all permits, approvals, authorizations and consents of all third parties necessary for Buyer to consummate the transactions contemplated by this Agreement.

Section 7.3.    Notice; Efforts to Remedy.  Buyer shall promptly give written notice to Seller upon becoming aware of the impending occurrence of any event which would cause or constitute a breach of any of the representations, warranties or covenants of Seller or Buyer in this Agreement.

Article 8.    Intentionally Omitted.

Article 9.    Conditions Precedent to Obligations of Buyer.  The obligations of Buyer hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

Section 9.1.    Representations/Warranties.  The representations and warranties of Seller contained in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects as of the date hereof and as of the Closing Date. The covenants and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date shall have been duly complied with and performed.

Section 9.2.    Approval Order.  A Approval Order in form and substance reasonably agreeable to both Buyer and Seller shall have been entered by the Bankruptcy Court.

Section 9.3.    Consents; Licenses.  All notices to, and consents, authorizations, approvals and waivers from, third parties required for Seller to consummate the transactions contemplated by this Agreement shall have been made and obtained.

Section 9.4.    Delivery of Certain Documents.  At the Closing, Seller shall have delivered to Buyer all documents, agreements and instruments contemplated by Section 3.1.

Section 9.5.    Approval by CMS.  The obligations of Buyer to perform under this Agreement are contingent upon Buyer and Seller obtaining any necessary approvals of the transaction from CMS, and the Buyer and Seller providing CMS with any additional information regarding the organization of the ACO which is requested by CMS prior to the Closing Date of this transaction.

Article 10.    Conditions Precedent to Obligations of Seller.  The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Seller:

Execution Version

Section 10.1.    Representations/Warranties.    The representations and warranties of Buyer contained in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects as of the date hereof and as of the Closing Date. The covenants and conditions of this Agreement to be complied with or performed by Buyer on or before the Closing Date shall have been duly complied with and performed.

Section 10.2.    Approval Order.    A Approval Order in form and substance reasonably agreeable to both Buyer and Seller shall have been entered by the Bankruptcy Court.

Section 10.3.    Delivery of Certain Documents.    At the Closing, Buyer shall have delivered to Seller all documents, agreements and instruments contemplated by Section 3.2. Seller and Buyer acknowledge and agree that this Agreement has been executed and delivered on the date first written above without the Schedules or Exhibit  to this Agreement relating to, among other things, exceptions to the representations and warranties made by Seller in this Agreement, and consents, being agreed to and attached to this Agreement. The parties shall cooperate to finalize the remaining Schedules and Exhibits to this Agreement within 14 calendar days following the date first written above (the "Outside Date"). Notwithstanding anything in this Agreement to the contrary, either party may terminate this Agreement without any further obligation or liability to the other party pursuant to or arising out of this Agreement in the event that the parties are unable to, in good faith, agree upon the form and content of the Schedules and Exhibits on or before the Outside Date. Subject to Buyer's and Seller's rights set forth in this Section 10.3, Seller and Buyer agree to amend this Agreement, if necessary, to include additional references to Schedules in the Agreement.

Article 11.    Post-Closing Covenants.

Section 11.1.    Confidential Information. The Seller shall hold in confidence at all times following the date hereof any and all any data or information concerning any RS Entity (including trade secrets), without regard to form (collectively, the "Confidential Information") including, without limitation: business process models, research, development, marketing, business plans, budgets, financial statements, licenses, suppliers, customers, and referral sources.   Notwithstanding the foregoing, "Confidential Information" shall not include data or information that is publicly known and in the public domain through means that do not involve a breach by the Seller, of any covenant or obligation set forth in this Agreement. The Seller shall not disclose, publish or make use of any Confidential Information at any time following the date hereof without the prior written consent of the Buyer.  Notwithstanding the foregoing, the Seller may disclose Confidential Information to its officers, financial advisors, legal advisors, accountants and consultants for any purpose or undertaking contemplated under this Agreement.

Section 11.2.    Severability.  In the event a judicial or arbitral determination is made that any provision of this Article 11 constitutes an unreasonable or otherwise unenforceable restriction against the Seller, such offending provisions shall be rendered void only to the extent that such judicial or arbitral determination finds such provisions to be unreasonable or otherwise unenforceable with respect to the Seller.  In this regard, any judicial authority construing this Agreement shall be empowered to sever any portion of the Territory, any prohibited business activity or any time period from the coverage of this Article 11 and to apply the provisions of this Article 11 to the remaining portion of the Territory, the remaining business activities and the remaining time period not so severed by such judicial or arbitral authority.  Moreover, notwithstanding the fact that any provision of this Article 11 is determined not to be specifically enforceable, the Buyer shall nevertheless be entitled to recover monetary damages as a result of the breach of such provision by the Seller.  The time period during which the prohibitions set forth in this Article 11 shall apply shall be tolled and suspended for a period equal to the aggregate time during which the Seller violates such prohibitions in any respect.

Execution Version

Section 11.3.    Injunctive Relief.   Any remedy at law for any breach of the provisions contained in this Article 11 shall be inadequate and the Buyer shall be entitled to injunctive relief in addition to any other remedy the Buyer might have hereunder.  The filing of any bond in connection with obtaining such injunctive relief is hereby waived by the Seller.

Section 11.4.    Payment of AP Obligation.   Buyer or the RS Entities (if after Closing) shall pay the sum of $211,000 to Seller in full payment of the AP Obligation.

Article 12.     General.

Section 12.1.    Exhibits, Schedules and Other Instruments.   Each exhibit, schedule and certificate, if any, delivered pursuant to or attached to this Agreement shall be considered a part hereof as if set forth herein in full.

Section 12.2.    Additional Assurances.    The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of either party, the other party shall execute such additional instruments and take such additional acts as are reasonably necessary to effectuate this Agreement.

Section 12.3.    Choice of Law.   THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MISSISSIPPI.

Section 12.4.    Benefit; Assignment.   Subject to the provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party, whether by operation of law or otherwise.

Section 12.5.    Cost of Transaction.   Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto; and (ii) Buyer shall pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

Section 12.6.    Waiver.   The waiver by either party of a breach or violation of any term or provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same provision by any party or of the breach of any other term or provision of this Agreement.  The delay or a failure of a party to transmit any written notice hereunder shall not constitute a waiver by such party of any default hereunder or of any other or further default under this Agreement except as may expressly be provided for by the terms of this Agreement.

Section 12.7.    Notice.   Any notice, demand or communication required, permitted, or desired to be given hereunder shall be in writing and shall be deemed effectively given when personally delivered or two (2) business days following the date such notice is mailed by prepaid certified mail, return receipt requested, or one (1) business day following the date such notice is deposited with a nationally recognized overnight courier service, delivery charge prepaid, and addressed as follows:

If to Seller or RS Entity, to:     c/o Pioneer Health Services
Scott Phillips, Chief Restructuring Officer

Execution Version

|                    |                                                                                                                                         |
| ------------------ | --------------------------------------------------------------------------------------------------------------------------------------- |
|                    | 1033 Demonbreun Street, Suite 300<br>Nashville, TN 37203<br>(215)    854-4086                                                           |
| With a copy to:    | Brian Browder, Esq.<br>Waller Lansden Dortch & Davis, LLP<br>Nashville City Center<br>511 Union Street, Suite 2700<br>Nashville, TN  37219-8966 |
| And:               | Darryl S. Laddin<br>Counsel to the Official Committee<br> of Unsecured Creditors<br>Arnall Golden Gregory LLP<br>171 17th Street, NW, Suite 2100<br>Atlanta, GA 30363 |
| Buyer:             | Rush Health Systems, Inc.<br>1314 19th Avenue<br>Meridian, MS  39301<br>Attention:   Christopher M. Rush,<br>                 Chief Financial Officer |
| with a copy to:    | J. Richard Barry, Esq.<br>Barry Thaggard May & Bailey<br>505 Constitution Avenue<br>Meridian, MS  39301                                 |

or to such other address, and to the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party.

Section 12.8.    Severability.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be in full force and effect, enforceable in accordance with its terms, including, without limitation, those terms which contemplate or require the further agreements of the parties. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid or enforceable.

Section 12.9.    Gender and Number.  Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

Section 12.10.    Divisions and Headings.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

Section 12.11.    Entire Agreement; Amendment. This Agreement supersedes all prior contracts, understandings and agreements, whether written or oral, and constitutes the entire agreement of the parties respecting the within subject matter and no party shall be entitled to benefits other than those

Execution Version

specified herein. No terms, conditions, warranties, or representations, other than those contained herein and no amendments or modifications hereto, shall be binding unless made in writing and signed by the party to be charged.

Section 12.12.   Counterparts. This Agreement may be executed in multiple originals or counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

Section 12.13.   Termination.

(a)      This Agreement may be terminated at any time prior to Closing in the following ways:

(i)      by mutual consent in writing of Seller and Buyer;

(ii)      by Buyer if there has been a material violation or breach by Seller of any of their representations, warranties or covenants contained herein which has not been waived in writing by Buyer;

(iii)      by Seller, if there has been a material violation or breach by Buyer of any of its representations, warranties or covenants contained herein which has not been waived in writing by Seller; or

(iv)      by either party if the Closing shall not have occurred on or before February 28, 2017 and the parties have not agreed in writing to consummate the Closing on some other date and time that is subsequent to February 28, 2017.

(b)      In the event this Agreement is terminated in accordance with this Section 12.13, this Agreement shall be of no further force or effect, except for the following which shall survive the termination of this Agreement:

(i)      any obligation or liability of any party based on or arising from any breach or default by such party with respect to its representations, warranties, covenants or agreements contained herein; and

(ii)      the obligation of each party set forth herein to bear its own expenses pursuant to Section 12.5 hereof.

Section 12.14.   Post-Closing Access to Information.  Buyer and Seller acknowledge that, subsequent to the Closing, Buyer and Seller may each need access to information, documents or computer data in the control or possession of the other, and Seller may need access to the Business for purposes of concluding the transactions contemplated herein and for audits, investigations, compliance with governmental requirements, regulations and requests, and the prosecution or defense of third party claims. Accordingly, Buyer agrees that, at the sole cost and expense of Seller, it will make available to Seller and its agents, independent auditors and/or governmental entities such documents and information as may be available relating to the Business in respect of periods prior to Closing and will permit Seller to make copies of such documents and information.

**[signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**BUYER:**

**RUSH HEALTH SYSTEMS, INC.**

By: _____

    Christopher M. Rush

Its:   Chief Financial Officer

PD.4843-9346-0029.17
PD.20606427.7

SELLER:

**PIONEER HEALTH SERVICES, INC.**

By:    _____

Its:    _____

18

**SIGNING FOR THE SOLE PURPOSE OF
MAKING THE REPRESENTATIONS AND
WARRANTIES IN ARTICLE 4 OF THIS
AGREEMENT**

**RURAL SOLUTIONS LLC**

By: Pioneer Health Services, Inc.
Its: Sole Member

By: _____

Its: _____


**PH ALLIANCE, LLC**

By: Rural Solutions LLC
Its: Sole Member


By: _____

Its:   Authorized Signatory


**RURAL SOLUTIONS OF ARKANSAS, LLC**

By: Rural Solutions LLC
Its: Sole Member


By: _____

Its:   Authorized Signatory


**RURAL SOLUTIONS OF FLORIDA AND
GEORGIA, LLC**

By: Rural Solutions LLC
Its: Sole Member


By: _____

Its:   Authorized Signatory

19

**RURAL SOLUTIONS OF MISSISSIPPI, LLC**

By: Rural Solutions LLC
Its: Sole Member

By:      _____

Its:      Authorized Signatory

**RURAL SOLUTIONS OF TENNESSEE, LLC**

By: Rural Solutions LLC
Its: Sole Member

By:      _____

Its:      Authorized Signatory

**RURAL SOLUTIONS OF TEXAS, LLC**

By: Rural Solutions LLC
Its: Sole Member

By:      _____

Its:      Authorized Signatory

20

PD.4843-9346-0029.17
PD.20606427.7

## SCHEDULE 4

The following representations, warranties and findings shall be embodied in any Approval Order in the same or substantially similar form as follows:

Excluded Liabilities - The Approval Order shall provide that Buyer shall not be liable for any Excluded Liabilities including:

(a)     any liabilities arising out of any breach by the Seller and/or any RS Entity prior to the Closing of any provision of the Contracts;

(b)     any liabilities or claims arising from or relating to the Seller's and/or the RS Entity's provider numbers, if any, including any overbillings made by the Seller or any RS Entity or overpayments of shared savings payments received by Seller or any RS Entity related to any goods or services provided prior to the Closing Date.

PD.4843-9346-0029.17
PD.20606427.7