___

**SO ORDERED,**

*Neil P. Olack*

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: April 4, 2017**

**The Order of the Court is set forth below. The docket reflects the date entered.**
___

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **PIONEER HEALTH SERVICES, INC. ET AL.,** | **CASE NO. 16-01119-NPO** |
| | **JOINTLY ADMINISTERED** |
| **DEBTORS.** | **CHAPTER 11** |

## MEMORANDUM OPINION AND ORDER DENYING IN PART MOTION TO ESTABLISH CERTAIN CLAIMANTS AS CRITICAL VENDORS AND TO APPROVE CRITICAL VENDOR PAYMENTS FOR EMERGENCY ROOM PHYSICIANS

This matter came before the Court for hearing on March 24, 2017 (the "Hearing"), on the Motion to Establish Certain Claimants as Critical Vendors and to Approve Critical Vendor Payments (the "Motion") (Dkt. 1725) filed by Pioneer Health Services, Inc. ("Pioneer Health") and the Objection to Debtors' Motion to Establish Certain Claimants as Critical Vendors and to Approve Critical Vendor Payments (the "Objection") (Dkt. 1780) filed by the Official Committee of the Unsecured Creditors (the "Committee") in the above-referenced bankruptcy case (the "Bankruptcy Case"). At the Hearing, Craig M. Geno represented Pioneer Health; Darryl Laddin represented the Committee; Brian I. Swett represented Capital One National Association; and David N. Usry and Robert E. Dozier represented the Internal Revenue Service.

In the Motion, Pioneer Health asked the Court for permission to pay in full the prepetition, unsecured claims of Grist Oil ("Grist") and three (3) emergency room physicians, Dr. Lamar Brand ("Dr. Brand"), Dr. Vincent Barker ("Dr. Barker"), and Dr. Kevin Hayes ("Dr. Hayes"), in the total amount of $116,259.73, on the ground that the goods and services they provide to its affiliate hospitals are critical to their continued viability. At the beginning of the Hearing, Pioneer Health announced that it had settled the Motion with respect to Grist and its supply of fuel oil. As a result of that settlement, the only issue presented at the Hearing was whether Dr. Brand, Dr. Barker, and Dr. Hayes qualified as "critical vendors." The Court denied the Motion from the bench as it pertained to the doctors. This Order memorializes and supplements that bench ruling. It does not address the settlement reached by Pioneer Health with Grist.

**Jurisdiction**

This Court has jurisdiction over the parties to and the subject matter of the Bankruptcy Case pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O). Notice of the Motion was proper under the circumstances.

**Facts**

1. Pioneer Health is the parent company of several hospitals and other healthcare facilities located throughout the southeastern United States. Pioneer Health filed a voluntary chapter 11 petition for relief (the "Petition") (Dkt. 1) on March 30, 2016. On that same date, certain affiliates of Pioneer Health also filed voluntary chapter 11 petitions for relief, including Pioneer Health Services of Monroe County, Inc. (Case No. 16-01125-NPO, Dkt. 1). Another affiliate of Pioneer Health, Pioneer Health Services of Early County, LLC (Case No. 16-01243-NPO, Dkt. 1), filed for chapter 11 relief on April 8, 2016. The bankruptcy cases of these affiliates have been administratively consolidated into the lead Bankruptcy Case. (Dkt. 44 & 92).

2.      Pioneer Health operates Pioneer Community Hospital of Aberdeen ("Aberdeen Hospital"), located in Monroe County, Aberdeen, Mississippi, through its affiliate Pioneer Health Services of Monroe County, Inc. and Pioneer Community Hospital of Early ("Early Hospital"), located in Early County, Georgia, through its affiliate Pioneer Health Services of Early County, LLC.  (Mot. ¶ 3).  Together, Aberdeen Hospital and Early Hospital are referred to in this Opinion as the "Hospitals."  This is a liquidating chapter 11 Bankruptcy Case, and Pioneer Health is actively marketing substantially all of its assets for sale, including the Hospitals.

3.      Pioneer Health entered into employment agreements with numerous physicians and other professionals to provide medical services and treatment for patients at the Hospitals and at other healthcare facilities.  (Mot. ¶¶ 4, 7).  It is undisputed that at the time the Petition was filed, Pioneer Health owed money to Dr. Brand, Dr. Barker, and Dr. Hayes pursuant to their respective employment agreements.[1]  (*Id*. ¶ 5).  Michael Morgan ("Morgan") of Healthcare Management Partners, LLC, Pioneer Health's chief restructuring officer, testified at the Hearing that Dr. Brand and Dr. Barker work in the emergency department at Early Hospital and Dr. Hayes, at Aberdeen Hospital.[2]  Each of their employment agreements with Pioneer Health is purportedly subject to termination by either party for any reason upon prior written notice.  Based on Morgan's testimony alone, Dr. Brand and Dr. Barker could terminate their employment upon thirty (30) days' prior

---

[1] Copies of their employment agreements were not introduced into evidence.  From the bankruptcy schedules, it appears that the employment agreements were not entered into with the individual physicians but with business entities in which they hold an interest, including:  Brand Professional Services (Case No. 16-01243-NPO, Dkt. 76-1 at 6) on behalf of Dr. Brand; Elite Physicians (Case No. 16-01243-NPO, Dkt. 76-1 at 10) on behalf of Dr. Barker; and Diversified Physicians (Case No. 16-01125-NPO, Dkt. 83-1 at 8) on behalf of Dr. Hayes.  The Committee introduced copies of the bankruptcy schedules into evidence as "Committee Ex. 1" and "Committee Ex. 2."

[2] Morgan testified that Dr. Brand and Dr. Barker also treat patients in a medical clinic operated by Pioneer Health.

written notice, and Dr. Hayes could terminate his employment upon ninety (90) days' prior written notice. In the Motion, Pioneer Health referred to the three (3) physicians as the "Affected Physicians," and the Court continues to refer to them as such in this Opinion.

4. According to Pioneer Health, the prepetition claims of the Affected Physicians are unsecured except that some portion may be entitled to priority under the Bankruptcy Code.[3] (Mot. ¶ 5).

5. Pioneer Health alleged in the Motion that the Affected Physicians have expressed "their concern about continuing employment in the absence of payment of their pre-petition claims prior to the time that priority claims are established." (Mot. ¶ 6). According to its counsel, Pioneer Health filed the Motion because it did not want to play a game of "chicken" with the Affected Physicians.[4] By paying their prepetition claims in full, Pioneer Health hopes to reduce the risk that the Affected Physicians will terminate their employment agreements and leave the Hospitals.

6. In support of elevating the status of the Affected Physicians to critical vendors, Pioneer Health alleged in the Motion that it cannot "obtain replacement physicians with the same

---

[3] Section 507(a)(4) of the Bankruptcy Code gives priority in distribution to claims of employees for prepetition wages, salaries, and commissions earned within one hundred eighty (180) days before the earlier of the date of the filing of the petition or the date the debtor ceased business. 11 U.S.C. § 507(a)(4)(A). For each individual, there is a statutory cap of $12,475.00 for cases commenced during the three (3) year period beginning April 1, 2013, and $12,850.00 for cases commenced on or after April 1, 2016. *Id.* At the Hearing, Pioneer Health argued that the immediate payment of the prepetition claims of the Affected Physicians, up to the statutory cap, would not disrupt the priority scheme, and, thus, only approximately $60,000.00 was actually at issue. It was undisputed at the Hearing, however, that the Affected Physicians are independent contractors, not employees, and, thus, their claims do not appear to fall within 11 U.S.C. § 507(a)(4), although that issue is not before the Court. *See* 4 COLLIER ON BANKRUPTCY ¶ 507.06[3][a] (16th ed. 2016). A further complication is that the priority is available, with one exception, only to individuals. *Id.; see supra* note 1.

[4] In the game of "chicken," two (2) drivers speed towards each other from opposite ends of a long, straight road, and in a contest of nerves, the first driver to swerve is the "chicken," meaning a coward. *See, e.g.*, REBEL WITHOUT A CAUSE (Warner Bros. 1955).

Page 4 of 13

level of competence, skill and, especially, the dedication that the[] Affected Physicians possess," and, moreover, their absence will hinder its ability to market and sell the Hospitals. (Mot. ¶¶ 8-9). At the Hearing, however, Pioneer Health articulated an additional reason for designating the Affected Physicians as critical vendors. In Morgan's opinion, if they leave, Early Hospital would close within one (1) month, and Aberdeen Hospital would struggle financially. In that regard, Morgan testified that Dr. Brand and Dr. Barker together are responsible for admitting ninety-five percent (95%) of the total number of patients admitted to Early Hospital, and that Dr. Hayes is responsible for admitting forty percent (40%) of the total number of patients admitted to Aberdeen Hospital.

7. Pioneer Health proposed to make the following payments to the Affected Physicians:

| Hospital | Physician | Proposed Payment |
|---|---|---|
| Aberdeen Hospital | Dr. Hayes | $42,260.78 |
| Early Hospital | Dr. Brand | $38,726.46 |
| | Dr. Barker | $17,203.29 |

(Mot. ¶ 11). To assist with cash flow, Pioneer Health proposed to make these critical vendor payments in three (3) equal payments over a three (3)-week period. (*Id.*).

8. According to Pioneer Health, the employment agreements may be executory contracts under 11 U.S.C. § 365, but it chose to classify the Affected Physicians as critical vendors rather than to assume the contracts because of the personal nature of the services rendered by the Affected Physicians.[5] (Mot. ¶ 12).

---

[5] *See* 11 U.S.C. § 365(c) (precluding assumption of an executory contract if applicable nonbankruptcy law would excuse the other party from rendering performance to an entity other than the debtor).

9.      The Committee opposed the Motion. In the Objection, the Committee pointed out that the Motion was not filed early in the Bankruptcy Case, as is customary with critical vendor motions, but almost ten (10) months after the date of the Petition. If granted, the Motion could encourage other creditors to demand critical vendor status. (Obj. ¶ 2 & n.2). Indeed, according to Morgan, there are approximately two hundred forty (240) employees at the Hospitals, many of whom have threatened to leave Pioneer Health. The Committee also pointed out that Pioneer Health failed to allege in the Motion that the Affected Physicians, notwithstanding their employment agreements, have actually refused or could realistically refuse to provide services if the critical vendor payments are not made. (*Id.* ¶¶ 4, 8). Finally, the Committee argued that Pioneer Health failed to address how other unsecured creditors will be treated if the proposed payments are made. (*Id.* ¶ 10).

## Discussion

A chapter 11 debtor generally may not make any payments or other distributions on account of prepetition claims except through a confirmed plan of reorganization or court-authorized liquidation. *See* 11 U.S.C. § 1129(b)(1). On occasion, a creditor that provides goods or services that are essential to the continued viability of a business declines to have any further dealings with the debtor unless its prepetition debt is paid in full or in part. *In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005). Under those circumstances, some courts have permitted a chapter 11 debtor to settle and pay the creditors their prepetition, unsecured claims prior to confirmation of a plan. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-77 (Bankr. S.D.N.Y. 1989). Generally, a chapter 11 debtor that seeks authorization to pay a prepetition claim of a vendor that the debtor believes is "necessary" to its continued business operations, the so-

called "critical" vendor does so within the first days of a chapter 11 bankruptcy case. *See, e.g., In re Mirant Corp.*, 296 B.R. 427, 428-29 (Bankr. N.D. Tex. 2003).

Courts have struggled to find authority in the Bankruptcy Code for violating the priority scheme established in 11 U.S.C. § 507[6] to elevate the prepetition claims of critical vendors. Historically, courts that have granted critical vendor motions have based their decisions on 11 U.S.C. § 105[7] and the equitable "doctrine of necessity," also known as the "necessity of payment rule."[8] *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999). These courts have reasoned that departing from the Bankruptcy Code's principal tenets of equality of treatment is necessary for the debtor to reach its goal of reorganization. *Id*.

Pioneer Health's Motion assumes that this Court has the authority to overrule the priority scheme and allow payment of general, unsecured prepetition claims under certain circumstances. As noted by the bankruptcy court in *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002), however, the Fifth Circuit Court of Appeals in *Chiasson v. J. Louis Matherne & Associates (In re Oxford Management, Inc.*), 4 F.3d 1329 (5th Cir. 1993), "has come perilously close to the view . . . that a prepetition unsecured claim cannot be elevated to an administrative expense." *CoServ,*

---

[6] Section 507 fixes the priority order of claims and expenses against the bankruptcy estate and does not carve out a priority status for prepetition, general unsecured claims based on the "critical" status of the creditor. 11 U.S.C. § 507.

[7] Section 105 allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code. 11 U.S.C. § 105(a). Under 11 U.S.C. § 1107, a debtor in possession has the same rights of a trustee, including the right to operate the business as provided by 11 U.S.C. § 1108. Thus, critical vendor payments arguably assist the debtor in implementing 11 U.S.C. § 1108.

[8] The "doctrine of necessity" evolved from the "necessity of payment rule," which was first developed and used in railroad organizations. *See Miltenberger v. Logansport, C.&S.W.R. Co.*, 106 U.S. 286 (1882).

273 B.R. at 495 (citation & quotation omitted).  In support of this proposition, *CoServ* quoted the following language from *Oxford Management*:

> Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code . . . . But, the powers granted by that statute must be exercised in a manner that is consistent with the Bankruptcy Code.
>
> Neither the appellees nor the bankruptcy court cited a specific provision of the Code that would allow payment of post-petition funds to satisfy prepetition claims.  By commanding payment, the bankruptcy court elevated the status of the appellees above that of the other general unsecured creditors . . . . This order effectuated an unpermissible alteration of the Code's provisions.

*Id.* at 495 (quoting *Oxford Mgmt.*, 4 F.3d at 1333-34).  "[P]referring 'critical vendors' . . . has the smell of a[n] . . . inappropriate adjustment of congressionally established priorities . . . ."  *Id.* at 496.

Recognizing that 11 U.S.C. § 105(a) on its face may be invoked only within the confines of the Bankruptcy Code,[9] the bankruptcy court in *CoServ* reasoned that "[t]o get from section 105(a) to the Doctrine of Necessity, the Court must find a bridge that makes application of the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code."  *Id.* at 496-97.  The *CoServ* Court constructed this "bridge" from 11 U.S.C. § 1107(a), which places a fiduciary duty on a debtor in possession to protect and preserve the debtor's estate, including the going-concern value of an operating business.  *CoServ, 273 B.R.* at 497.  "There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim" of a critical vendor.  *Id.* at 497.  Thus, CoServ recognized the necessity of critical vendor payments but only in narrow circumstances.

---

[9] *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) ("the powers granted by [§ 105] may be exercised only in a manner consistent with the provisions of the Bankruptcy Code" and does not "constitute a roving commission to do equity.").

The bankruptcy court in *CoServ* articulated the following test for determining whether a creditor falls within the definition of a critical vendor:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant the debtor risk the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498; *see also In re Mirant*, 296 B.R. at 429 (reaffirming same three (3)-part test). To satisfy the first element of the test, the creditor must be "indispensable to profitable operations or preservation of the estate." *CoServ,* 273 B.R. at 498. The second element requires that a debtor show "that meaningful economic gain to the estate or the going concern value of the business will result or that serious economic harm will be avoided through payment of the prepetition claim, which itself is materially less than the potential loss to the estate or business." *Id*. at 498-99. The third element recognizes that payment of the prepetition claim may not be the only avenue of relief. *Id*. at 499. For example, a vendor's concerns may be met by practical means, such as paying a deposit. *Id*. Additionally, the debtor may have legal remedies. *Id*. In some instances, the automatic stay may afford an alternative relief. *Id*. "[T]he irreplaceable supplier which uses its leverage to extort payment of a pre-petition debt may violate 11 U.S.C. § 362(a)(6)." *CoServ*, 273 B.R. at 499.

After applying the three (3)-part test, the *CoServ* Court granted the debtor's motion with respect to only one of the alleged critical vendors. *Id*. at 500. That vendor provided the debtor, "at cost," the services of an information technology professional formerly employed by the debtor, who was intimately familiar with the debtor's information systems. The vendor testified that it would be unable to continue this arrangement without payment of its prepetition claim. The bankruptcy court allowed payment of the vendor's prepetition claim on the condition that the

vendor continue making the professional available to the debtor under the existing arrangement. *Id*. at 500.

In a widely discussed opinion, *In re Kmart Corp*., 359 F.3d 866 (7th Cir. 2004), the Seventh Circuit Court of Appeals curtailed the commonplace practice in some courts of allowing critical vendor payments with little supporting evidence. Citing the doctrine of necessity and § 105(a), the bankruptcy court designated more than half of Kmart Corporations' vendors as "critical" based solely on the testimony of its chief executive officer. *Id*. at 871. Addressing the legal authority cited by the bankruptcy court, the Seventh Circuit concluded that "Section 105(a) allows a bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Code. This does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override." *Id*. at 871 (citations & quotations omitted). Moreover, the Seventh Circuit rejected the doctrine of necessity as justification for the critical vendor payments, calling it "just a fancy name for a power to depart from the Code." *Id*. The Seventh Circuit, however, suggested that § 363(b)(1) might operate as a possible bridge (using *CoServ*'s analogy) justifying the payment of prepetition claims under limited circumstances. *Id*. at 872. Those circumstances would exist if there was sufficient evidence that: (1) the payments are necessary for a successful reorganization, (2) the disfavored unsecured creditors will be as well off with reorganization as with liquidation, and (3) the critical vendors would cease doing business with the debtor if the payments are not made. *Id*. at 872-74. Because the critical vendor orders at issue did not come close to satisfying this test, the Seventh Circuit declined to decide whether they are ever permissible. *Id*. at 872.

Recently, in *Czyzewski v. Jevic Holding Corp*., No. 15-649, 2017 WL 1066259 (Mar. 22, 2017), the U.S. Supreme Court mentioned *Kmart*. There, the Supreme Court held that bankruptcy

courts may not approve non-consensual structured dismissals that vary the priority scheme established by the Code. *Id.*, at *10. In reaching this conclusion, the Supreme Court distinguished critical vendor orders from structured dismissals on the ground that unlike the former, the latter served no "significant offsetting bankruptcy-related justification." *Id.*, at *12.

> [I]t does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a confirmable plan; it does not help to restore the *status quo ante*; and it does not protect reliance interests.

*Id*. *Jevic* suggests that *CoServ*'s and *Kmart*'s restrictive view of critical vendor payments is the correct approach.

Mindful of the increased scrutiny required by *Oxford Management*, *CoServ,* and *Kmart*, and, apparently, by *Jevic*, the Court finds that the evidence presented at the Hearing by Pioneer Health was insufficient to show that the Affected Physicians fall within any definition of critical vendors to the extent that such payments are authorized. First, Pioneer Health has not shown that it is critical that Pioneer Health deal with the Affected Physicians. *See CoServ*, 273 B.R. at 498. Although Pioneer Health alleged in the Motion that the Affected Physicians are irreplaceable, there was no testimony at the Hearing about their education, skills, training, or licensing that would support such a conclusion. That the Affected Physicians are well-liked in their respective communities does not render them critical, as opposed to important or preferred. Moreover, no evidence was presented at the Hearing as to the efforts, if any, made by Pioneer Health to find replacements for the Affected Physicians.

Second, Pioneer Health has not shown that unless the payments are made, the Affected Physicians will actually leave the Hospitals. *See id.* In the Motion and at the Hearing, Pioneer Health expressed a preference to avoid the risk that the Affected Physicians will leave, but it failed to provide any admissible evidence that they actually intend to leave. The Affected Physicians did

not submit affidavits in support of the Motion, did not testify at the Hearing, and were not physically present in the courtroom. The Court is not persuaded by Pioneer Health's speculations, especially given that the Motion was filed almost one (1) year after the Bankruptcy Case was commenced.

Third, there is a legal alternative by which Pioneer Health can deal with the Affected Physicians other than by full payment of their unsecured claims. *See id.* From Pioneer Health's allegations, it appears that the Affected Physicians may be stay violators. *See* 11 U.S.C. § 362(a)(6).[10] If the Affected Physicians are impermissibly threatening to leave the Hospital in order to force Pioneer Health to pay their prepetition claims, despite being obligated to provide services under their employment agreements, the Court will authorize the Committee to bring actions against them for violations of the automatic stay, assuming Pioneer Health declines to do so. *See* 11 U.S.C. § 362(k) (providing for the recovery of actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages for any willful violation of a stay).

Moreover, the Court questions whether a sound business purpose justifies the critical vendor payments. Pioneer Health proposed to pay the Affected Physicians their prepetition, unsecured claims in full without obtaining from them any commitment to continue providing medical services to patients at the Hospitals. Theoretically, the Affected Physicians could terminate their employment agreements the same day they receive payment of their prepetition claims and then leave the Hospitals only thirty (30) to ninety (90) days later. Unlike traditional critical vendor motions, Pioneer Health failed to negotiate any benefit for the estate.

---

[10] Section 362(a)(6) provides that "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case" is a violation of the automatic stay. 11 U.S.C. § 362(a)(6).

Page 12 of 13

Finally, the Committee expressed concerns as to whether allowing the critical vendor payments would open a floodgate of requests by the Hospitals' other creditors for immediate payment of prepetition claims such as the prepetition wages of two hundred forty (240) employees. The Court shares the Committee's concern, not only for the Bankruptcy Case but also for the precedent of approving "critical vendor" payments that are so far outside the norm.

## Conclusion

The Fifth Circuit, at best, takes a dim view of critical vendor orders. The Supreme Court recently rejected non-consensual structured dismissals as violating priority rules. Here, the Courts finds no "significant offsetting bankruptcy-related justification" for classifying the Affected Physicians as critical vendors. Counsel for Pioneer Health mentioned playing a game of "chicken" with the Affected Physicians, but the Court notes that "Chicken Little" arguments that the sky is falling make bad law. *See, e.g., United States v. Clark*, 96 U.S. 37, 49 (1877) (Harlan J., dissenting) ("[I]t is the duty of all courts of justice to take care . . . that hard cases do not make bad law."). Accordingly, the Court finds that the Motion should be denied with respect to the relief sought as to the Affected Physicians. In reaching this finding, the Court does not address any other issue, such as whether the Affected Physicians have a wage priority claim or have violated the automatic stay.

IT IS, THEREFORE, ORDERED that the Motion with respect to the Affected Physicians is hereby denied.

##END OF OPINION##