## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
**PIONEER HEALTH SERVICES, INC.[1]**          **NO. 16-01119-NPO**
**DEBTOR**                                     **CHAPTER 11**

## MOTION FOR AUTHORITY TO SELL REAL PROPERTY
## OUTSIDE THE ORDINARY COURSE OF BUSINESS, FREE AND
## CLEAR OF LIENS, CLAIMS AND INTERESTS
### [STOKES MOB]

COMES NOW Pioneer Health Services, Inc.[1] (the "Debtor-in-Possession" or "Debtor") and files this its *Motion for Authority to Sell Real Property Outside the Ordinary Course of Business, Free and Clear of Liens, Claims and Interests [Stokes MOB]* (the "Motion"), and in support thereof, would respectfully show as follows, to-wit:

1. One December 19, 2016, the Court entered the *Agreed Order Granting Second Amended Motion to Sell Substantially All of the Assets Owned by Pioneer Health Services of Stokes County, (16-01122-NPO), Free and Clear of Liens, Claims and Interests, with Liens Attaching to Proceeds of Sale, Outside the Ordinary Course of Business* (DK #1501; the "Sale Order") whereby the Court approved the sale of substantially all of the assets of Debtor Pioneer Health Services of Stokes County, Inc. (the "Stokes Debtor") to Lifebrite Hospital Group, LLC ("Lifebrite") pursuant to that certain Asset Purchase Agreement dated as of September 9, 2016 between the Stokes Debtor and Lifebrite **[DK #1501]**.

2. That certain medical office building located at 167 Moore Road, King, North

---

[1] On April 6, 2016, the bankruptcy cases of *Pioneer Health Services of Patrick County, Inc.*, No. 16-01120-NPO; *Pioneer Health Services of Newton County, LLC*, No. 16-01121-NPO; *Pioneer Health Services of Stokes County, Inc.*, No. 16-01122-NPO; *Pioneer Health Services of Choctaw County, LLC*, No. 16-01123-NPO; *Pioneer Health Services of Oneida, LLC*, No. 16-01124-NPO; and *Pioneer Health Services of Monroe County, Inc.*, No. 16-01125-NPO were administratively consolidated into the bankruptcy case of *Pioneer Health Services, Inc.*, No. 16-01119-NPO. Debtor *Pioneer Health Services of Early County, LLC,* No. 16-01243-NPO, filed its Chapter 11 bankruptcy case on April 8, 2016. *Pioneer Health Services of Early County, LLC,* No. 16-01243-NPO was administratively consolidated into the "main" case of *Pioneer Health Services , Inc.*, No. 16-01119-NPO, on April 15, 2016. All of these cases are hereinafter referred to collectively as "the Debtor".

Carolina 27021 (the "Stokes MOB") remained property of the Stokes Debtor pursuant to Section 1.1(b) of the APA.  Debtor agreed to market and sell the Stokes MOB.

3.	There is a business justification for the sale of the Stokes MOB.  Specifically, the Debtor has sold and disposed of, as Paragraph 1 indicates, substantially all of the assets of the Stokes Debtor.  That transaction has long since closed and has been consummated and, as a result, Debtor no longer needs the Stokes MOB to "place" hospital related tenants or providers there.  Moreover, since this is a liquidating Chapter 11, the Debtor does not need to retain ownership of the Stokes MOB as an investment.  The Stokes MOB asset, therefore, is better suited for a sale than any other disposition and certainly more so than any retention of it.

4.	Subsequently, Debtor sought, and obtained, authority of the Court to engage Michael Bennett ("Mr. Bennett") **[DK #1607]** to serve as the Debtor's broker in connection with the marketing of the Stokes MOB.

5.	Mr. Bennett engaged in a vigorous and robust marketing, advertising and due diligence campaign in order to secure the highest and best offer that he could secure for the Stokes MOB.

6.	After many months of those efforts, Mr. Bennett has secured a purchaser who is ready, willing and able to purchase the Stokes MOB.

7.	The Debtor and the prospective purchaser have entered into a purchase and sale agreement (the "Sale Agreement") which was the result and product of extensive negotiations and bargaining over many weeks.  A copy of the proposed Sale Agreement is attached, incorporated by reference and marked as **Exhibit "A"**.

8.	Generally, the basic terms and conditions of the Sale Agreement are:  The Sale Agreement contains a legal description of the real property to be sold which is incorporated here.  The offer is for the cash amount of $825,000.00 (the "Purchase Price") for good title to the real property.

9.      During the negotiations in connection with the Sale Agreement, Capital One National Association ("CONA"), the consensual lien holder in connection with the Stokes MOB, also engaged in that process and, as the Debtor understands it, CONA has also agreed that the Sale Agreement is fair, reasonable and appropriate.

10.     The prospective purchaser under the Sale Agreement is Coastal Medical Properties, LLC (the "Purchaser"). Neither the Purchaser, nor its owners, officers, directors or employees have, prior to the negotiation and execution of the Sale Agreement, had any connection to, or relationship with, the Debtor, its owners, officers, directors or employees.

11.     Accordingly, the contemplated sale of the Stokes MOB is an arms-length transaction with a third party that is unrelated to, and has no connections to, or relationships with, the Debtor as seller. Under the circumstances, then, the Purchaser is a good faith purchaser and should be afforded that status under the Bankruptcy Code.

12.     Based upon the extensive marketing, advertising and due diligence efforts of Mr. Bennett, the responses received from the prospective purchasers and the Purchaser, the Debtor asserts that the Purchase Price is fair, reasonable and appropriate under the circumstances and represents a reasonable value for the Stokes MOB.

13.     The remaining terms and conditions of the Sale Agreement are fair, reasonable, typical and commercially appropriate under the circumstances and they represent reasonable and typical sale agreements for the sale of real estate in and around the King, North Carolina, community and elsewhere. There are no unusual or atypical terms and conditions contained therein.

14.     As noted, CONA is the consensual lien holder in and upon the Stokes MOB and it has agreed to the terms and conditions of the Sale Agreement.

15.     In addition, while Debtor seeks authority to sell the Stokes MOB free and clear of liens, claims and interests, the Debtor further asserts that disbursements should be made according to the Sale Agreement, the Bankruptcy Code and lien priorities in connection with the Stokes MOB.

Under the Sale Agreement, certain costs, expenses and disbursements are to be paid at closing. Debtor will seek, by separate application, authority to pay the commission due to Mr. Bennett. Otherwise, the Debtor will present a sources and uses disclosure and request to the Court at the hearing in order to approve disbursements to occur as part of the closing of the transaction.

16.     Under the circumstances, the Debtor moves the Court for an order granting the Motion and authorizing it to sell the Stokes MOB to the Purchaser for the consideration stated in the Sale Agreement free and clear of liens, claims and interests, with liens, claims and interests attaching to the sale proceeds and authorizing disbursement of the sale proceeds accordingly.

17.     Other grounds to be assigned upon a hearing hereof.

WHEREFORE, premises considered, the Debtor respectfully prays that upon a hearing hereof this Honorable Court will enter its order granting the Motion. Debtor further prays that Scott Phillips or Ronald Winters, as Chief Restructuring Officers of the Debtor, be authorized to execute such deeds, bills of sale or other transfer instruments to close and consummate the transaction. Debtor prays for general relief.

This, the _16th_ day of October, 2017.

Respectfully submitted,

PIONEER HEALTH SERVICES, INC.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____
     Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jarret P. Nichols; MSB No. 99426
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com
jnichols@cmgenolaw.com

N:\Firm Data\Users\Bankrupt\Pioneer Health\Pleadings\Sale - Stokes\M to Sell - Stokes MOB 10-13-17.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, hereby certify that I have caused to be served this date, via electronic filing transmission and/or email transmission, a true and correct copy of the above and foregoing to the following:

Ronald H. McAlpin, Esq.
ronald.mcalpin@usdoj.gov

Christopher J. Steiskal, Esq.
christopher.j.steiskal@usdoj.gov

Sean C. Kulka, Esq.
sean.kulka@agg.com

Brian I. Swett, Esq.
bswett@mcguirewoods.com

J. Trevor Johnston, Esq.
tjohnston@mcguirewoods.com

Darryl S. Laddin, Esq.
dladdin@agg.com

James A. McCullough, II, Esq.
jmccullough@brunini.com

Robert Dozier, Esq.
robert.e.dozier@usdoj.gov

David N. Usry, Esq.
David.Usry@usdoj.gov

William H. Leech, Esq.
bleech@cctb.com

THIS, the _____16th_____ day of October, 2017.

_____
Craig M. Geno

EXECUTION VERSION

## CONTRACT FOR PURCHASE AND SALE OF REAL ESTATE
*(167 Moore Road, King, North Carolina)*

This Contract for Purchase and Sale of Real Estate (this "**Contract**") is made as of the 27th day of September, 2017 (the "**Effective Date**"), by and between **COASTAL MEDICAL PROPERTIES, LLC**, a North Carolina limited liability company ("**Purchaser**"), and **PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation ("**Seller**").

### RECITALS

WHEREAS, Seller is the record title holder of that certain parcel or parcels of land commonly known 167 Moore Road, Stokes County, North Carolina 27021 (Tax Parcel No. 6902-04-51-4252) legally described on attached **Exhibit A** (the "**Land**"), improved with a two-story medical office building containing net rentable area of approximately 40,777 square feet (the "**Building**") and two surface parking lots.

WHEREAS, the Building is currently leased to the tenants (the "**Tenants**") disclosed in the description of leases and the rent roll (the "**Rent Roll**") attached hereto as **Exhibit B**.

WHEREAS, Purchaser desires to purchase and Seller desires to sell the Premises (as defined below) on the terms and conditions set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants herein contained, Ten Dollars ($10.00) paid and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.  **The Premises**.  The "**Premises**" consist of and are defined as the following:

(a)    The Land, the Building and all structures, parking areas and other improvements of every kind and description now or hereafter erected thereon, and all easements, tenements, hereditaments, privileges and appurtenances in any way belonging thereto (the Building and such improvements, structures and parking areas being hereinafter collectively referred to as the "**Improvements**", and the Land, the Improvements and any such appurtenant or beneficial easements, tenements, hereditaments, privileges and appurtenances being hereinafter collectively referred to as the "**Real Property**");

(b)    All of Seller's right, title and interest (whether now or hereinafter existing) in and to any land lying in the bed of any street, road or avenue, open or proposed, at the foot of or adjoining the Land;

(c)    All fixtures, furniture, furnishings, equipment, signs, carpeting, window treatments and other personal property of every kind and description owned by Seller located on or about the Real Property or used exclusively in conjunction therewith, including without limitation, all heating, lighting, plumbing, electrical and air-conditioning fixtures and equipment,



all hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, shelving and partitions, tools, parts, all ventilating, incinerating, disposal, cleaning, maintenance, snow removal and landscaping equipment (collectively, the "**Personalty**"), excluding from the Personalty such equipment, furniture, furnishings and other tangible personal property as are owned by the Tenants, any subtenants or any property manager of the Real Property;

(d)     All of Seller's right, title and interest in and to the following (collectively, the "**Intangible Property**"): (i) any and all licenses, permits, franchises and approvals issued by any federal, state, county or municipal authority relating to the ownership, use, maintenance or operation of the Real Property, running to or in favor of Seller; (ii) any and all plans and specifications, drawings, diagrams, blueprints, site plans, surveys and environmental and soils reports (whether in draft or final form) covering the Real Property; (iii) any and all service marks, logos or any trade names relating to the Premises; and (iv) any and all contract rights, agreements, warranties and guaranties, zoning and development rights and all other intangible property relating to the Premises;

(e)     All of Seller's right, title and interest as landlord in and to the Leases (as hereinafter defined) and all rentals, security deposits and other monetary items, if any, payable by the Tenants, together with (i) all books and records, tenant correspondence and files relating to the Leases, (ii) all amendments, supplements, modifications and consents to the Leases and (iii) all of Seller's right, title and interest in and to any and all guaranties, if any, of a Tenant's obligation under a Lease (collectively, the "**Guaranties**");

(f)     All of Seller's right, title and interest in and to Approved Service Agreements (as hereinafter defined); and

(g)     All of Seller's right, title and interest (whether now or hereafter existing) in and to any award made or to be made as a result or in lieu of condemnation, and in and to any award for damage to the Premises or any part thereof by reason of casualty, to the extent Purchaser is entitled to the same under the provisions of this Contract.

2.     **Purchase Price; Earnest Money**.  Subject to the terms and conditions contained herein, Seller agrees to sell the Premises to Purchaser, and Purchaser agrees to purchase the Premises from Seller, subject only to the matters set forth on **Exhibit C** hereto (the "**Permitted Exceptions**"), for a purchase price of Eight Hundred Twenty-Five Thousand and No/100 Dollars ($825,000.00) (the "**Purchase Price**"), subject to prorations and adjustments as provided herein. The Purchase Price shall be payable as follows:

(a)     No later than two (2) business days after the Effective Date, Purchaser shall deposit initial earnest money in the amount of Twenty Thousand and No/100 Dollars ($20,000.00) (the "**Initial Deposit**") with First American Title Insurance Company, 30 North LaSalle Street, Suite 2700, Chicago, Illinois 60602, Attention: John E. Beckstedt, Jr., as escrow agent (the "**Title Company**" or "**Escrow Agent**").  In the event that Purchaser does not terminate this Contract on or prior to the Due Diligence Date (as hereinafter defined), Purchaser shall, within two (2) business days after such Due Diligence Date, make a second deposit of earnest money in the amount of Twenty Thousand and No/100 Dollars ($20,000.00) (the "**Additional Deposit**") with the Title

-2-

Company so that the total earnest money deposit shall equal Forty Thousand and No/100 Dollars ($40,000.00).  The Initial Deposit and, to the extent made, the Additional Deposit, together with any interest accrued thereon, are collectively referred to herein as the "**Earnest Money**".  The Title Company shall administer the Earnest Money in accordance with Section 13(c) hereof and shall apply the Earnest Money to the Purchase Price at Closing.

(b)     At Closing, Purchaser shall pay the balance of the Purchase Price, plus or minus prorations and adjustments, by wire transfer.

3.     **Title and Survey**.

(a)     Deed.  Upon Closing, Seller shall convey title to the Real Property to Purchaser by delivery of the Deed (as hereinafter defined), conveying title subject only to the Permitted Exceptions.  In addition, if the legal description based on the Survey (as hereinafter defined) shall differ from the legal description originally attached hereto or from the record legal description, Purchaser may request and Seller shall have an obligation to deliver at Closing, a quitclaim deed, in proper recordable form (in addition to the Deed), with the legal description of the quitclaim deed based on and conforming to the Survey (the "**Quitclaim Deed**").

(b)     Evidence of Title.  Seller shall provide Purchaser with its most recent title insurance policy of the Premises, if any, within two (2) business days after the Effective Date.  As evidence of title, Purchaser promptly shall obtain a current commitment (the "**Title Commitment**") for title insurance issued by the Title Company to issue to Purchaser at Closing an ALTA (2006) Owner's Title Insurance Policy in the amount of the Purchase Price, subject only to the Permitted Exceptions (the "**Title Policy**"), together with legible copies of all documents of record and other documents referenced in the Title Commitment (the "**Title Documents**").  The cost to issue the Title Commitment and the Title Policy (including extended coverage over the general exceptions listed therein) and all examination costs shall be borne by Purchaser, and the cost of any endorsements and any lender's policy of title insurance shall be borne by Purchaser.

(c)     Survey.  Seller shall provide Purchaser with its most recent survey of the Premises, if any, within two (2) business days after the Effective Date.  Purchaser shall have the right, but not the obligation, to order a current or updated survey of the Premises (the "**Survey**"), and shall promptly deliver a copy thereof to Seller and the Title Company upon receipt.  The cost of the Survey shall be borne by Purchaser, which obligation shall expressly survive the Closing or the earlier termination of this Contract.

(d)     Objections to Title.  Within ten (10) days after the latest of the receipt of the Title Commitment, Title Documents and Survey, but no later than the Due Diligence Date, Purchaser shall notify Seller in writing (the "**Purchaser's Title Notice**") of any title matters or survey matters reflected in the Title Commitment, Title Documents or the Survey, if any, to which Purchaser objects (the "**Title Defects**").  Any matter disclosed in the Title Commitment, Title Documents or Survey or otherwise of record and not so objected to by Purchaser or subsequently waived by Purchaser shall be deemed Permitted Exceptions.  In addition, in the event of any subsequent updates to the Title Commitment and/or the Survey (with it being agreed that the Purchaser shall have the Title Commitment updated not later than five (5) days but no sooner than ten (10) days before the Closing Date), Purchaser shall have the right to further object to any Title

-3-

Defects which occurred subsequent to and were not revealed by the initial Title Commitment or the initial Survey (a "**New Title Defect**") by delivery of an additional Purchaser's Title Notice to Seller, on or prior to the date that is five (5) days after receipt of written notice of such New Title Defects. Seller shall notify Purchaser of Seller's decision to cure or not to cure any Title Defect or New Title Defect, as the case may be, within five (5) days after receipt of Purchaser's Title Notice. Seller's failure to respond to any one or more Title Defects or New Title Defects set forth in Purchaser's Title Notice shall be deemed a decision by Seller to elect to not cure any such Title Defects or New Title Defects. Within five (5) days of Seller's election (or deemed election) not to cure such Title Defects or New Title Defects, Purchaser may (i) elect to waive such Title Defects or New Title Defects and proceed with Closing, without a reduction of the Purchase Price or (ii) terminate this Contract by written notice given to Seller, in which event the Earnest Money shall be refunded to Purchaser, and thereafter neither party shall have any further claims or obligations hereunder, except such obligations as are herein expressly made to survive such termination. Purchaser's failure to make one of the elections described in the foregoing clauses (i) and (ii) shall be deemed a decision by Purchaser to waive the Title Defects or New Title Defects which Seller elected (or has deemed to elect) not to cure. If Seller has responded to Purchaser's Title Notice by electing to cure certain Title Defect(s) or New Title Defects and Seller thereafter fails to cure such Title Defect(s) by the Closing Date (as hereinafter defined), then such failure of Seller to cure any such Title Defect hereunder shall be an event of default by Seller under this Contract and entitle Purchaser to pursue its rights and remedies under Section 11(b) below, including, without limitation, recovery of Break-Up Costs (as hereinafter defined). At the option of Purchaser, the Closing Date shall be adjourned as necessary to allow for the running of the full time periods permitted under this Section 3(d).

      (e)    Required Cure Items of Seller. Notwithstanding anything to the contrary in Section 3 or elsewhere in this Contract and irrespective of whether Purchaser provides notice to Seller of the following in any Purchaser's Title Notice, Seller shall be obligated to remove or satisfy (or cause the Title Company to affirmatively insure over in a manner acceptable to Purchaser in its sole discretion) at Closing and at Seller's sole cost and expense: (i) any mortgages or deeds to secure debt and other financing documents securing any financing which encumber the Premises; (ii) any and all mechanics or materialmens liens or other monetary liens encumbering or affecting the Premises; (iii) any and all judgment liens encumbering or affecting the Premises; (iv) any and all delinquent real estate taxes and assessments relating to the Premises; and (v) all New Title Defects arising from the voluntary acts or omissions of Seller (collectively, the "**Required Cure Items**"). Seller's failure to cure all such Required Cure Items at or prior to Closing shall be an event of default by Seller under this Contract and entitle Purchaser to pursue its rights and remedies under Section 11(b) below, including, without limitation, recovery of Break-Up Costs.

    4.    **Seller's Representations and Warranties**. All of the representations and warranties of Seller contained in this Contract are made as of the Effective Date, shall be deemed remade on and as of the Closing Date but shall not survive the Closing and shall be deemed to merge upon the delivery and acceptance of the Deed (or any other deeds) for the Premises. Seller represents and warrants to, and agrees with, Purchaser that to the best of Seller's knowledge (except that the following shall not be subject to and shall be made without reference to the foregoing knowledge qualifier: (i) the first three sentences of Section 4(a) below, (ii) Section 4(c)

-4-

below, (iii) the first two sentences of <u>Section 4(d)</u> below, (iv) <u>Section 4(f)</u> below, (v) <u>Section 4(h)</u> below, (vi) <u>Section 4(j)</u> below, (vii) <u>Section 4(l)</u> below and (viii) <u>Section 4(q)</u> below):

(a)     <u>The Leases and the Tenants</u>.  There are no leases, tenancies, licenses, or occupancy agreements affecting the Premises other than the leases set forth and occupancy arrangements described in the Rent Roll and in **Exhibit B** attached hereto (collectively, the "**Leases**").  All information contained in the Rent Roll is accurate and correct in all material respects as of the date thereof.  As part of the Seller's Deliveries (as hereinafter defined), Seller has delivered or made available to Purchaser true, accurate and complete copies of the Leases and there are no other agreements, either written or oral, with any of the Tenants except as noted on **Exhibit B** and in the Rent Roll.  The Leases are in full force and effect and, and except as set forth on **Exhibit K**, no defaults or breaches by Seller or the Tenants under the Leases exists and nothing has occurred and no condition exists which with the passage of time or giving of notice or both might result in a default by Seller or any Tenant under any Lease.  All material provisions of the Leases required to be performed as of the date hereof by the Seller have been performed and satisfied in all material respects.  Except as set forth on **Exhibit K**, there are no unpaid free rent or rent abatement periods, tenant allowances or other out-of-pocket payments required under the Leases to be paid by the landlord thereunder (including the cost of work to be performed by or on behalf of the landlord) to or for the benefit of any Tenant thereunder, which is in the nature of a tenant inducement or concession (collectively, "**Tenant Inducement Costs**").  Except as set forth on **Exhibit K**, no leasing commissions to any broker or leasing agent ("**Leasing Commissions**") are due or will become due on account of any of the Leases or upon extension or renewal of the original term thereof, or upon the leasing of additional space in the Property, whether or not pursuant to an option or other rights contained in such lease.  No Tenant under any Lease has any ownership interest or option or right of first refusal or right of first offer to acquire any ownership interest in the Premises or any part thereof.   The Rent Roll accurately discloses all security and other deposits made by each of the Tenants under the Leases.  Seller has not received any advance payment of rent under the Leases more than thirty (30) days in advance.  The rentals and other charges set forth in each Lease are the actual rentals and other charges being collected under such Lease by Seller.  None of the rents or other amounts now or hereafter payable under the Lease have been assigned, pledged or encumbered except pursuant to assignments that will be released at Closing.

(b)     <u>Legal Compliance</u>.  Seller has received no written notice of any violation of any law, ordinance, order, regulation or requirements with respect to the Premises which has not been cured, including, but not limited to, building, zoning, fire, environmental, safety and health ordinances, statutes, regulations and requirements issued by any governmental or municipal body or agency having jurisdiction over the Premises and no such violation currently exists.  Further, Seller has received no written notice and is not aware of any uncured default or breach under any of the covenants, conditions, restrictions, rights-of-way or easements affecting the Premises or any portion thereof or any Lease which are to be performed or complied with by the owner of the Premises.

(c)     <u>Not a Foreign Person</u>.  Neither Seller nor its principals is a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986.

PFS:007600.0002.1667840.7
93148908_8

(d)     Service Agreements. Except for the agreements disclosed in **Exhibit D**, there are no management, leasing, employment, service or maintenance contracts, licenses, or other agreements executed by Seller and affecting the Premises or the business conducted thereon (collectively, "**Service Agreements**") that will be binding upon Purchaser after the Closing Date. As part of the Seller's Deliveries, Seller has delivered or made available to Purchaser true, accurate and complete copies of the Service Agreements and there are no other agreements, either written or oral, with any of the counterparties under the Service Agreements. Seller has not received nor delivered any written notice asserting a default under any of the Service Agreements, which remains uncured, and Seller has no knowledge of any default by Seller or any counterparty thereto under any Service Agreement.

(e)     Intentionally Deleted.

(f)     Options to Purchase. No person or entity has a contract or option to purchase, right of first refusal or first offer, or similar rights to purchase the Premises (other than Purchaser as contemplated by this Contract).

(g)     Litigation. Except for the Seller's bankruptcy proceeding, Case No. 16-01122-NPO jointly administered with Case No. 16-01119-NPO, pending in the United States Bankruptcy Court for the Southern District of Mississippi, neither the Premises nor Seller is affected by or subject to any pending or, to Seller's knowledge, threatened (i) condemnation suits or similar proceedings, (ii) claims, charges, complaints, petitions or unsatisfied orders by or before any administrative agency or court (including, without limitation, any proceedings with respect to taxes or special assessments to be levied against the Premises), or (iii) litigation, claims, actions, complaints, petitions or unsatisfied orders by or in favor of any party whatsoever.

(h)     Authority. The effectiveness of this Contract is subject to the approval of the United States Bankruptcy Court for the Southern District of Mississippi (the "**Bankruptcy Approval**").

(i)     Intentionally Deleted.

(j)     OFAC. Neither Seller nor any beneficial owner of Seller: (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 133224 66 Fed. Reg. 49079 (September 25, 2001) (the "**Order**") and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable orders (such lists are collectively referred to as the "Lists"); (ii) is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Order; (iii) is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Order; or (iv) is or has engaged in any dealings or transactions, or is otherwise associated, with any Forbidden Entity. A "**Forbidden Entity**" is defined as (A) the governments of Cuba, Iran, North Korea, Myanmar, Syria and Sudan (each, a "**Prohibited Country**") and any of their agencies, including, but not limited to political units and subdivisions (each, a "**Prohibited Government**"); and (B) any company that (1) is a wholly or partially managed or controlled by a Prohibited Government, (2) is established, organized under,

PFS:007600.0002.1667840.7
93148908_8

or whose principal place of business is in any Prohibited Country, or (3) has failed to submit an affidavit following request therefore averring that it does not own or control any property or asset in and has not and does not transact business with any Prohibited Country.  For purposes of this Section 4(j), a "company" is any entity whether publicly traded or privately owned capable of affecting commerce, including, but not limited to a government, government agency, natural person, legal person, sole proprietorship, partnership, firm, corporation, subsidiary, affiliate, franchisor, franchisee, joint venture, trade association, financial institution, utility, public franchise, provider of financial services, trust, or enterprise and any association thereof.

      (k)    <u>Insurer Notices; Warranties</u>.  Seller has received no written notice from any insurer with respect to any defects or inadequacies of all or any part of the Premises or the use or operation thereof nor has Seller received any written notice from any party terminating, canceling, modifying or amending any existing warranties affecting or relating to the Premises.

      (l)    <u>Employees</u>.  Seller has no employees who work at the Premises.  Seller has not entered into any collective bargaining agreement, or similar labor or union agreement relating to the Premises, and to Seller's knowledge, no such collective bargaining agreement or similar labor or union agreement affects or binds any successor owner of the Premises.

      (m)    <u>No Mechanics Liens</u>.  On the Closing Date, Seller will not be indebted to any contractor, laborer, mechanic, materialman, architect or engineer for work, labor or services performed or rendered, or for materials supplied or furnished, in connection with the Premises which any such person could presently claim a lien against the Premises, nor shall the Premises be subject to any such liens.

      (n)    <u>Utilities</u>.  All utilities, including, without limitation, public drinking water, electric, and sanitary and storm sewers are available to the Premises.  The Premises has access to a dedicated public roadway, directly or by valid public or private easements.

      (o)    <u>No Restrictions; Taxes, Fees and Assessments</u>.  The Premises is not subject to any use or occupancy restrictions (except those imposed by applicable zoning laws and regulations), special taxes and assessments or utility "tap-in" fees (except those generally applicable throughout the tax district in which the Premises is located), or charges or restrictions, whether existing of record or arising by operation of law, unrecorded agreement, the passage of time or otherwise (other than the Permitted Exceptions).  The Premises is not taxed under any special use covenant or otherwise subject to roll-back taxes.  There are not any unpaid tap fees, hook-up fees, impact fees or similar charges or assessments for the improvements existing on the Premises.

      (p)    <u>Seller's Deliveries</u>.  All Seller's Deliveries (as hereinafter defined) furnished to Purchaser are true and correct in all material respects, contain no false, misleading, or materially incomplete information and, as applicable, accurately reflect the financial condition of the Premises.

      (q)    <u>Lender Approval</u>.  In the event that the Purchase Price is less than the outstanding payoff amount of any existing financing obtained by Seller and encumbering the Premises, Seller's lender has agreed to release the Premises from the lien of such existing financing

and accompanying deed of trust or mortgage upon, and in accordance with, the Closing of, and which otherwise permits Seller to consummate, the transactions set forth in this Agreement.

5.     **As Is Sale**.  Purchaser acknowledges and agrees that, except for the covenants, representations and warranties of Seller expressly stated in this Contract and in the documents executed and delivered by Seller at or in connection with the Closing, (collectively, the "**Closing Documents**"), the Premises shall be sold and conveyed to (and accepted by Purchaser at Closing) **AS IS**, **WHERE IS**, WITH ALL DEFECTS AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW.  Except for the covenants, representations and warranties of Seller expressly stated in this Contract and in the Closing Documents, Seller makes no representation, warranty or covenant, express, implied or statutory, of any kind whatsoever with respect to the Premises, including, without limitation, any representation, warranty or covenant as to the Title Commitment, survey conditions, use of the Premises, the condition of the Premises, past or present use, development, investment potential, tax ramifications or consequences, compliance with law, present or future zoning, the presence or absence of Hazardous Materials, the availability of utilities, access to public road, habitability, merchantability, fitness or suitability for any purpose (collectively, the "**Condition of the Premises**"), all of which are, except as otherwise expressly provided in this Contract and the Closing Documents, hereby expressly disclaimed by Seller and waived by Purchaser.  Except for the covenants, representations and warranties of Seller expressly stated in this Contract and in the Closing Documents, Purchaser acknowledges that Seller has made no representation, warranty or covenant as to the Condition of the Premises or compliance of the Premises with any federal, state, municipal or local statutes, laws, rules, regulations or ordinances, including, without limitation, those pertaining to construction, building and health codes, land use, zoning, hazardous substances or toxic wastes or substances, pollutants, contaminants, or other environmental matters.  Purchaser further represents and warrants that Purchaser has knowledge and expertise in financial and business matters that enable Purchaser to evaluate the merits and risks of the transaction contemplated by this Contract and that Purchaser is in an equal bargaining position.  The terms and conditions of this Section 5 shall survive Closing or any termination of this Contract and will not merge with any documents delivered at Closing.

6.     **Seller's Covenants and Agreements**.  Seller covenants and agrees with Purchaser that from the Effective Date and until the earlier of the termination of this Contract or the Closing:

(a)     Leases.  Seller shall keep and perform all covenants and agreements required to be kept or performed by Seller as landlord under the Leases.  From and after the Effective Date until the Closing, Seller shall not make, enter into or grant any new lease, tenancy, license or other agreement for the use or occupancy of the Premises or any portion thereof or enter into any amendments (including, without limitation, extensions and renewals) of or terminate or cancel any Lease without Purchaser's prior written consent, which consent by Purchaser may be granted or withheld in Purchaser's sole and absolute discretion.  In the event Purchaser fails to respond to such a request for consent within five (5) business days following Purchaser's receipt of such written request, Purchaser shall be deemed to have denied its consent with respect to such request.  Seller shall promptly provide Purchaser with a copy of any new lease, tenancy, license or other agreement for the use or occupancy of the Premises or any portion thereof or any amendment, extension, renewal or cancellation of the Lease entered into or approved by Seller after the

-8-

Effective Date in accordance with the terms of this Contract.  In the event Closing occurs, Seller shall be responsible for the payment of all Leasing Commissions and Tenant Inducement Costs outstanding as of the Closing Date under (i) all Leases in existence as of the Effective Date, including, without limitation, those set forth on **Exhibit K** attached hereto, and (ii) all new Leases or amendments to existing Leases entered into after Effective Date and up through and including the Closing Date.  To the extent that Seller has not paid any of the Tenant Inducement Costs and/or Leasing Commissions for which it is responsible hereunder as of the Closing Date, then Purchaser shall receive a dollar-for-dollar credit at Closing against the Purchase Price for any such unpaid amounts.

(b)     Service Agreements.  From and after the Effective Date until the Closing, Seller shall not amend or terminate any Service Agreements, or enter into any new Service Agreements that will be binding upon Purchaser after Closing, without in each case first obtaining Purchaser's written consent, which consent by Purchaser may be granted or withheld in Purchaser's sole and absolute discretion.  Any new Service Agreement entered into in accordance with this Section 6(b) shall be terminable upon thirty (30) days' notice without any cost, penalty or fee to Purchaser.  In the event Purchaser fails to respond to such a request for consent within five (5) business days following Purchaser's receipt of such request, Purchaser shall be deemed to have denied its consent with respect to such request.  Seller shall promptly provide Purchaser with a copy of any amendment or termination of any Service Agreement or any new Service Agreement that will be binding upon Purchaser after Closing.  Notwithstanding the foregoing, (1) Seller will terminate at Closing its existing property management and/or leasing agreement, if any, and provide written evidence of the same to Purchaser and (2) Purchaser shall notify Seller on or before the Due Diligence Date of those existing Service Agreements which Purchaser disapproves ("**Disapproved Service Agreements**"), and Seller shall terminate the Disapproved Service Contracts at or prior to Closing at Seller's sole cost and expense to the extent terminable without expense.  All Service Agreements which are not timely disapproved by Purchaser will be deemed approved by Purchaser ("**Approved Service Agreements**").  Upon Closing, (i) Purchaser shall be liable for any obligations under all Approved Service Agreements which first arise from and after the Closing Date, and (ii) Seller shall retain sole liability for (1) any obligations under all Approved Service Agreements which arise prior to  the Closing Date and (2) any obligations under (and, correspondingly, Purchaser shall have no liability whatsoever for any obligations under) all Disapproved Service Agreements and all other Service Agreements that Purchaser does not expressly assume.  The terms of this Section 6(b) shall expressly survive the Closing.

(c)     Additional Encumbrances; No Transfer; No Back-Up Contracts.  From and after the Effective Date, Seller shall not mortgage, hypothecate, pledge, transfer or otherwise dispose all or any portion of the Premises, other than the transfer or disposal of Personalty in the ordinary course of business as long as replaced with Personalty of like quality and functionality.  Without notice to and the prior written consent of Purchaser, which may be granted or withheld in Purchaser's sole and absolute discretion, Seller shall not create or consent to the imposition of any lien, encumbrance, easement, reservation, limitation, covenant, condition or restriction upon the Premises.  From and after the Effective Date, so long as this Contract is in full force and effect, Seller shall not execute any "back-up" contracts for the sale of the Premises or list the property with any broker or otherwise solicit, negotiate or accept any offers to purchase any or all of the Premises.

-9-

(d)      <u>Maintenance of Premises, Payment of Obligations</u>.  Seller shall operate and manage the Premises in a manner consistent with Seller's current practice.  Seller shall maintain the Premises in the same condition as now exists, ordinary wear and tear and damage by casualty excepted.  Seller shall pay (or require the Tenants to pay) all taxes, insurance premiums, debt service, and other obligations pertaining to the Premises as they come due.  Seller shall maintain in full force and effect all insurance policies currently in effect with respect to the Premises, or policies providing similar coverage.  Seller will not make any change in its management of the Premises or in its normal and customary leasing and billing practices, but shall not apply any security deposits against rent delinquencies or other Lease defaults without notice to and the prior written consent of Purchaser.

(e)      <u>Compliance with Laws</u>.  Seller shall comply with all federal, state, municipal and other governmental laws, ordinances, requirements, rules, regulations, notices and orders, and all agreements, covenants, conditions, easements and restrictions relating to the Premises, including, without limitation, any such requirements, rules, regulations, notices or orders issued or imposed after the Effective Date; provided, however, that in no event shall Seller initiate, consent to, approve or otherwise take any action with respect to the zoning of the Premises without Purchaser's prior written consent, which may be granted or withheld in Purchaser's sole and absolute discretion.

(f)      <u>Representations and Warranties</u>.  Seller shall promptly inform Purchaser of any developments which would cause any of its representations or warranties contained in this Contract to be no longer materially accurate.

(g)      <u>Tenant Estoppel Certificates</u>.  Seller shall use good faith, commercially reasonable efforts to obtain and deliver to Purchaser an estoppel certificate (the "**Estoppel Certificates**") for each Tenant with respect to its Lease, substantially in the form in **Exhibit E** or such other form as is required by Purchaser.  Purchaser shall prepare the drafts of the Estoppel Certificates, and Seller shall deliver an Estoppel Certificate to each Tenant for its Lease.  The failure to obtain any Estoppel Certificate shall not be an event of default by Seller hereunder or a condition precedent to Purchaser's obligation to close; provided, however, that if any Estoppel Certificate received (other than as to the Medicomp Lease) discloses a material breach or default that Seller does not cure, then Purchaser may terminate this Contract by written notice given to Seller on or before the Due Diligence Date and the Earnest Money shall be immediately refunded to Purchaser and thereafter neither party shall have any further claims or obligations hereunder, except such obligations as are herein expressly made to survive such termination.

(h)      <u>Intentionally Deleted</u>.

(i)      <u>Intentionally Deleted</u>.

(j)      <u>Transfer of YMCA Parcel</u>.  Pursuant to that certain Quitclaim Deed dated February 26, 2015 and recorded on February 27, 2015 in Book 660, Page 229 of the Office of the Register of Deeds of Stokes County, North Carolina (the "**Recorder's Office**"), Seller was quitclaimed title to that a certain parcel of land adjacent to the Premises, containing approximately 1.0434 acres (Tax Parcel No. 6902-18-41-7827) and legally described on **Exhibit J** attached hereto (the "**YMCA Parcel**").  The YMCA Parcel is also depicted in Plat Book 13, Page 48 as filed in

-10-

the Recorder's Office and is partially improved with a surface parking lot servicing the adjacent landowner, Young Men's Christian Association of Northwest North Carolina, a North Carolina non-profit corporation ("**YMCA**"). Seller currently receives real estate tax bills for the YMCA Parcel and is listed as the owner on such real estate tax bills. As a condition precedent to the Closing, at or prior to the Closing, Seller shall have (i) paid (or cause to be paid) all delinquent and due and payable real estate taxes relating to the YMCA Parcel and (ii) shall have conveyed the YMCA Parcel to the YMCA by appropriate deed (and that YMCA shall have confirmed acceptance of title to the YMCA Parcel). Notwithstanding anything to the contrary in this Agreement, in no event shall the YMCA Parcel be considered part of the Premises under this Contract.

      7.      <u>**Seller Deliveries; Purchaser's Inspections; Conditions Precedent to Closing**</u>.

      (a)      <u>Seller Deliveries</u>. No later five (5) business days after the Effective Date, Seller shall deliver to Purchaser copies of the following materials, to the extent in existence and within Seller's possession (collectively, the "**Seller's Deliveries**"), and, in addition, Seller shall allow Purchaser reasonable access to Seller's other records pertaining to Seller's use and ownership of the Premises:

      (i)      true, accurate and complete copies of the Leases, together with all amendments and letter agreements thereto and together with true, accurate and complete copies of all Guaranties, along with access to all Tenant correspondence and Lease files;

      (ii)      all plans and specifications of the Premises, including, without limitation, floor and site plans and architectural building plans;

      (iii)      certificates of occupancy for the Real Property and other documentation with respect to compliance of the Property with government requirements;

      (iv)      all financial and income and operating statements (and operating expense records if not part of the operating statements) pertaining to the Premises for the past three (3) calendar years and current year to date (or such shorter period of time as Seller has owned the Premises), including, without limitation, reconciliations for common area maintenance/taxes/insurance for the past three (3) calendar years (or such shorter period of time as Seller has owned the Premises) and a statement of current monthly amounts paid by Tenants for common area maintenance/taxes/insurance, plus a year to date balance of amounts paid by each Tenant;

      (v)      all financial and/or operating statements pertaining to the Tenants for the past three (3) calendar years and current year to date (or such shorter period of time as Seller has owned the Premises);

      (vi)      true, accurate and complete copies of all Service Agreements, together with all amendments thereto;

      (vii)      all engineering reports, environmental, soil and groundwater tests, reports, or investigations in relating to the Premises;

PFS:007600.0002.1667840.7
93148908_8

(viii)    all appraisals and prior property condition reports for the Premises;

(ix)    the latest real estate tax bills as well as the real estate tax bills for the prior three (3) calendar years (or such shorter period of time as Seller has owned the Premises), assessment notices, tax protests and challenges, and similar matters pending, or filed or affecting the Premises;

(x)    all agreements, notices, licenses, permits, unexpired warranties, certificates of occupancy, and applications in for the Premises that have been entered, received, given, filed or pending with, to or from any municipal or governmental authority that materially affect or pertain to the Premises;

(xi)    all delinquency reports for the Leases and the Tenants;

(xii)    Seller's current operating and/or capital improvement budget for the Premises, if any;

(xiii)    copies of all insurance certificates for insurance policies specific or limited to Premises and a 3-year loss claim report from the current insurance carrier;

(xiv)    a copy of Seller's most recent title insurance policy and/or title commitment for the Premises and a copy of the most recent survey for the Premises;

(xv)    a schedule and description of pending litigation, if any, affecting the Premises;

(xvi)    current year operating budget and utility bills for the past twelve (12) months and a list of capital improvements for the past three (3) years (or such shorter period of time as Seller has owned the Premises) and a list of any planned capital improvements;

(xvii)    an itemized list of all Personal Property and Intangible Property to be included in the sale of the Premises;

(xviii) a general ledger for the Premises, an aged receivables report, a vendor list, documentation showing the average occupancy for the past three (3) years (or such shorter period of time as Seller has owned the Premises), tenant billing statements for the current month, CAM billing statements for the current month and year-to-date, any rental market surveys, and a list of open base building and tenant improvement construction, architectural or consultant agreements; and

(xix)    any and all other contracts, agreements, documentation or evidence relating to the ownership, zoning, value, construction and development of the which is reasonably required or requested by Purchaser or its lender.

(b)    Purchaser's Inspection(s), Due Diligence Date.    From and after the Effective Date and through the Closing and upon at least twenty-four (24) hours prior notice (which notice may be verbal) to Seller (or such shorter period, with Seller's consent), Purchaser and its agents shall have the right, subject to the rights of the Tenants, to enter upon the Premises

-12-

and conduct such non-invasive investigations as Purchaser desires relating to the physical condition of the Premises, environmental matters, operating expenses, architectural, engineering, zoning, title, survey, tenancy and other matters. If Purchaser, in its sole and absolute discretion, is not satisfied with the Premises, its review of Seller's Deliveries, the Title Commitment, the Title Documents, the Survey or the results of its investigations or any other matters affecting this transaction for any reason or no reason at all, then Purchaser may terminate this Contract by serving notice of such termination on Seller no later than 5:00 P.M. Chicago, Illinois Time on the Due Diligence Date, in which event the Earnest Money shall be refunded to Purchaser, and thereafter neither party shall have any further claims or obligations hereunder, except such obligations as are herein expressly made to survive such termination. The "**Due Diligence Date**" shall mean the date that is thirty (30) days after the Effective Date (i.e., October 27, 2017).

During the period between the Effective Date through the Closing, Purchaser may request that Seller provide notice to one or more Tenants under Leases listed as items 1,4, 6 and 7 on **Exhibit B** to prevent the renewal of such Tenants' Leases or to cause the early termination of such Tenants' Leases (if such early termination is allowed under the express terms of any such Lease), provided that Purchaser deposits with the Escrow Agent additional non-refundable funds (The "**Termination Amount**") in the amount of One Hundred Thousand Dollars ($100,000.00), payable as follows: (1) Seventy-Five Thousand Dollars ($75,000.00) within one (1) business day after the Effective Date and (2) the remaining Twenty-Five Thousand Dollars ($25,000.00) within two (2) business days after the Due Diligence Date (it being understood that if Purchaser terminates this Agreement on or prior to the Due Diligence Date pursuant to the first paragraph of this Section 7(b), then Purchaser shall have no obligation to make, and no liability for, the second installment payment (*i.e.* the $25,000 payment) of the Termination Amount). The Termination Amount shall be applied to the Purchase Price at Closing but shall not be refundable to Purchaser except in the event of a default by Seller hereunder. In such event, Seller shall promptly send such notice of non-renewal or termination notice, as applicable, to each such Tenant specified. Effective as of the Effective Date, Purchaser hereby notifies Seller to send such notice of non-renewal and/or termination to the Tenants for the Leases listed as items 1 (Dana Shoaf and Isabel Clemente), 4 (Lyndhurst Gynecologic Associates), 6 (OrthoCarolina, P.A.) and 7 (Salem Neurological Center, P.A.) on **Exhibit B** attached hereto. Unless otherwise notified by Purchaser, all such notices in the foregoing sentence shall be sent by Seller to such Tenants on the earlier of (i) September 29, 2017 and (ii) upon immediate expiration of the Due Diligence Date.

Notwithstanding the foregoing or anything else to the contrary, Purchaser shall not be permitted to interfere unreasonably with Seller's or the Tenants' operations at the Premises. In the event of any damage to the Premises caused by Purchaser's inspections, Purchaser shall promptly restore the Premises to substantially its condition immediately preceding such inspections and examinations and shall keep the Premises free and clear of any mechanics liens or materialmens liens in connection with such inspections and investigations. Purchaser shall have the right to communicate with or interview any Tenants or any of their respective representatives and Seller shall use commercially reasonable efforts in facilitating all such communications and interviews. Purchaser shall keep all information or data received or discovered in connection with its inspections and due diligence with respect to the Premises strictly confidential, except that Purchaser may disclose the same to prospective mortgage lenders or their agents, joint venture partners, investors or their respective agents, to the consultants, attorneys and other professionals engaged by Purchaser to assist in Purchaser's acquisition of the Premises, or as may be required

PFS:007600.0002.1667840.7
93148908_8

by applicable law or to extent the information is available or widely known in the public domain. Further, nothing herein shall prevent Purchaser or its consultants from contacting governmental authorities in relation to performance customary due diligence inquiries, such as for the completion of zoning reports or building/property violation searches.  Purchaser shall indemnify, protect, defend and hold Seller harmless from and against any obligation, liability, claim (including any claim for damage to property or injury to or death of any persons), lien or encumbrance, loss, damage, cost or expense, including reasonable attorneys' fees, in any way caused by or arising out of the inspections or examinations of the Premises by Purchaser or its agents or contractors; provided, however, that the provided, however, that the preceding indemnification shall not apply or extend to either (i) the mere discovery or legally required disclosure (or the consequences of such mere discovery or disclosure) of a pre-existing environmental or physical condition at the Premises or (ii) the acts or omissions of Seller and its employees, contractors, agents and representatives.  The foregoing indemnification shall survive the Closing or the termination of this Contract for any reason for a period of one (1) year.

(c)      Purchaser's Conditions Precedent to Closing.  Purchaser's obligation to proceed with Closing shall be conditioned upon and subject to the satisfaction or performance of the all of the following:

(i)      Seller shall have conveyed the YMCA Parcel to the YMCA and other satisfied the requirements of Section 6(j) above.

(ii)      All of Seller's representations and warranties shall be true and correct in all material respects as of Closing and Seller shall have performed and complied in all material respects with all covenants, agreements and conditions required by this Contract to be performed or completed by Seller prior to or at the Closing, including, without limitation, the delivery of all documents required under Sections 9(c) and 9(e).

(iii)      The Title Company shall be prepared to issue the Title Policy (or a signed mark-up or pro forma thereof) in the amount of the Purchase Price and insuring the title and interest of Purchaser in and to the Premises and any easements or rights of way appurtenant thereto, effective as of Closing, subject only to the Permitted Exceptions and otherwise in the form and condition required by this Contract.  The Title Policy shall not include any standard, pre-printed conditions, and shall include any Specified Endorsements.

(iv)      On the Closing Date, the Premises shall be in substantially the same condition as on the Effective Date, normal wear and tear excepted.

(v)      On the Closing Date, the Premises shall be leased to the Tenants pursuant to the Leases, the Leases are in full force and effect and there is no uncured default by either the Seller or the Tenants under any of the Leases except for terminations and modifications agreed upon prior to Closing by Seller and Purchaser.

(vi)      Seller shall have sent the notices of non-renewal and/or termination, as applicable, to the tenants specified by Purchaser pursuant to the second paragraph of Section 7(b) hereof within the time period specified thereon, so as to properly effectuate the non-renewal and/or termination, as applicable, of such Leases.

-14-

(vii)     Each of the Tenants under the Leases listed as Items 2 (Hugh Chatham Memorial Hospital, Inc.) and 10 (LifeBrite Hospital Group of Stokes, Inc.) on **Exhibit B** attached hereto shall have surrendered and vacated their respective leased spaces within the Building based on the natural expiration of such Leases (or to the extent such Leases have not so expired, Seller has caused the termination of the Leases).

(viii)     Seller has obtained the written consent from any Tenant of the assignment of its Lease to Purchaser at Closing, to the extent such Tenant consent is expressly required under the terms of its Lease.

(ix)     Seller has received the Bankruptcy Approval prior to the Closing Date.

If the above conditions are not satisfied as of Closing, Purchaser shall have the right, at its option, to waive such condition(s) and proceed to Closing, or to terminate this Contract whereupon the Earnest Money shall be refunded to Purchaser, and thereafter neither party shall have any further obligation hereunder, except such obligations as are expressly made to survive the termination of this Contract, provided however, that in the event the failure to meet any of the above conditions is the result of or otherwise constitutes a default by Seller under this Contract, then Purchaser may also pursue its remedies as set forth in Section 11(b) of this Contract in connection with any such termination of this Contract.  The provisions of this paragraph shall survive the Closing or the termination of this Contract for any reason.

(d)     Seller's Conditions Precedent to Closing.  Seller's obligation to proceed with Closing shall be conditioned upon and subject to the satisfaction or performance of the all of the following:

(i)     Purchaser shall have performed and complied in all material respects with all covenants, agreements and conditions required by this Contract to be performed or completed by Purchaser prior to or at the Closing, including, without limitation, the delivery of all documents required under Sections 9(d) and 9(e).

(ii)     All of Purchaser's representations and warranties shall be true and correct in all material respects as of Closing.

(iii)     Seller has received the Bankruptcy Approval prior to the Closing Date.

If the above conditions are not satisfied as of Closing, Seller shall have the right, at its option, to waive such condition(s) and proceed to Closing, or to terminate this Contract; provided however, that in the event the failure to meet any of the above conditions is the result of or otherwise constitutes a default by Purchaser under this Contract, then Seller may also pursue its remedies as set forth in Section 11(a) of this Contract in connection with any such termination of this Contract.  Following termination of this Contract by Seller as provided herein, neither party shall have any further obligation hereunder, except such obligations as are expressly made to survive the termination of this Contract.  The provisions of this paragraph shall survive the Closing or the termination of this Contract for any reason.

-15-

8.   **Purchaser's Representations and Warranties**.  All of the representations and warranties of Purchaser contained in this Contract are made as of Effective Date, shall be deemed remade on and as of the Closing Date, shall survive the Closing for the Survival Period and shall not be deemed to merge upon the delivery and acceptance of any deed(s) for the Premises. Purchaser represents and warrants to Seller that:

(a)   Authority.  Purchaser is duly organized, validly existing and qualified and empowered to conduct its business, and Purchaser has the requisite company power and authority to enter into and perform the terms of this Contract. The execution and delivery of this Contract and the consummation of the transactions contemplated hereby have been duly authorized by all necessary company action and authority, the signatory to this Contract on behalf of Purchaser is duly authorized to execute this Contract, and no other proceedings on Purchaser's part are necessary in order to permit Purchaser to consummate the transaction contemplated hereby. Neither the execution and delivery of this Contract nor its performance by Purchase will conflict with or result in the breach of any contract, agreement, law, rule, court order, judgment or regulation to which Purchaser is a party or by which Purchaser is bound.  This Contract is valid and enforceable against Purchaser in accordance with its terms and each instrument to be executed by Purchaser pursuant to this Contract or in connection herewith will, when executed and delivered, be valid and enforceable against Purchaser in accordance with its terms.

(b)   Litigation.  Purchaser is not affected by or subject to any pending or, to Purchaser's knowledge, threatened (i) claims, charges, complaints, petitions or unsatisfied orders by or before any administrative agency or court, or (ii) litigation, claims, actions, complaints, petitions or unsatisfied orders by or in favor of any party whatsoever that would prohibit the consummation by Purchaser of the transactions contemplated by this Contract.

(c)   Bankruptcy.  No proceedings involving Purchaser under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law or statute of the federal government or any state government, whether voluntary or involuntary, are currently pending and Purchaser is not currently contemplating initiating or filing any such proceedings.

(d)   OFAC.  Neither Purchaser nor any beneficial owner of Purchaser: (i) is listed on OFAC, the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable orders; (ii) is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iii) is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Order; or (iv) is or has engaged in any dealings or transactions, or is otherwise associated, with any Forbidden Entity.

9.   **Closing**.

(a)   Closing Date.   The consummation of the transaction contemplated hereunder (the "**Closing**") shall occur on November 21, 2017, or such earlier or later date as Seller and Purchaser shall agree upon in writing; provided that if such date would fall on a weekend or holiday, then the Closing shall occur on the next following business day (the "**Closing Date**").

PFS:007600.0002.1667840.7
93148908_8

The Closing shall occur through escrow at the offices of the Title Company at the address set forth in <u>Section 2(a)</u>.  The Closing shall occur through a deed and money escrow as a so-called "New York Style" closing.

        (b)      <u>Closing Costs</u>.

        (i)      Seller shall be responsible for the (i) the costs of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Premises (provided nothing herein waives rights to costs, damages and attorneys' fees if otherwise recoverable by Seller under the <u>Section 12(c)</u> of this Agreement), (ii) any filing or recording fees relating to the cure any Title Defects that Seller has agreed or is required to cure pursuant to <u>Sections 3(d)</u> and <u>3(e)</u>, (iii) all transfer taxes on the Deed (and Quitclaim Deed, if applicable), (iv) one-half of the closing escrow fees of the Escrow Agent, and (v) any and all costs of transferring the YMCA Parcel to the YMCA.

        (ii)      Purchaser shall be responsible for (i) the costs of its legal counsel, advisors and other professionals employed by it in connection with the acquisition of the Premises (provided nothing herein waives rights to costs, damages and attorneys' fees if otherwise recoverable by Seller under the <u>Section 12(c)</u> of this Agreement), (ii) the cost of the Survey, (iii) the cost to issue the Title Commitment (including all examination costs) and the base premium of the Title Policy (including extended coverage over the general exceptions listed therein) and 100% of the cost of any additional endorsements to the Title Policy (other than for any endorsements required to clear any exception set forth in the Title Commitment that Seller is required to or has elected to cure pursuant to this Contract), (iv) the recording fee for the Deed (and Quitclaim Deed, if applicable), (v) all costs and expenses incurred in connection with any financing obtained by Purchaser, including without limitation, loan fees, recording fees for Purchaser's loan documents, the cost of any title insurance policy for Purchaser's lender, the legal fees of Purchaser's lender and the mortgage tax and intangible tax relating to such financing, and (vi) one-half of the closing escrow fees of the Escrow Agent.

        (c)      <u>Seller's Deliveries</u>.  Seller shall deliver sole possession of the Premises to Purchaser at Closing, subject only to the Leases and the Permitted Exceptions.  At the Closing, Seller shall execute and/or deliver to Purchaser all instruments and documents required under this Contract, including without limitation the following, if not previously delivered:

        (i)      a special warranty deed for the Premises substantially in the form attached hereto as **Exhibit F** (the "**Deed**"), subject only to the Permitted Exceptions, duly executed and acknowledged by Seller.  The Deed shall also convey (and include within its legal description) any beneficial easements separately insured by the Title Company in the Title Policy;

        (ii)      if requested by Purchaser, the Quitclaim Deed, duly executed and acknowledged by Seller.

        (iii)      a Bill of Sale for all Personalty substantially in the form attached hereto as **Exhibit G**;

PFS:007600.0002.1667840.7
93148908_8

(iv)     a certificate stating that all representations and warranties made by Seller in this Contract are true and correct in all material respects on the Closing Date, except as may be set forth in such certificate;

(v)     a current copy of the Rent Roll, certified by Seller as being true and correct in all respects;

(vi)     an owner's title affidavit/ALTA Statement and "gap" indemnity sufficient for the Title Company to issue, without extra charge, the Title Policy free of any exceptions for: (a) unfiled mechanics' or materialmen's liens, (b) rights of parties in possession other than those of Tenants under the Leases, and (c) "gap" matters, duly executed and acknowledged by Seller

(vii)     originals of the Leases and Guaranties, together with the Lease files and correspondence with respect thereto;

(viii)     a non-foreign affidavit sufficient in form and substance to relieve Purchaser of any and all withholding obligations under Section 1445 of the Internal Revenue Code (which affidavit shall also be executed by the federal taxpaying entity if Seller is a disregarded entity for tax purposes);

(ix)     a notice to each Tenant under its Lease stating that the Premises have been sold, such Tenant's lease has been assigned to Purchaser (including the security deposit thereunder) and that all future rent should be paid as Purchaser shall direct and new insurance certificates delivered to Purchaser, in a form reasonably acceptable to Purchaser;

(x)     all written cancellation letters, together with a check for all appropriate cancellation fees, for all Disapproved Service Agreements, including, without limitation, termination of any existing property management and leasing agreements.

(xi)     all keys and combinations for the Property, including without limitation keys for maintenance shops, storage rooms and maintenance equipment, with identification of the lock to which each such key relates, to the extent in Seller's possession or control;

(xii)     a consent or authorization authorizing this transaction, to the extent required by the Title Company; and

(xiii)     all other documents, certificates, forms and agreements required by this Contract or applicable law, customarily delivered in the State of North Carolina or reasonably required by the Title Company in order to close the transaction.

(d)     Purchaser's Deliveries.  At the Closing, Purchaser shall deliver to the Title Company (i) the balance of the Purchase Price in good, immediately available funds, (ii) a consent or authorization authorizing this transaction, to the extent required by the Title Company, and (iii) all other documents, certificates, forms and agreements required by this Contract or applicable law, customarily delivered in the State of North Carolina or reasonably required by the Title Company in order to close the transaction.

PFS:007600.0002.1667840.7
93148908_8

(e)     Mutual Deliveries.   At the Closing, Purchaser and Seller shall jointly execute and/or deliver, or cause to be executed and delivered, the following:

(i)     A settlement statement showing the flow of funds necessary to close the transactions contemplated hereby (the "**Settlement Statement**");

(ii)    an Assignment of Intangible Property by Seller to Purchaser relating to the Premises, substantially in the form attached hereto as **Exhibit H**;

(iii)   an Assignment and Assumption of Leases and Approved Service Contracts by Seller to Purchaser substantially in the form attached hereto as **Exhibit I**; and

(iv)    All required transfer tax forms, if any.

10.    **Closing Adjustments**.   Adjustments to the Purchase Price shall be made between Seller and Purchaser and shall be prorated on a per diem basis as 11:59 P.M. (Charlotte, North Carolina time) on the day preceding the Closing Date (the "**Adjustment Date**").   The Closing Date shall be a day of income and expense for Purchaser.   The following items shall be prorated and adjusted between Seller and Purchaser as of the Closing Date, except as otherwise specified:

(a)     Rents.   Rents and other charges collected by Seller as of the Adjustment Date from the Tenants for the month of Closing and succeeding months shall be prorated by credit to Purchaser.   Rents and other charges due from the Tenants which have not been collected as of Closing (collectively, "**Delinquent Rents**") shall not be prorated.   Purchaser shall cause Delinquent Rents to be remitted to Seller if, as and when collected, but in no event shall Purchaser be obligated to expend any funds or institute any legal proceedings of any nature with regard to any Delinquent Rents and provided, further, that any Delinquent Rents and other payments received from the Tenants more than thirty (30) days after the Closing Date shall be the sole property of Purchaser.   Seller expressly understands and agreements that it shall have not right whatsoever from and after the Closing Date to initiate or continue collection actions against any Tenant owing Delinquent Rents.   Rents and other amounts received from a Tenant from and after the Closing Date shall be applied (i) first, in payment of any rents and other amounts for the first full month after the Closing Date, (ii) second, to any rents and other amounts due and payable for periods subsequent to the Closing Date other than the first full month after the Closing Date, (iii) third, to any rents and other amounts due and payable for the month in which the Closing Date occurs, and (iv) finally, to Delinquent Rents for any period prior to the month in which the Closing Date occurs.   Seller shall promptly remit to Purchaser any rents or other sums received from the Tenants after Closing for application by Purchaser in the manner provided above.   Purchaser shall promptly remit to Seller any amounts due Seller on account of Delinquent Rents after application of rents in the manner provided above.

(b)     Security and Other Deposits.   The amount of all security deposits and other Tenant deposits required to be held by Seller shall be credited to Purchaser.   To the extent any security deposits are held in a form other than cash, Seller, at its sole cost and expense, shall cause such non-cash security deposits to be transferred to Purchaser at Closing by appropriate documentation.

-19-

(c)    Certain Payments by the Tenants. Operating expense, common area, real estate tax and other installments and payments made by the Tenants under the Leases (collectively, "**Tenant Operating Payments**") shall be prorated as of the Adjustment Date for the calendar year 2017 based on a year-to-date reconciliation of the actual receipts of Tenant Operating Payments collected by Seller to the underlying incurred operating expenses to which they relate. Seller shall have completed any reconciliation under the Leases of Tenant Operating Payments for the calendar year 2016 prior to the Closing and shall have delivered any credits or refunds due to the Tenants for such calendar year. If, as of Closing Date, Seller has received Tenant Operating Payments for calendar year 2017 in excess of the expenses incurred by Seller which are reimbursable as additional rent prior to the Closing Date, Purchaser shall receive a credit in the amount of such excess at Closing. If, as of the Closing Date, Seller has incurred expenses reimbursable as additional rent for calendar year 2017 in excess of the amount of Tenant Operating Payments actually received from the Tenants, Seller shall receive a credit in the amount of such deficiency at Closing. As soon as practicable after the Closing, Seller and Purchaser shall fully cooperate with one another in good faith re-prorating such Tenant Operating Payments for the calendar year 2017 at the time that such estimates are actually adjusted or reconciled pursuant to the term of the Leases. Any amounts due by Purchaser or Seller, as applicable, from such re-proration shall be paid within twenty (20) days after the same is determined. The parties acknowledge and agree that Purchaser shall be responsible for preparing and forwarding to Tenants and Seller the reconciliation of the Tenant Operating Payments collected for the 2017 calendar year versus the operating, common area, real estate taxes and other expenses actually incurred for the 2017 calendar year.

(d)    Leasing Commissions and Tenant Inducement Costs. Leasing Commissions and Tenant Inducement Costs shall be paid and credited by the parties in accordance with the provisions of Section 6(a) above.

(e)    Approved Service Agreements. Amounts due or prepaid under Approved Service Agreements shall be prorated as of the Adjustment Date.

(f)    Utilities. Charges for utilities serving the Premises (that are not paid directly by Tenants to utility providers under their Leases) shall be determined as of the Adjustment Date, and Seller shall pay the amount of the utility charges to such date to the utility companies involved or to Purchaser in the event Purchaser is responsible for the payment of such utility charges. All utility deposits of Seller shall belong to Seller.

(g)    Taxes. Seller shall pay at or before Closing all real estate and personal property taxes and assessments ("**Property Taxes**") which have accrued, have been billed, and are due and payable or delinquent before the Closing Date, including penalties, interest and delinquencies. To the extent not paid directly by Tenants, real estate and personal property taxes and assessments ("**Property Taxes**") for the calendar year in which Closing occurs shall be apportioned as of the Adjustment Date on the basis of the actual full-year tax bill for such calendar year (or on the basis of 105% of the most recent ascertainable full-year tax bill for the Premises, if the actual bill for such calendar year has not been issued as of the Closing Date). If applicable, the Property Taxes shall be reprorated by the parties within ten (10) business days after the issuance of the actual tax bill and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other based on such recalculation. Seller shall not file any new, or continue any existing,

-20-

tax appeal for the real estate taxes attributable to the calendar year 2017 and all subsequent years, it being expressly agreed to by the parties that Purchaser shall have the sole right to pursue any such tax appeals for such calendar years and to retain all refunds related to such calendar years; provided, however, that Property Tax refunds and credits received after the Closing Date which are attributable to the calendar year in which Closing occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof (subject to the rights, if any, of Tenants under the Leases).

(h)    <u>Miscellaneous Items</u>.  Such other items and operating expenses, including, without limitation, assessments, fees or cost sharing payments required under any declarations or reciprocal easement agreements affecting the Premises, that are customarily prorated upon the sale of similar property in the metropolitan area in which the Premises is located shall be equitably prorated.

(i)    <u>Closing Statement; Reproration</u>.  Prior to the Closing, Seller and Purchaser and/or their respective agents or designees will jointly prepare a closing statement (the "**Closing Statement**") which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for herein, and such net due amount will be added to or subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing, as applicable.  To the extent that any adjustment set forth herein is based upon estimated bills, is not otherwise capable of being definitively determined (based on lack of relevant information or otherwise) and/or was subject to error, the amount of such adjustment will be readjusted by the parties upon final determination of such amount, but in all events by that date which is one (1) year after the Closing Date, except for such longer period of time as is required to reproration of Tenant Operating Payments and Property Taxes under <u>Sections 8(c)</u> and <u>8(g)</u> hereof.

(j)    The provisions of this <u>Section 10</u> shall expressly survive the Closing.

11.    **Defaults; Failure to Close**.

(a)    <u>Default by Purchaser</u>.  If, prior to Closing, Purchaser shall fail to perform any of its obligations hereunder, and such failure is not corrected within five (5) business days after written notice from Seller (provided that no such cure period shall apply to the failure of the Purchaser to deliver the balance of the Purchase Price or all documents required under <u>Sections 9(d)</u> and <u>9(e)</u> on the Closing Date), or if any representations or warranties made by Purchaser hereunder are or become materially untrue, Purchaser shall be in "default" hereunder.  Upon such a default by Purchaser, Seller, as its sole and exclusive remedy, may terminate this Contract by written notice to Purchaser and retain the Earnest Money as liquidated damages as Seller's sole and exclusive remedy, the parties agreeing that Seller's actual damages in such event being difficult if not impossible to ascertain as of the Effective Date, and thereafter neither party shall have any further claims or obligations hereunder, except such obligations as are herein expressly made to survive such termination.  EXCEPT WITH RESPECT TO THE INDEMNIFICATIONS BY PURCHASER HEREIN (INCLUDING THAT SET FORTH IN SECTION 7(b), SELLER WAIVES ANY RIGHT THAT IT MAY HAVE UNDER RELEVANT STATUTORY LAW TO SEEK SPECIFIC PERFORMANCE OR ANY OTHER REMEDY IN LAW OR EQUITY OTHER THAN RECEIPT OF THE EARNEST MONEY.

PFS:007600.0002.1667840.7
93148908_8

(b)      Default by Seller.  If, prior to Closing, Seller shall fail to perform any of its obligations hereunder, and such failure is not corrected within five (5) business days after written notice from Purchaser (provided that no such cure period shall apply to the failure of the Seller to deliver all documents required under Sections 9(c) and 9(e) on the Closing Date) or any representations or warranties made by Seller hereunder are or become materially untrue, then Seller shall be deemed to be in "default" under this Contract. Upon a default by Seller, Purchaser, as its sole and exclusive remedy, may elect to pursue one (but only one) of the following remedies: (i) terminate this Contract by written notice given to Seller, receive a return of the Earnest Money; and receive a reimbursement from Seller of Purchaser's actual out-of-pocket expenses associated with this Contract (including the negotiation thereof) and its due diligence and financing activities, including without limitation, Purchaser's attorney's and other professionals' fees and costs, in an amount not to exceed $25,000.00; (ii) commence an action for specific performance within forty-five (45) days of providing Seller with notice of such default; provided, if specific performance is unavailable, Purchaser may seek any and all remedies available at law or equity; or (iii) proceed to Closing.  Notwithstanding the foregoing, if Seller willfully and intentionally fails or declines to transfer the Premises to Purchaser in violation or breach of this Contract, then Purchaser shall have any and all remedies available at law or equity.

(c)      Costs of Enforcement.  The defaulting party shall pay all reasonable attorneys fees and costs of the non-defaulting party incurred in enforcing this Contract. In the event either party hereto is required to employ an attorney because any litigation arises out of this Contract between the parties hereto, the non-prevailing party shall pay to the prevailing party all reasonable fees and expenses, including attorneys' fees and expenses, incurred in connection with such litigation.

12.    **Casualty and Condemnation**.

(a)      Casualty to Premises.  If any of the improvements on the Premises are destroyed or damaged by fire or other casualty prior to the Closing Date (a "**Casualty**"), Seller shall provide Purchaser with written notice of any Casualty promptly after learning of such Casualty. As used herein, a "**Material Casualty**" shall mean a Casualty where (i) the cost of repairing such damage will exceed $25,000.00 as reasonably determined by Purchaser, (ii) any Tenant is entitled to terminate its Lease and such right is not waived in writing, (ii) such damage is estimated to take longer than sixty (60) days to repair, or (d) such Casualty is not insured or underinsured and Seller has not agreed in writing to give Purchaser a credit at Closing against the Purchase Price in the amount of the uninsured loss (each such event being referred to as a "**Material Casualty**"). In the event of a Material Casualty, then within fifteen (15) days after the date the later of the date (1) Purchaser receives Seller's written notice of an Casualty and (2) the estimated cost of the repair of the damage is determined, Purchaser shall elect:

(i)      to terminate this Contract, in which event the Earnest Money shall be refunded to Purchaser and no party hereto shall have any claim against any other party hereto by virtue of this Contract, except such obligations as are herein expressly made to survive any termination of this Contract, or

(ii)      to close the sale and purchase contemplated hereby, in which event Purchaser shall be entitled to settle the loss with Seller's insurance companies and to receive the

-22-

proceeds of insurance applicable thereto, and receive a credit at Closing in the amount of any deductible, and thereupon Seller shall be relieved of all obligations to repair. To this end, Seller shall execute all necessary proofs of loss, assignments of claim and similar items as reasonably requested by Purchaser.

If Purchaser fails to notify Seller of its election within the applicable fifteen (15) day period, Purchaser shall be deemed to have elected 12(a)(i) above. The Closing Date shall be extended as necessary to permit the running of such 15-day period. If Purchaser elects to close under Section 12(a)(ii) above, then Closing shall be extended until the date that is later of the originally scheduled Closing Date set forth above and the date that is thirty (30) days after the expiration of such 15-day period. If the Casualty is not a Material Casualty, then Closing shall not be extended and Purchaser shall proceed to Closing and, at Purchaser's option, Seller shall either (i) repair such damage at Seller's expense prior to Closing (and for such purpose, Closing may be extended for up to 90 days) or (ii) Purchaser shall receive a credit at Closing equal to the lesser of the amount of the deductible for any applicable insurance policy or the cost of repairing such damage, as reasonably estimated by Seller and Purchaser, and Seller shall execute all necessary proofs of loss, assignments of claim and similar items as reasonably requested by Purchaser.

(b)    Condemnation of Premises. If between the Effective Date and the Closing Date, any material portion of the Premises are taken under power of eminent domain, any condemnation or eminent domain proceedings are filed with respect to any material portion of the Premises (which shall include, without limitation, (i) the condemnation or taking of any portion of the Building, (ii) any condemnation which affects parking or access to the Premises on a permanent basis, or (iii) results in the Premises being in violation of any applicable zoning ordinance) or entitles any Tenant to terminate its Lease and such right is not waived in writing, or Seller receives written notice of an offer to purchase, in anticipation of condemnation if a negotiated price cannot be reached, from any authority with power of eminent domain with respect to any material portion of the Premises (which shall include, without limitation, the items set forth above), Purchaser may, within fifteen (15) days after learning of such proceedings, at its option, elect either to:

(i)    terminate this Contract, in which event the Earnest Money shall be refunded to Purchaser and no party hereto shall have any claim against any other party hereto by virtue of this Contract, except such obligations as are herein expressly made to survive any termination of this Contract, or

(ii)    close the transaction contemplated hereby, in which event Seller shall assign to Purchaser all of Seller's right, title and interest in and to any award made in connection with such condemnation or eminent domain proceedings; provided, that if Seller has received an award on account thereof, Seller shall credit Purchaser at Closing with an amount equal to such award.

If Purchaser fails to notify Seller of its election within said fifteen (15) days, Purchaser shall be deemed to have elected 13(b)(i) above. The Closing Date shall be extended as necessary to permit the running of such 15-day period. If Purchaser elects to close under Section 12(b)(ii) above, then Closing shall be extended until the date that is later of the originally scheduled Closing Date set forth above and the date that is thirty (30) days after the expiration of such 15-day period.

-23-

13.    **Miscellaneous**.

(a)    <u>Notice</u>.  All notices to be given hereunder shall be in writing and shall be deemed properly served if (i) delivered personally, (ii) three (3) days after being sent by registered or certified mail, return receipt requested, with postage prepaid, (iii) deposited with Federal Express or other recognized overnight courier service, or (iv) sent by electronic mail, to the parties at their respective, email addresses and/or street addresses set forth below:

| | |
|---|---|
| <u>If to Seller</u>: | Pioneer Health Services of Stokes County, Inc. |
| | 100 Pioneer Way |
| | Magee, Mississippi 39111 |
| | Attn:  Scott Phillips |
| | Email:  sphillips@hcmpllc.com |
| | |
| with a copy to: | Law Offices of Craig M. Geno |
| | 587 Highland Colony Parkway |
| | Ridgeland, MS  39157 |
| | Attn:  Craig M. Geno, Esq. |
| | Email: cmgeno@cmgenolaw.com |
| | |
| <u>If to Purchaser</u>: | Coastal Medical Properties, LLC |
| | c/o James R. Vannoy & Sons Construction Company, Inc. |
| | P.O. Box 635 |
| | 1608 Highway 221 North |
| | Jefferson, North Carolina 28640 |
| | Attn: Brandon Vannoy |
| | Email:  brandon.vannoy@jrvannoy.com |
| | |
| with a copy to: | Patzik, Frank & Samotny Ltd. |
| | 150 South Wacker Drive, Suite 1500 |
| | Chicago, Illinois 60606 |
| | Attn: Vito M. Pacione, Esq. |
| | Email: vpacione@pfs-law.com |
| | |
| <u>If to Title Company</u>: | First American Title Insurance Company |
| | 30 North LaSalle Street, Suite 2700 |
| | Chicago, Illinois 60602 |
| | Attn: John E. Beckstedt, Jr. |
| | Email:  jbeckstedt@firstam.com |

A notice under this Contract may be given either by a party or by such party's attorney. Seller or Purchaser may designate, by notice given to the others in accordance with the terms of this <u>Section 13(a)</u>, additional or substituted parties to whom notices should be sent hereunder.  All notices delivered after 5:00 p.m. (Chicago, Illinois time) shall be deemed delivered on the next business day.

(b)    <u>Brokers</u>.  Seller and Purchaser each represent and warrant to the other, that they know of no brokers or other persons or entities who have been involved in this transaction,

-24-

except for MXRE ("**Named Broker**"), who shall be compensated by Seller at Closing pursuant to the terms and conditions of a separate written agreement between Seller and Named Broker. Each party agrees that should any claim be made for brokerage commissions or finder's fees by any broker or finder other than Named Broker by, through or on account of any acts of such party or its representatives, such party will indemnify and hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense in connection therewith. The provisions of this paragraph shall survive Closing or the earlier termination of this Contract.

(c)     Escrow Agent.

(i)     Deposit Upon Termination. The Earnest Money shall be deposited in such interest-bearing account as the Purchaser may designate, if any. Any fee or other cost for holding the Earnest Money at interest shall be paid by Purchaser. In the event this Contract shall be terminated after the Due Diligence Date as a result of Purchaser's default, the Earnest Money shall be paid to Seller. In the event Purchaser terminates or defaults on this Contract, at any time, the Termination Amount shall be paid to Seller. In the event this Contract shall be otherwise terminated, the Earnest Money shall be delivered to Purchaser. Escrow Agent shall wait ten (10) days after receipt of notice from either party to allow the other party to object to such notice. In the event of any such objection, but subject to the Escrow Agent's right to deposit the Earnest Money with a clerk of court as set forth in Section 13(c)(ii) below, Escrow Agent shall continue to hold the Earnest Money in accordance with the terms of this Contract. Seller and Escrow Agent hereby irrevocably agree that notwithstanding anything to the contrary herein or elsewhere, if Purchaser timely delivers a termination note pursuant to Section 7(b) of this Contract on or prior to the Due Diligence Date, then the Earnest Money shall be immediately distributed by Escrow Agent to Purchaser without the need for any notice to or from or any consent or instruction from Seller and notwithstanding any instruction or notice to the contrary from Seller.

(ii)     Escrow Agent's Rights and Obligations. Escrow Agent shall be responsible solely for the safekeeping of the Earnest Money. Escrow Agent is authorized to act upon any documents that it reasonably believes to be genuine without incurring any liability with respect thereto. In the event litigation is commenced involving the Earnest Money or this Contract, or the Escrow Agent has received conflicting instructions from the parties (or one party has objected to other party's notice to Escrow Agent), Escrow Agent shall have the right to deposit the Earnest Money with the clerk of the court in which the litigation is pending, or if the Escrow Agent is a party to such litigation, to interplead all interested parties in any court of competent jurisdiction and deposit the Earnest Money with the clerk of such court. Escrow Agent shall not be required to determine any questions of fact or law.

(iii)     Indemnification of Escrow Agent. Except in connection with Escrow Agent's willful misconduct or gross negligence, Escrow Agent shall be indemnified and held harmless jointly and severally by the other parties hereto from and against any and all expenses or loss suffered by Escrow Agent (as Escrow Agent), including reasonable attorneys' fees, in connection with any action, suit or other proceeding involving any claim, which arises out of or relates to this Contract, the services of Escrow Agent hereunder or the monies held by it hereunder.

(iv)     Successor Escrow Agent. Escrow Agent may resign at any time as Escrow Agent hereunder upon giving five (5) days' prior written notice to that effect to both Seller

-25-

and Purchaser.  In such event, the successor Escrow Agent shall be a nationally recognized title insurance company or other person acceptable to both Seller and Purchaser.  Such party that will no longer be serving as Escrow Agent shall deliver, against receipt, to such successor Escrow Agent, the Earnest Money held by such party, to be held by such successor Escrow Agent pursuant to the terms and provisions of this Contract.  If no such successor has been designated on or before such party ceases to be Escrow Agent hereunder, whether by resignation or otherwise, its obligations as Escrow Agent shall continue until such successor is appointed, provided, however, its sole obligation thereafter shall be to safely keep all monies then held by it and to deliver the same to the person, firm or corporation designated as its successor or until directed by a final order or judgment of a court of competent jurisdiction, whereupon Escrow Agent shall make disposition thereof in accordance with such order; provided further, however, that such Escrow Agent, in such event, shall deliver the Earnest Money against receipt, to any bank or trust company or title insurance company operating in Chicago, Illinois selected by such party.  If no successor Escrow Agent is designated and qualified within five (5) days after its resignation is effective, such party that will no longer be serving as Escrow Agent may apply to any court of competent jurisdiction for the appointment of a successor Escrow Agent.

(d)   Choice of Law.  This Contract shall be governed by and interpreted in accordance with the laws of the State of North Carolina.  The captions, section numbers and article numbers appearing in this Contract are inserted only as a matter of convenience and do not define, limit, construe or describe the scope or intent of such paragraphs or articles of this Contract nor in any way affect this Contract.

(e)   Time of the Essence; Business Day.  Time is of the essence of this Contract.  As used herein, "**business day**" shall mean a day other than Saturday, Sunday or any day on which commercial banks in in the State of Illinois are authorized or obligated to close.  In the event any period would begin or expire, or any action is required to be taken by any party hereunder, on a day that is not a business day, such period will be deemed to commence or expire or the action will not be required to be taken, as the case may be, until the next business day.

(f)   Entire Agreement, Amendments, Construction.  This Contract and the Exhibits attached hereto contain the entire agreement between the parties in connection with this transaction, and there are no oral or parol agreements, representations or inducements existing between the parties relating to this transaction which are not expressly set forth herein and covered hereby.  This Contract may not be modified except by a written agreement signed by all of the parties hereto.  This Contract shall not be construed for or against Seller or Purchaser but shall be interpreted in accordance with the general tenor of the language in an effort to reach the intended result.

(g)   Assignment.  Except in connection with an Exchange (as hereinafter defined), Purchaser may assign all or any portion of its rights and obligations under this Contract without Seller's prior consent to an entity that is one hundred percent (100%) owned by Purchaser, James Mark Vannoy and/or William E. Vannoy, and Purchaser shall provide reasonable evidence of such ownership.  Otherwise, Purchaser may not assign its interest in this Contract without Seller's consent.  Except in connection with an Exchange, Seller may not assign its rights under or obligations under this Contract without the written consent of Purchaser, which may be granted or withheld in Purchaser's sole and absolute discretion.

-26-

PFS:007600.0002.1667840.7
93148908_8

(h)      Enforceability.  Wherever possible, each provision of this Contract shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Contract shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Contract or affecting the validity or enforceability of such provision in any other jurisdiction.

(i)      Counterparts.  This Contract may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Signatures transmitted via facsimile and/or electronic mail shall be deemed originals for all purposes.

(j)      Like-Kind Exchange.  Seller and Purchaser agree to cooperate with one other to effectuate a tax deferred like kind exchange (an "**Exchange**") with respect to (a) the sale of the Property by Seller and/or (b) the acquisition of the Property by  Purchaser; provided, however, that (i) neither party shall have liability to the other if such other party is unable to effectuate an Exchange for any reason, other than by reason of a default under this Contract by the other party, (ii) either party's ability to effectuate an Exchange shall not be a condition to its obligation to close under this Contract, and (iii) neither party shall be obligated to incur any costs, expenses or liabilities or be required to take title to any property other than the Real Property with respect to the Exchange of the other party.

*[Remainder of Page Intentionally Left Blank.*
*Signatures Follow]*

PFS:007600.0002.1667840.7
93148908_8

IN WITNESS WHEREOF, the undersigned have executed this Contract as of the date set forth above.

**SELLER:**                                    **PURCHASER:**

**PIONEER HEALTH SERVICES OF**          **COASTAL MEDICAL PROPERTIES,**
**STOKES COUNTY, INC.**, a North         **LLC**, a North Carolina limited liability
Carolina corporation                    company

By: _Scott K. Phillips_                  By: _____
Name: _Scott K. Phillips_                Name: James Mark Vannoy
Title: _CRO_                             Its:    Member

                                        By: _____
                                        Name: William E. Vannoy
                                        Its:    Member

**Acceptance by Title Company of Earnest Money and Escrow Provisions:**

Title Company acknowledges and agrees to perform its duties as set forth in Section 13(c) of this Contract.

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned have executed this Contract as of the date set forth above.

**SELLER:**                                    **PURCHASER:**

**PIONEER HEALTH SERVICES OF**                 **COASTAL MEDICAL PROPERTIES,**
**STOKES COUNTY, INC.,** a North Carolina       **LLC,** a North Carolina limited liability
corporation                                     company

By: _____                   By: _Jame M. Vanny_____
Name: _____                   Name: James Mark Vannoy
Title: _____                  Its:    Member

                                                By: _William E. Vannoy_____
                                                Name:  William E. Vannoy
                                                Its:    Member


**Acceptance by Title Company of Earnest Money and Escrow Provisions:**

Title Company acknowledges and agrees to perform its duties as set forth in Section 13(c) of this Contract.

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: _____
Title: _____

PFS:007600.0002.1667840.7
93148908_8

IN WITNESS WHEREOF, the undersigned have executed this Contract as of the date set forth above.

**SELLER:**

**PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.,** a North Carolina corporation

By: _____
Name: _____
Title: _____

**PURCHASER:**

**COASTAL MEDICAL PROPERTIES, LLC,** a North Carolina limited liability company

By: _____
Name: James Mark Vannoy
Its:    Member

By: _____
Name: William E. Vannoy
Its:    Member

**Acceptance by Title Company of Earnest Money and Escrow Provisions:**

Title Company acknowledges and agrees to perform its duties as set forth in Section 13(c) of this Contract.

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: Adriene T Aylor

## SCHEDULE OF SCHEDULES AND EXHIBITS

Exhibit A - Legal Description of Real Property

Exhibit B – List of Leases and Rent Roll

Exhibit C - Permitted Exceptions

Exhibit D – List of Service Agreements

Exhibit E - Form Tenant Estoppel

Exhibit F – Form of Special Warranty Deed

Exhibit G - Form of Bill of Sale

Exhibit H - Form of Assignment of Intangible Property

Exhibit I - Form of Assignment and Assumption of Leases and Approved Service Agreements

Exhibit J – Legal Description of YMCA Parcel

Exhibit K – Disclosures as to Leases

## EXHIBIT A

**Legal Description of the Real Property**

A-1

PFS:007600.0002.1667840.7
93148908_8

### TRACT 1:

LYING AND BEING in Yadkin Township, Stokes County, North Carolina, and beginning at a nail in the center line of Mt. View Road (State Road No. 1122) at its point of intersection with the northern boundary line of that property described in Deed Book 242 at Page 642 in the Office of the Register of Deeds of Stokes County, North Carolina; and running thence from said beginning nail the following eight (8) courses and distances: South 53° 23' 33" East 30.11 feet to an iron stake in the eastern right of way line of Mt. View Road, South 53° 23' 33" East 81.72 feet to an iron stake, South 45° 09' 19" East 159.53 feet to an iron stake. South 36° 24' 51" East 187.35 feet to an iron stake. South 32° 10' 22" East 619.79 feet to an iron stake, South 41° 54' 28" West 36.99 feet to an iron stake, South 34° 36' 23" East 287.75 feet to an iron stake, and South 19° 54' 01" East 232.47 feet to an iron stake in the southern right of way line of Southern Railroad; thence along a new line North 76° 01' 08" West 885.02 feet to an iron stake located in the center line of Mt. View Road; thence along the center line of Mt. View Road the three (3) following courses and distances: North 29° 50' 54" West 181.35 feet to a nail; along a curve to the right a chord course and distance of North 02° 12' 32" East 884.76 feet to a nail; and North 32° 46' 35" East 97.90 feet to the point and place of beginning, same containing 16.72 acres, more or less, of which 0.71 acre is located within the right of way for Mt. View Road and 3.75 acres, more or less, are located within the right of way of Southern Railroad, same being those premises surveyed and platted by W. Max Brady, Jr., R.L.S. on the 28th day of April, 1994, and being a portion of that property described in Deed Book 242 at Page 642 in the Office of the Register of Deeds of Stokes County, North Carolina.

### TRACT 2:

LYING AND BEING in Yadkin Township, Stokes County, North Carolina, and beginning at a nail in the center line of Mt. View Road (State Road No. 1122), said nail being a comer with Merivale Johnson (see Deed Book 356 at Page 2417 in the Office of the Register of Deeds of Stokes County, North Carolina); and running thence along the center line of Mt. View Road the two (2) following courses and distances: along a curve to the left a chord course and distance of North 19° 39' 05" West 393.95 feet to a nail; and North 29° 50' 54" West 433.39 feet to an iron stake; thence along a new line South 76° 01' 08" East 885.02 feet to an iron stake in the southern right of way line of Southern Railroad; thence along the northern boundary line of that property described in Deed Book 242 at Page 642 in the Office of the Register of Deeds of Stokes County, North Carolina, the seven (7) following courses and distances: South 19° 54' 01" East 92.09 feet to an iron stake; South 30° 03' 35" East 196.87 feet to an iron stake; South 35° 06' 00" East 225.57 feet to an iron stake; South 41° 33' 26" East 316.50 feet to an iron stake; South 61° 53' 25" East 290.21 feet to an iron stake; South 54° 29' 00" East 320.46 feet to an iron stake; and North 60° 11' 51" East 51.02 feet to a point in the center line of the main track located within the right of way of Southern Railroad; thence along the center line of the main track North 42° 48' 22" West 45.49 feet to an iron stake; thence North 11° 20' 00" East 88.68 feet to an iron stake in

-2-

the center line of Old Highway 52 (State Road No. 1236); thence along the center line of Old Highway 52 South 42° 48' 40" East 258.07 feet to an iron stake; thence North 78° 38' 00" West 123.26 feet to an iron stake in the center line of the main track of Southern Railroad; thence along a curve to the right a chord course and distance of South 65° 59' 12" West 175.12 feet to an iron stake; thence South 39° 28' 47" West 110.16 feet to an iron stake; thence North 64° 32' 31" West 275.32 feet to an iron stake in the northern boundary line of Merivale Johnson; thence along the northern boundary line of Merivale Johnson North 64° 32' 31" West 1,186.00 feet to an iron stake in the eastern right of way line of Mt. View Road; thence continuing North 64° 32' 31" West 36.49 feet to the point and place of beginning, same containing 19.37 acres, more or less, of which 0.55 acre, more or less, is located within the right of way of Mt. View Road, and 0.57 acre, more or less, is located within the right of way of Southern Railroad, and being that same property surveyed and platted by W. Max Brady, Jr., R.L.S. on the 28th day of April, 1994, and being a portion of that property described in Deed Book 242 at Page 642 in the Office of the Register of Deeds of Stokes County, North Carolina.

**SAVE AND EXCEPT** that certain tract conveyed to the Young Men's Christian Association of Greater Winston-Salem as recorded in Book 393, Page 1410, Stokes County Registry, being described as follows:

LYING AND BEING in Yadkin Township, Stokes County, North Carolina, and beginning at a nail in the center line of Mt. View Road (State Road No. 1122) at its point of intersection with the northern boundary line of that property described in Deed Book 242 at Page 642 in the Office of the Register of Deeds of Stokes County, North Carolina; and running thence from said beginning nail the following five (5) courses and distances: South 53° 23' 33" East 30.11 feet to an iron stake in the eastern right of way line of Mt. View Road; South 53° 23' 33" East 81.72 feet to an iron stake; South 45° 09' 19" East 159.53 feet to an iron stake; South 36° 24' 51" East 187.35 feet to an iron stake; and South 32° 10' 22" East 464.67 feet to an iron stake; thence crossing Parcel 3A, Map No. 90 (DB 375, Page 1421) the following four (4) new calls: South 57° 49' 38" West 284.62 feet to an iron stake; North 75° 42' 34" West 196.02 feet to an iron stake; South 75° 46' 37" West 234.07 feet to an iron in the eastern right of way of Mt. View Road; and South 75° 46' 37" West 30.50 feet to a nail; thence along the centerline of Mt. View Road, along a curve to the right, having a radius of 824.42 feet, a chord course and distance of North 05° 08' 31" East 812.40 feet; thence continuing with the centerline of Mt. View Road, North 32° 46' 35" East 97.90 feet to the point and place of beginning same containing 9.64 acres, more or less, of which 0.64 acres, more or less, are located within the right of way of Mt View Road (allowing for 60' R/W), and 2.58 acres, more or less, are located within the right of way of Southern Railroad (allowing 200' R/W), same being the premises surveyed and platted by W. Max Brady, Jr., R.L.S. on the 9th day of May, 1996, and being a portion of that property described in Deed Book 375, Page 1421 in the Office of the Register of Deeds of Stokes County, North Carolina.

## LESS AND EXCEPT THE FOLLOWING PROPERTY:

### YMCA Tract  (1.0434 acres)

PFS:007600.0002.1667840.7
93148908_8

Commencing at North Carolina Geodetic Survey monument "Queen" whose NCGS coordinates are N = 921,723.76', E = 1,605,492.55'; thence N 65°06'51" W a distance of 569.46' to a set 5/8" rebar, the point of beginning (POB); thence along a new property line with North Carolina Baptist Hospital   S 66°24'15" W a distance of 371.40' to a set 5/8" rebar and continuing a distance of  30.19' for a total distance of 401.59' to a point in the centerline of Moore Rd., SR 1122; thence with the centerline of Moore Rd. the following two calls: N 29°48'45" W a distance of 79.86' to a point; thence with a curve turning to the right with a radius of 824.42', with a chord bearing of N 27°18'35" W, with a chord length of 84.37' to a point; thence along the property line of YMCA of Winston Salem (Bk 393 Pg 1410)  the following two calls: N 75°46'33" E a distance of 30.56' to a set 5/8" rebar and continuing 234.01' for a total distance of 264.57' to an existing magnail; thence S 75°40'26" E a distance of 196.06' to the point of beginning.

Containing **1.0434 acres** more or less per Boundary Survey dated February 16, 2015, prepared by Cooke Land Survey, Joe L. Cooke, North Carolina Registered Land Surveyor # L-2970 and recorded in the Office of the Register of Deeds of Stokes County, North Carolina on February 25, 2015 in Plat Book 13, Page 48.

**Being the same property described as follows:**

Commencing at North Carolina Geodetic Survey monument "Queen" whose NCGS coordinates are N = 921,723.76', E = 1,605,492.55'; thence S 85°18'38" W a distance of 54.55' to an existing iron stake, the point of beginning (POB); thence N 34°37'02" W a distance of 287.71' to an existing iron stake; thence N 41°52'21" E a distance of 37.00' to an existing iron stake in the centerline of the tracks of Southern Railroad; thence with the center of said tracks N 32°10'11" W a distance of 155.10' to a set 5/8" rebar in the center of said tracks, a common corner with YMCA of Winston Salem (Bk 393 Pg 1410) thence leaving the railroad and running along the common property line of said YMCA:  S 57°49'49" W a distance of 284.58' to a set 5/8" rebar; thence along a new property line S 66°24'15" W a distance of 371.40' to a set 5/8" rebar and continuing a distance of  30.19' for a total distance of 401.59' to a point in the centerline of Moore Rd., SR 1122; thence with the centerline of Moore Rd. the following two calls: S 29°48'45" E a distance of 534.82' to a point; thence with a curve turning to the right with a radius of 1145.92', with a chord bearing of S 19°39'05" E, with a chord length of 393.95' to a point; thence along the common property lines of Susan Stewart (Bk 652 Pg 949) and Sarah Johnson (Bk 652 Pg 952) the following three calls: S 64°32'35" E a distance of 36.49' to an existing iron stake and continuing a distance of 1461.37' for a total distance of 1497.86' to an existing iron stake; thence N 39°29'38" E a distance of 110.05' to a point ; thence with a curve turning to the left with a radius of 480.00' with a chord bearing of N 65°59'12" E, with a chord length of 175.12' to an existing iron stake in the centerline of the tracks of Southern Railroad, thence S 78°38'00" E a distance of 86.18' to a set 5/8" rebar and continuing a distance of 37.08' for a total distance of 123.26' to a point in the centerline of Old U.S. Hwy 52, thence with the center of said Hwy N 42°48'18" W a distance of 258.04' to a point; thence leaving said Hwy. and running  S 11°20'00" W a distance of 24.98' to a set 5/8" rebar and continuing a distance of 63.7' for a total distance of 88.68' to an existing nail in the centerline of the tracks of Southern Railroad; thence with the centerline of said tracks S 42°48'52" E a distance of 45.45' to a set 5/8" rebar in the centerline of said tracks; thence leaving said tracks and running S 60°11'51" W a distance of

51.02' to an existing iron stake; thence running along the common property lines of the Clarence W. Carter Family Limited Partnership (Bk 754 Pg 756) the following seven calls; N 54°28'43" W a distance of 320.43' to an existing iron stake; thence N 61°52'50" W a distance of 290.09' to an existing iron stake; thence N 41°32'20" W a distance of 316.49' to an existing iron stake; thence N 35°06'15" W a distance of 225.64' to an existing iron stake; thence N 30°00'47" W a distance of 196.76' to an existing iron stake; thence N 20°01'17" W a distance of 91.91' to an existing iron stake; thence N 19°51'40" W a distance of 232.69' to the point of beginning.

Containing **25.6144 acres** more or less per ALTA/ACSM Land Title Survey dated April 7, 2014, last revised February 16, 2015, prepared by Cooke Land Survey, Joe L. Cooke, North Carolina Registered Land Surveyor # L-2970.

PFS:007600.0002 1667840 7
93148908_8

## EXHIBIT B

### List of Leases and Rent Roll

1.  Continuing occupancy by Isabel Clemente only under Lease Agreement dated November 15, 2009 by and between Seller (as successor-in-interest to Stokes-Reynolds Memorial Hospital, Inc.), as landlord, and **Dana S. Shoaf** and **Isabel Clemente**, jointly and severally as tenant.

2.  Independent Contractor Service and Lease Agreement dated as of April 1, 2015 by and between Seller, as landlord, and **Hugh Chatham Memorial Hospital, Inc. (d/b/a Hugh Chatham Podiatry)**, as tenant.

3.  Intentionally Deleted.

4.  Agreement dated as of January 4, 2016, with attached Business Associate Addendum, by and between Seller, as landlord, and **Lyndhurst Gynecologic Associates**, as tenant.

5.  Lease Agreement dated January 1, 2016 by and between Seller, as landlord, and **Medicomp, Inc.**, as tenant.

6.  Independent Contractor Service and Lease Agreement dated as of January 23, 2015 by and between Seller, as landlord, and **OrthoCarolina, P.A.**, as tenant.

7.  Independent Contractor Service and Lease Agreement dated as of December 11, 2013 by and between Seller, as landlord, and **Salem Neurological Center, P.A.**, as tenant.

8.  Agreement dated as of May 27, 2015 by and between Seller, as landlord, and **Wake Forest University Baptist Medical Center**, as tenant.

9.  Lease Agreement dated February 25, 2017 by and between Seller, as landlord, and **Wake Forest University Health Sciences**, as tenant.

10. Lease Agreement dated as of January 31, 2017 between Seller, as landlord, and **LifeBrite Hospital Group of Stokes, LLC**, as tenant. (expires October 31, 2017)

*Rent Roll Follows as is Attached.*

PFS:007600.0002.1667840.7
93148908_8

STOKES MOB RENT ROLL

| Tenant | Invoiced | | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chatham Podiatry | 1st of month | Invoiced | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | | | |
| Dr. Stauffer | for previous | Payments | (650.00) | (650.00) | (650.00) | (650.00) | (650.00) | (650.00) | (650.00) | (650.00) | (650.00) | | | |
| | $650.00 | Balance | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Isabel Clemente | 1st of month | Invoiced | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | | | | |
| | Pre-pay | Payments | (150.00) | (150.00) | | | (300.00) | (150.00) | | (150.00) | (150.00) | | | |
| | $150.00 | Balance | 0.00 | 0.00 | 150.00 | 150.00 | 0.00 | 0.00 | 150.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lifebrite | | Invoiced | 213.95 | 5,990.60 | 5,632.45 | 6,418.50 | 6,632.45 | 6,418.50 | 6,632.45 | 6,632.45 | 6,418.50 | 6,632.45 | | |
| | | Payments | | | | | | | | | | | | |
| | | Balance | 213.95 | 6,204.55 | 12,837.00 | 19,255.50 | 25,887.95 | 32,306.45 | 38,938.90 | 45,571.35 | 51,989.85 | 58,622.30 | 58,622.30 | 58,622.30 |
| Lyndhurst GYN | 1st of month | Invoiced | 2,280.00 | 1,900.00 | 3,420.00 | 1,900.00 | 2,660.00 | 2,660.00 | 1,900.00 | 3,040.00 | | | | |
| | for previous | Payments | | (6,460.00) | (1,900.00) | (3,420.00) | (1,900.00) | (2,660.00) | | (4,560.00) | (3,040.00) | | | |
| | Rate/clinic | Balance | 6,460.00 | 1,900.00 | 3,420.00 | 1,900.00 | 2,660.00 | 2,660.00 | 4,560.00 | 3,040.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Medicomp | 1st of month | Invoiced | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | 7,680.00 | | | |
| | Pre-pay | Payments | (7,680.00) | (7,680.00) | | | | | | | | | | |
| | $7,680.00 | Balance | 23,040.00 | 23,040.00 | 30,720.00 | 30,720.00 | 38,400.00 | 46,080.00 | 53,760.00 | 61,440.00 | 69,120.00 | 69,120.00 | 69,120.00 | 69,120.00 |
| OrthoCarolina | 1st of month | Invoiced | 352.63 | 486.84 | 243.42 | | 461.84 | 461.84 | 268.42 | 268.42 | | | | |
| Dr. Pollock | for previous | Payments | | (596.05) | (352.63) | (485.84) | (730.26) | (461.84) | | (730.26) | | | | |
| +2$ additional expenses | Rate/clinic | Balance | 1,435.52 | 1,326.31 | 1,217.10 | 730.26 | 461.84 | 461.84 | 730.26 | 268.42 | 268.42 | 268.42 | 268.42 | 268.42 |
| Salem Neurology Center | 1st of month | Invoiced | 1,087.24 | 979.46 | 1,112.24 | 954.46 | 1,087.24 | 979.46 | 846.68 | 1,112.24 | | | | |
| +$2$ additional expenses | for previous | Payments | | (3,173.94) | (979.46) | (1,112.24) | (954.46) | (954.46) | (979.46) | (1,933.92) | (1,933.92) | | | |
| | Rate/clinic | Balance | 3,178.94 | 979.46 | 1,112.24 | 954.46 | 1,087.24 | 2,066.70 | 1,933.92 | 1,112.24 | 1,112.24 | 1,112.24 | 1,112.24 | 1,112.24 |
| Wake Forest | 1st of month | Invoiced | 3,910.00 | 3,128.00 | 3,128.00 | 3,128.00 | 3,910.00 | 3,128.00 | 2,346.00 | 3,128.00 | 3,128.00 | | | |
| Dermatology | for previous | Payments | | | | (3,128.00) | (3,128.00) | (3,910.00) | (3,128.00) | (2,346.00) | | | | |
| | Rate/clinic | Balance | 9,384.00 | 12,512.00 | 3,128.00 | 3,128.00 | 3,910.00 | 3,128.00 | 2,346.00 | 3,128.00 | 3,128.00 | 3,128.00 | 3,128.00 | 3,128.00 |
| Wake Forest | 1st of month | Invoiced | 616.60 | 616.60 | 616.60 | 616.60 | 616.60 | 616.60 | 616.60 | 616.60 | | | | |
| Pineridge | Pre-pay | Housekeeping | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | 6,299.02 | | | |
| | $6,299.02 | Payments | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | (6,915.62) | 6,915.62 | 6,915.62 | 6,915.62 |
| | | Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,915.62 | 6,915.62 | 6,915.62 | 6,915.62 |

Balance Due:

| | |
|---|---|
| Chatham Podiatry | 0.00 |
| Isabel Clemente | 0.00 |
| Lifebrite | 58,622.30 |
| Lyndhurst GYN | 0.00 |
| Medicomp | 69,120.00 |
| Ortho Carolina | 268.42 |
| Salem Neurology | 1,112.24 |
| Wake Forest: Dermatology | 3,128.00 |
| Wake Forest Pineridge | 6,915.62 |
| **Total** | **139,166.58** |

Pending Payments

## EXHIBIT C

**Permitted Exceptions**

1.    General real estate taxes and assessments which are not yet due and payable.

2.    Rights of Tenants, as tenants only, under the Leases, with no options, rights of first refusal or rights of first offer to purchase the Premises or any portion thereof.

3.    Matters approved by Purchaser pursuant to Section 3(d) of the Contract.

C-1

## EXHIBIT D

### List of Service Agreements

Seller has service agreements with the following vendors:

1. Westpoint Services, LLC (cleaning).
2. Woods Lawn Service.
3. Granite Telecommunications.
4. Windstream.
5. Tyco Security.
6. ThyssenKrupp (elevator service).
7. Johnson Controls.
8. AT&T.

D-1

<u>EXHIBIT E</u>

**Form of Estoppel Certificate**

<u>TENANT ESTOPPEL CERTIFICATE</u>
[insert name of tenant and suite number]

Coastal Medical Properties, LLC, and its
permitted assigns
1608 Highway 221 North
Jefferson, North Carolina 28640

  *Re: Lease for space at 167 Moore Road, King, North Carolina 27021*

Ladies and Gentlemen:

  The undersigned ("<u>Tenant</u>") hereby certifies to Coastal Medical Properties, LLC, a North Carolina limited liability company, and its successors and assigns (collectively, "<u>Purchaser</u>"), and any lender providing financing to the Purchaser, and its successor and assigns (collectively, "<u>Lender</u>"), as of the date of this Tenant Estoppel Certificate (this "<u>Estoppel</u>"):

  1. Tenant is the tenant under that certain [*insert title of lease document*] dated as of _____, 201___ with Pioneer Health Services of Stokes County, Inc. (or its predecessor-in-interest), as landlord ("<u>Landlord</u>"), relating to the building located at 167 Moore Road, King, North Carolina 27021 (the "<u>Property</u>"), together with any amendments thereto as listed in paragraph 2 below (collectively, the "<u>Lease</u>"). The Lease, as modified, amended, supplemented and assigned in Paragraph 1 below, represents the entire agreement between Tenant and Landlord with respect to the leasing of the demised premises described therein and known as Suite _____ (the "<u>Premises</u>"). The Premises contains approximately _____ rentable square feet. Attached as <u>Exhibit A</u> hereto is a true, correct and complete copy of the Lease.

  2. The Lease includes only the modifications, amendments, supplements and assignments listed below and no other documents, and is in full force and effect.

  **[Insert list of any amendments, modifications, parking agreements or storage agreements]**

  3. There are no other agreements, oral or in writing, between Landlord and Tenant with respect to the Premises excepted as identified above.

  4. Tenant is not in default under the Lease nor does any circumstance currently exist that, but for the giving of notice or the passage of time or both, would constitute a default by Tenant under the Lease.

PFS:007600.0002.1667840.7
93148908_8

5.      No default exists under the Lease by Landlord nor does any circumstance currently exist that, but for the giving of notice or the passage of time or both, would constitute a default by Landlord under the Lease.

6.      Tenant has no claim, demand, lien, right of offset, credit, deduction, delay or defense against the Landlord under the Lease or against the payment of rent or other charges under the Lease.

7.      Monthly base rent payable under the Lease ("Base Rent") is currently equal to $_____.    Tenant's pro rata share under the Lease for the payment operating expenses, common area maintenance charges, real estate taxes and insurance costs and other such expenses and charges ("Additional Rent") is _____%.  The Additional Rent currently payable under this Lease is $_____ per month.  Tenant has paid in full all Base Rent, Additional Rent and all other sums or charges presently due and payable under the Lease by Tenant (collectively, "Rent") through _____, 2017.  No Rent had been paid more than thirty (30) days in advance of the due date thereof other than the Prepaid Rent (as defined in the Lease).

8.      Tenant's security deposit in the form of [cash/letter of credit] held by Landlord is $_____.

9.      Tenant has no right or option to purchase any portion of the Property or Premises or the real property upon which the Premises are situated.

10.      The Lease commenced as of _____ and expires as of _____. Tenant has _____ remaining options to renew the current term of the Lease, each for a period of _____ years.

11.      Tenant has accepted possession of the Premises leased under the Lease, and all improvements, alterations and other work to be performed or constructed by Landlord under the Lease have been completed and accepted by Tenant.  All required contributions and allowances by Landlord, if any, to Tenant on account to Tenant's improvements have been received.

12.      Tenant is not entitled to any partial or total abatement of rent, rental concessions or other amounts due under the Lease.

13.      Tenant has not sublet or licensed all or a portion of the Premises to any sublessee or other occupant and has not assigned, transferred or encumbered any of its rights or interests under the Lease.

14.      The address for notices to Tenant is as set forth in the Lease.

15.      There are no actions or proceedings, whether voluntary or involuntary, pending against Tenant under the bankruptcy or insolvency laws of the United States of America or any state thereof.

16.      Tenant has no early termination right under the Lease (other than with respect to a Landlord's default or a casualty or condemnation event) except as set forth in Section _____ of

E-2

the Lease.  Tenant has no option or right to contract or expand the Premises except as set forth in Section _____ of the Lease.  [*if inapplicable, insert N/A*]

17.     The Tenant is not currently in discussions or negotiations with the Landlord with respect to (i) any modification of the Lease, including, without limitation, any reduction in the Rent or extension of the Term, or (ii) any disputes related to the Premises, Property or Lease.

18.     The Lease is guaranteed by: _____.

19.     The person signing this estoppel certificate on behalf of Tenant is a duly authorized representative of Tenant, and upon its execution and delivery, this Estoppel shall be binding upon and enforceable against Tenant and its successors and assigns to the maximum extent permitted under applicable laws.

Tenant acknowledges that Purchaser and Lender will rely on the representations and agreements made by Tenant in this Estoppel Certificate in connection with the acquisition and financing of the property of which the Premises are a part, and Tenant agrees that Purchaser and Lender may so rely on such representations and agreements.

Dated: _____, 2017

**TENANT:**

_____,

a(n) _____ _____

By:_____
Name:_____
Title:_____

**[IF APPLICABLE]**

The undersigned acknowledges and agrees as of the date set forth above that it (a) has guaranteed the obligations of the Tenant under the Lease referred to above pursuant to that certain [*insert title of Guranty agreement*] dated as of _____, 201___ (the "Guaranty"), (b) reaffirms all of its obligations under the Guaranty and acknowledges that the Guaranty executed by the undersigned is in full force and effect.

**GUARANTOR:**

_____,

a _____

By:_____

Name:_____

Title:_____

Date:_____, 2017

PFS:007600.0002.1667840.7
93148908_8

<u>**EXHIBIT F**</u>

**Form of Special Warranty Deed**

# NORTH CAROLINA SPECIAL WARRANTY DEED

Excise Tax $_____

| | |
|---|---|
| Tax Info. _____ | Parcel Identifier Nos. _____ |
| Verified by _____ | County on the _____ day of 20_____, |
| By _____ | |
| Mail after recording to | Patzik, Frank & Samotny Ltd., 150 South Wacker Drive, Suite 1500, Chicago, IL 60606, Attn: Vito M. Pacione |
| This instrument was prepared by _____ | |
| Brief description for the Index | |

THIS DEED made this _____ day of _____, 20 17 _____, by and between

F-1

| GRANTOR | GRANTEE |
|---|---|
| Pioneer Health Services of Stokes County, Inc., a North Carolina corporation<br>100 Pioneer Way<br>Magee, Mississippi 39111 | _____,<br>a _____<br>1608 Highway 221 North<br>Jefferson, North Carolina 28640 |

All or a portion of the property herein conveyed ____ includes or  X  does not include the primary residence of a Grantor.

**Enter in appropriate block for each party:  name, address, and, if appropriate, character of entity, e.g. corporation or partnership.**

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in Stokes County, North Carolina and more particularly described as follows:

See **Exhibit "A"** attached hereto and incorporated herein by reference.

A map showing the above-described property is recorded in _____, _____.

The property hereinabove described was acquired by Grantor by instruments recorded in Book 660 at Page 233 and in Book 660 at Page 229 in the Stokes County Register of Deeds.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor has done nothing to impair such title as Grantor received, and Grantor will warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor, except for the exceptions hereinafter stated.

Title to the property hereinabove described is subject to the following exceptions:

See **Exhibit B** attached hereto and made a part hereof by reference, without any intent to reimpose the same.

**[SIGNATURE APPEARS ON FOLLOWING PAGE]**

PFS:007600.0002 1667840 7<br>93148908_8

IN WITNESS WHEREOF, the Grantor has caused this instrument to be signed by its duly authorized officer, the day and year first above written.

**PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation

_____ (SEAL)

By: _____
Name: _____
Title: _____

_____

SEAL – STAMP

State of North Carolina, _____ County.

I, _____, a Notary Public for said County and State, do hereby certify that _____, the _____ of Pioneer Health Services of Stokes County, Inc., a North Carolina corporation, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of the company.

WITNESS my hand and official seal, this the _____ day of _____, 2017.

_____
Notary Public
Print

Name:_____

My commission expires: ................

F-3

## EXHIBIT G

### Form of Bill of Sale

### BILL OF SALE

*167 Moore Road, King, North Carolina 27021*

 Effective as of _____, 2017, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation ("Seller"), does hereby grant, bargain, sell, convey, assign, transfer and deliver to [_____], a _____ ("Purchaser"), all of Seller's right, title and interests in and to any and all personal property (collectively, the "Personalty") owned by Seller and located on or used in connection with the real property identified on attached **Exhibit A** (the "Real Property"), including without limitation, all fixtures, furniture, furnishings, equipment, signs, carpeting, window treatments and other personal property of every kind and description owned by Seller located on or about the Real Property or used exclusively in conjunction therewith, including without limitation, all heating, lighting, plumbing, electrical and air-conditioning fixtures and equipment, all hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, shelving and partitions, tools, parts, all ventilating, incinerating, disposal, cleaning, maintenance, snow removal and landscaping equipment, excluding, however, any such equipment, furniture, furnishings and other tangible personal property owned by tenants and subtenants leasing space at the Real Property or any property manager of the Real Property.

 Seller agrees to execute and deliver such other documents as may be reasonably necessary to carry out or otherwise confirm the conveyance contemplated by this Bill of Sale upon Purchaser's request.  Except as set forth in this Bill of Sale or in the Contract for Purchase and Sale of Real Estate (as amended and modified, the "Purchase Contract") dated as of June \_\_\_, 2017, between Seller and Purchaser (as successor-in-interest by assignment from Coastal Medical Properties, LLC), this Assignment and Bill of Sale is made on an **"AS-IS", "WHERE-IS"** basis in all respects and Seller makes no representation, covenant or warranty, whether express or implied, of any kind or nature, including without limitation any representation, covenant or warranty (i) of merchantability, (ii) fitness for a particular purpose or (iii) by statute or otherwise, all of which Seller expressly disclaims and Purchaser hereby waives.

 Seller represents and warrants to Purchaser (i) that it is the owner of the Personalty, (ii) that it has the right to convey such Personalty and has not previously conveyed its rights in and to such Personalty, and (iii) that such Personalty is free and clear of all liens, charges and encumbrances.

 This Bill of Sale inures to the benefit of the parties hereto and their respective successors and assigns.

 This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of North Carolina, without regard to its conflicts of laws provisions.

G-1

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above written.

**SELLER:**

**PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.,** a North Carolina corporation

By: _____
Name: Joseph S. McNulty
Title: President

G-2

**EXHIBIT H**

**Form of Assignment of Intangible Property**

**ASSIGNMENT OF INTANGIBLE PROPERTY**

*167 Moore Road, King, North Carolina 27021*

Effective as of _____, 2017, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation ("Assignor"), does hereby grant, bargain, sell, convey, assign, transfer and deliver to [_____], a _____ limited liability company ("Assignee"), and Assignee hereby accepts from Assignor, all of Assignor's right, title and interests in and to the following (collectively, the "Transferred Assets"): (i) all guaranties, warranties, claims and rights, if any, owned or held by Assignor with respect to the real property identified on attached **Exhibit A** (the "Real Property") from any and all contractors and manufacturers of the roof, equipment, fixtures and other improvements located on or used in connection with the Real Property, (ii) any and all licenses, permits, franchises and approvals issued by any federal, state, county or municipal authority relating to the ownership, use, maintenance or operation of the Real Property, running to or in favor of Assignor, (iii) any and all plans and specifications, drawings, diagrams, blueprints, site plans, surveys and environmental and soils reports (whether in draft or final form) covering the Real Property and the improvements located thereon, (iv) any and all service marks, logos or any trade names relating to the Real Property, and (v) any and all contract rights, agreements, other warranties and guaranties, zoning and development rights and all other intangible property relating to the Real Property and the improvements located thereon.

Assignee hereby accepts the foregoing assignment of the Transferred Assets from Assignor.

Assignor agrees to execute and deliver such other documents as may be reasonably necessary to carry out or otherwise confirm the conveyance contemplated by this Assignment of Intangible Property upon Assignee's request.

This Assignment and Assumption of Intangible Property and the respective rights and obligations of the parties hereto shall be governed by and construed in accordance with the internal laws of the State of North Carolina, without regard to its conflicts of laws provisions.

This Assignment of Intangible Property inures to the benefit of the parties hereto and their respective successors and assigns.

This Assignment of Intangible Property may be executed in one or more counterparts, all of which shall constitute the same document.  Counterparts to this Assignment of Intangible Property may be executed and delivered by facsimile or e-mail transmission, and for purposes of

PFS:007600.0002.1667840.7
93148908_8

this Assignment of Intangible Property signatures transmitted by facsimile or e-mail shall be deemed to be original signatures.

*Remainder of Page Intentionally Left Blank.*
*Signature Follows.*

H-2

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment of Intangible Property as of the date first above written.

**ASSIGNOR:**

**PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation

By: _____
Name: Joseph S. McNulty
Title:  President

**ASSIGNEE:**

_____, a _____ limited liability company

By: _____
Name: _____
Title: _____

H-3

PFS:007600.0002.1667840.7
93148908_8

<u>**EXHIBIT I**</u>

**Form of Assignment and Assumption of Leases and Approved Service Agreements**

<u>**ASSIGNMENT AND ASSUMPTION OF LEASES AND SERVICE AGREEMENTS**</u>

*167 Moore Road, King, North Carolina 27021*

Effective as of _____, 2017, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation ("<u>Assignor</u>"), does hereby grant, bargain, sell, convey, assign, transfer and deliver to [_____], a _____ limited liability company ("<u>Assignee</u>"), all of Assignor's right, title and interests in and to (i) the leases and occupancy agreements identified on attached **Exhibit B** (collectively, the "<u>Leases</u>") related to the real property identified on attached **Exhibit A** (the "<u>Real Property</u>"), and (ii) the management, leasing, employment, service or maintenance contracts, licenses and other agreements identified on attached **Exhibit C** (collectively, the "<u>Assumed Service Agreements</u>") related to the Real Property. The foregoing assignment by Assignor shall include (1) any and all amendments, supplements, modifications and consents to the Leases and guaranties thereof, if any, (2) all of Assignor's right, title and interest in and to the security deposits held under the Leases, and (3) any and all amendments, supplements, and modifications to the Assumed Service Agreements.

Assignor agrees to execute and deliver such other documents as may be reasonably necessary to carry out or otherwise confirm the conveyance contemplated by this Assignment and Assumption of Leases and Service Agreements upon Assignee's request. Assignor agrees to indemnify, hold harmless and defend Assignee from and against any and all obligations, liabilities, costs, expenses, losses, damages and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of Assignor's or the landlord's obligations under the Leases or Assignor's obligations under the Assumed Service Agreements that are attributable to the period of time prior to the date of this Assignment and Assumption of Leases and Service Agreements.

Assignee agrees to (i) assume and perform all of the covenants, agreements and obligations of the landlord under the Leases as such shall first arise or accrue on or after the date of this Assignment and Assumption of Leases and Service Agreements, (ii) assume and perform all of the covenants, agreements and obligations of Assignor under the Assumed Service Agreements as such shall first arise or accrue on or after the date of this Assignment and Assumption of Lease and Service Contracts and (iii) indemnify, hold harmless and defend Assignor from and against any and all obligations, liabilities, costs, expenses, losses, damages and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of Assignee's or the landlord's obligations under the Leases or Assignee's obligations under the Assumed Service Agreements that are attributable to the period of time on or after the date of this Assignment and Assumption of Leases and Service Agreements.

This Assignment and Assumption of Leases and Service Agreements and the terms, covenants, provisions and conditions hereof shall be binding upon, and shall inure to the benefit

I-1

of, the respective heirs, successors and assigns of the parties hereto.  This Assignment and Assumption of Leases and Service Agreements and the respective rights and obligations of the parties hereto shall be governed by and construed in accordance with the internal laws of the State of North Carolina, without regard to its conflicts of laws provisions.

This Assignment and Assumption of Leases and Service Agreements may be executed in one or more counterparts, all of which shall constitute the same document.  Counterparts to this Assignment and Assumption of Leases and Service Agreements may be executed and delivered by facsimile or e-mail transmission, and for purposes of this Assignment and Assumption of Leases and Service Agreements signatures transmitted by facsimile or e-mail shall be deemed to be original signatures.

*Remainder of Page Intentionally Left Blank.*
*Signatures Follow.*

PFS:007600.0002.1667840.7
93148908_8

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption of Leases and Approved Service Agreements as of the date first above written.

**ASSIGNOR:**          **PIONEER HEALTH SERVICES OF STOKES COUNTY, INC.**, a North Carolina corporation

By:   _____
Name:   Joseph S. McNulty
Title:   President

**ASSIGNEE:**          _____, a _____ limited liability company

By:   _____
Name:   _____
Title:   _____

J-3

## EXHIBIT J

### Legal Description of YMCA Parcel

### YMCA Tract  (1.0434 acres)

Commencing at North Carolina Geodetic Survey monument "Queen" whose NCGS coordinates are N = 921,723.76', E = 1,605,492.55'; thence N 65°06'51" W a distance of 569.46' to a set 5/8" rebar, the point of beginning (POB); thence along a new property line with North Carolina Baptist Hospital  S 66°24'15" W a distance of 371.40' to a set 5/8" rebar and continuing a distance of  30.19' for a total distance of 401.59' to a point in the centerline of Moore Rd., SR 1122; thence with the centerline of Moore Rd. the following two calls: N 29°48'45" W a distance of 79.86' to a point; thence with a curve turning to the right with a radius of 824.42', with a chord bearing of N 27°18'35" W, with a chord length of 84.37' to a point; thence along the property line of YMCA of Winston Salem (Bk 393 Pg 1410)  the following two calls: N 75°46'33" E a distance of 30.56' to a set 5/8" rebar and continuing 234.01' for a total distance of 264.57' to an existing magnail; thence S 75°40'26" E a distance of 196.06' to the point of beginning.

Containing 1.0434 acres more or less per Boundary Survey dated February 16, 2015, prepared by Cooke Land Survey, Joe L. Cooke, North Carolina Registered Land Surveyor # L-2970 and recorded in the Office of the Register of Deeds of Stokes County, North Carolina on February 25, 2015 in Plat Book 13, Page 48.

## EXHIBIT K

**Disclosures as to Leases**

### Breaches and Defaults

Medicomp, Inc. has failed to pay rent from January 2017 through the current date.

### Leasing Commissions

None.

### Tenant Inducement Costs

None.

K-1