SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: October 2, 2018

The Order of the Court is set forth below. The docket reflects the date entered.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

PIONEER HEALTH                         CASE NO. 16-01119-NPO
SERVICES, INC. ET AL.,                 JOINTLY ADMINISTERED

DEBTORS.                               CHAPTER 11

## MEMORANDUM OPINION AND ORDER
## OVERRULING OBJECTION OF JAMISON TRUST TO
## CONFIRMATION OF PLAN FOR PIONEER HEALTH SERVICES OF MONROE
## COUNTY, INC. WITHOUT PAYMENT OF ITS ADMINISTRATIVE EXPENSES

This matter came before the Court for a hearing on September 6, 2018 (the "Confirmation

Hearing"), on the Joint Liquidating Chapter 11 Plan (the "Plan") (Dkt. 2919),[1] as amended and

modified by the Joint Immaterial Modification to Joint Liquidating Chapter 11 Plan of the Debtors

(the "First Plan Modification") (Dkt. 3273); the Second Joint Immaterial Modification to Joint

Liquidating Chapter 11 Plan of the Debtors (Dkt. 3560); and the Third Joint Immaterial

Modification to Joint Liquidating Chapter 11 Plan of the Debtors (Updated Waterfall) (the "Third

Plan Modification") (Dkt. 3564) filed by Pioneer Health Services, Inc., *et al.* (the "Debtors") and

the Official Committee of Unsecured Creditors of the jointly-administered cases of Pioneer Health

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-referenced lead bankruptcy case (the "Lead Bankruptcy Case") are cited as "(Dkt. ____)"; (2) citations to docket entries in the bankruptcy case of Pioneer Health Services of Monroe, Inc. (the "Monroe Bankruptcy Case") (No. 16-01125-NPO) are cited as "(Monroe Dkt. ____)"; and (3) citations to docket entries in adversary proceeding 18-00026-NPO are cited as "(Adv. Dkt. ____)".

Services, Inc., *et al.* (the "Committee" or, together with the Debtors, the "Plan Proponents"); the Corrected Objection of Jamison Trust to Confirmation of Plan for Pioneer Health Services of Monroe County, Inc. Without Payment of its Administrative Expenses (the "Jamison Trust Plan Objection") (Dkt. 3290) filed by the John W. Jamison, III Irrevocable Trust dated April 1, 1999 (the "Jamison Trust"); and the Supplemental Joint Reply of the Committee, the Debtors, and Capital One, N.A. to the Objection of Jamison Trust to Confirmation of Plan for Pioneer Health Services of Monroe County, Inc. Without Payment of its Administrative Expenses (the "Joint Reply") (Dkt. 3587) filed by the Plan Proponents and Capital One, N.A. ("CONA") in the Lead Bankruptcy Case. At the Confirmation Hearing, Craig M. Geno ("Geno") represented the Debtors, Darryl Scott Laddin and James A. McCullough, II represented the Committee, Brian Swett represented CONA, and David B. Anderson ("Anderson"), Deanna Weidner, and Derek A. Henderson ("Henderson") represented Jamison Trust. Thirty exhibits were admitted into evidence on behalf of the Debtors; three exhibits, on behalf of the Committee; and one exhibit, on behalf of Jamison Trust.[2] Three witnesses testified on behalf of the Plan Proponents. This Opinion resolves the dispute only with respect to the Jamison Trust Plan Objection. All other objections to the Plan were resolved by agreement.

### Jurisdiction

This Court has jurisdiction over the parties to and subject matter of the Lead Bankruptcy Case pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O). Notice of the Confirmation Hearing was proper under the circumstances.

---

[2] The Debtors' exhibits are cited as "(Debtors Ex. ___)"; the Committee's exhibits, as ("Comm. Ex. ___)"; and Jamison Trust's one exhibit, as "(J.T. Ex.)".

**Facts[3]**

Pioneer Health Services, Inc. ("PHS") was founded in 1996 in Magee, Mississippi.  PHS owned and operated, through numerous affiliates, ten Critical Access Hospitals[4] in five states. (Dkt. 2920 at 6).  The dispute before the Court involves Pioneer Community Hospital of Aberdeen ("Aberdeen Hospital") in Monroe County, Aberdeen, Mississippi, which PHS acquired in 2001. (Dkt. 2920 at 9; Debtors Ex. 2 at 9).  Pioneer Health Services of Monroe, Inc. ("PHS of Monroe"), one of PHS's affiliates, operated Aberdeen Hospital continuously since its acquisition by PHS until September 30, 2017, when Aberdeen Hospital was sold to another entity.  (Dkt. 2211, 2715).

Jamison Trust owns 1.7 acres of land adjacent to Aberdeen Hospital (the "Land").  (J.T. Ex. § 1).  Pillars of Aberdeen, L.L.C. owns the building located on the Land, containing physician's offices, surgical suites, and a cafeteria.  (J.T. Ex. § 1).  On October 10, 2005, Aberdeen Hospital and PHS of Monroe, as lessees, and Jamison Trust and Pillars of Aberdeen, L.L.C., as lessors, entered into a non-residential real property lease (the "Jamison Trust Lease") (J.T. Ex.) of the building and land (together, the "Building").  The initial ten-year term of the Jamison Trust Lease expired on December 31, 2015, but PHS of Monroe had the option of extending the Jamison Trust Lease for two consecutive terms of five years each "at a price to be negotiated."  (J.T. Ex. § 2).  During the first year of the initial ten-year term of the Jamison Trust Lease, the monthly base rent remained the same at $10,000.00, but during the next five years, the base rent increased in scheduled increments to $15,000.00 per month.  (J.T. Ex. § 3 & Sched. 1).  During the last five years of the initial ten-year term, the monthly base rent remained the same at $16,666.67.  (*Id.*).

---

[3] The following findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[4] In general, Critical Access Hospitals are rural hospitals located 35 miles away from any other hospital or 15 miles away from any other hospital where the terrain is mountainous or where there is no access to a main road.  (Dkt. 2920 at 6; Debtors Ex. 2 at 6).

In addition to the base rent, PHS of Monroe was required to pay all ad valorem and other taxes relating to the Building.  (J.T. Ex. § 4).

On August 1, 2015, PHS of Monroe gave Jamison Trust notice of its intent to renew the Jamison Trust Lease for an additional five years.  (Dkt. 3290 at 2).  According to Jamison Trust, it discovered that PHS of Monroe had failed to pay ad valorem taxes assessed against the Building, thereby allowing the Building to be sold at two tax sales.  (Dkt. 3290 at 2).  As part of the negotiations over the amount of base rent payable during the renewal period, Jamison Trust allegedly sought the redemption by the Debtors of the Building from the prior tax sales.  (Dkt. 3290 at 2).

Before Jamison Trust and PHS of Monroe had completed their negotiations of the new rent amount for the renewal term beginning January 1, 2016, PHS of Monroe commenced the Monroe Bankruptcy Case on March 30, 2016.  Similarly, PHS; Pioneer Health Services of Patrick County, Inc. ("PHS of Patrick") (No. 16-01120-NPO); Pioneer Health Services of Newton County, LLC ("PHS of Newton") (No. 16-01121-NPO); Pioneer Health Services of Stokes County, Inc. ("PHS of Stokes") (No. 16-01122-NPO); Pioneer Health Services of Choctaw County, LLC ("PHS of Choctaw") (No. 16-01123-NPO); and Pioneer Health Services of Oneida, LLC ("PHS of Oneida") (No. 16-01124-NPO) also filed voluntary petitions for relief under chapter 11 on March 30, 2016. All cases were administratively consolidated into the Lead Bankruptcy Case on April 6, 2016. Later, the chapter 11 bankruptcy cases of Pioneer Health Services of Early County, LLC (No. 16-01243-NPO) and Medicomp, Inc. (No. 16-01126) also were administratively consolidated into the Lead Bankruptcy Case.

Having reached no agreement as to the new rent amount, PHS of Monroe paid Jamison Trust after commencement of the Monroe Bankruptcy Case monthly rent of $16,666.67 from April

1, 2016 until September 30, 2017, when Aberdeen Hospital was sold, and the Jamison Trust Lease

was assigned to the new owner.  (Dkt. 3007 ¶¶ 10, 20).  Jamison Trust refers to these payments as

"status quo" rent payments, which Jamison Trust accepted without objection.

In the Monroe Bankruptcy Case, Schedule G: Executory Contracts and Unexpired Leases

("Schedule G") listed monthly rent of $16,667.67 owed to Conservative Capital Pillars (Monroe

Dkt. 53-1 at 21), and Schedule E/F: Creditors Who Have Unsecured Claims listed an unsecured

claim of $50,001.00 owed Conservative Capital L (Monroe Dkt. 53 at 33).  Amended Schedule G

identified Jamison Trust and Pillars of Aberdeen, LLC as lessors with the same address as the one

listed for Conservative Capital Pillars.  (Monroe Dkt. 83-1 at 40).

On October 26, 2016, PHS filed the First Omnibus Motion for Authority to Assume All

Non-Residential Real Property Leases (the "Omnibus Assumption Motion") (Dkt. 1190) on behalf

of all Debtors.  In the Omnibus Assumption Motion, PHS requested authority to assume several

unexpired leases of non-residential real property, including the Jamison Trust Lease, pursuant to

11 U.S.C. § 365.[5]  (Dkt. 1190 ¶ 5(d)(2)).  In paragraph eight of the Omnibus Assumption Motion,

PHS asserted the following with respect to any cure amounts:

> The Debtor does not believe that any defaults exist in connection with the above
> described Leases, but in the event defaults exist, non-debtor parties will have the
> opportunity to point those out to the court, and the parties will then have the
> opportunity to present their respective positions as to the existence of defaults at a
> hearing on the Motion.  In the event the Court determines there are defaults, the
> Debtor will propose appropriate cures of the existing defaults and adequate
> assurance of future performance.

(Dkt. 1190 at 5).  Jamison Trust did not object or otherwise respond to the Omnibus Assumption

Motion although other lessors did.  A hearing was held on January 4, 2017, after which an order

---

[5] From this point forward, all code sections refer to the U.S. Bankruptcy Code found at title
11 of the U.S. Code unless otherwise noted.

was entered by the Court (the "Omnibus Assumption Order") (Dkt. 1577) approving the assumption by PHS of Monroe of the Jamison Trust Lease as well as the assumption of other unexpired leases by the Debtors.

On March 27, 2017, PHS filed a motion for an order approving bidding procedures and a stalking horse bidder in connection with the auction sale of Aberdeen Hospital (the "Bid Procedures Motion") (Dkt. 1832).  Jamison Trust did not object or otherwise respond to the Bid Procedures Motion although other parties in interest did.  PHS resolved all objections by agreement, and on April 24, 2017, the Court entered an agreed order approving the Bid Procedures Motion and the attached § 363 Asset Purchase Agreement (the "APA") (Dkt. 1832-2) for use as a template for any interested bidders or purchasers (the "Bid Procedures Order") (Dkt. 1888). Schedule 2.1(e) of the APA listed the Jamison Trust Lease as one of several purchased real property leases.  (Dkt. 1832-6 at 8).  The Bid Procedures Order scheduled dates for an auction and a hearing for the Court to consider final approval of the sale.  (Dkt. 1888).

On April 26, 2017, PHS filed a motion to sell substantially all of the assets owned by PHS of Monroe outside the ordinary course of business (the "Sale Motion") (Dkt. 1893).  As part of the Sale Motion, PHS sought the Court's approval of the procedures for the assumption and assignment of unexpired leases by the ultimate purchaser.[6]  In that regard, paragraph seventeen of the Sale Motion specified that each APA must designate the unexpired leases as to which the bidder desired that PHS of Monroe assume and then assign to the successful purchaser.  With respect to any cure amount, the Sale Motion provided as follows:

> Such designation [of the leases to be assumed and assigned] shall provide the
> amount, method and timing of any economic cures or other cures of default that the

---

[6] Given the previous entry of the Omnibus Assumption Order, it is unclear why PHS again sought the Court's approval of its assumption of the Jamison Trust Lease.  *See generally In re Eastman Kodak Co.*, 495 B.R. 618 (Bankr. S.D.N.Y. 2013) (holding that the assumption and assignment of an unexpired commercial lease need not occur simultaneously).

ultimate prevailing purchaser may need, or desire, to submit to the Debtor in connection with the assumption and assignment process. To the extent that there are disputes regarding any of the cure amounts of other issues, the applicable parties may resolve such dispute by mutual agreement or by seeking recourse from the Court.

(Dkt. 1893 ¶ 17). In the event any qualified bidder designated any such lease, the Sale Motion required PHS of Monroe to file a motion to assume and assign that lease by May 24, 2017. (*Id.* ¶ 18). "Any amounts necessary to cure any existing defaults in connection with any contracts or leases shall be paid by [*sic*] in accordance with the APAs." (*Id.*). Objections to any motions to assume and assign would be heard at the sale hearing. (*Id.* ¶ 17). Notice of the Sale Motion was mailed to Jamison Trust. (Dkt. 1897 at 38). Jamison Trust did not object or otherwise respond to the Sale Motion although other parties in interest did.

On May 25, 2017, PHS filed the Motion for Authority to Assume, and to Assign Unexpired Lease of Non-Residential Real Property Lease to Boa Vida Hospital of Aberdeen, MS, LLC (the "Boa Vida Assignment Motion") (Dkt. 2011). PHS alleged that Boa Vida Hospital of Aberdeen, MS, LLC ("Boa Vida") had submitted a qualified bid and had designated certain unexpired leases that it desired PHS of Monroe to assume and then to assign to Boa Vida, as well as certain non-residential real estate leases that it designated to be rejected. Paragraph ten of the Boa Vida Assignment Motion provided:

> Upon information and belief, the Debtor asserts that there are no monetary or nonmonetary defaults with respect to the non-residential real estate leases that need to be cured prior to the assumption and then the assignment thereof. However, if the Debtor is mistaken in this belief, its lessors will respond to the Motion with those alleged cures (monetary and non-monetary), so as to allow the Debtor and Boa Vida Aberdeen to either negotiate and resolve the alleged cures, or in the event of a failure of negotiations to reach a resolution, then the Debtor, the lessors and Boa Vida Aberdeen can present those issues to the Court for resolution.

(Dkt. 2011 ¶ 10). Notice of the Boa Vida Assignment Motion was mailed to Jamison Trust. (Dkt. 2016 at 19). No one, including Jamison Trust, objected or otherwise responded to the Boa Vida Assignment Motion.

An auction for the sale of the Aberdeen Hospital occurred on June 22, 2017, and Boa Vida (not the stalking horse bidder) was deemed the successful bidder. The sale hearing was held on June 23, 2017, to consider objections to the sale based, among other things, on disputed cure amounts. Jamison Trust did not object to the Sale Motion and did not participate in the sale hearing. In an order dated August 4, 2017 (the "Sale Order") (Dkt. 2211; Debtors Ex. 24), the Court approved the sale of the Aberdeen Hospital to Boa Vida and the Asset Purchase Agreement, supplemented by a list of unexpired leases to be assumed and assigned to Boa Vida (the "Boa Vida APA") (Dkt. 2211 at 67). The list of unexpired leases, attached as "Exhibit B" to the Sale Order, set the amounts necessary to cure existing defaults of the leases being purchased (the "Cure Amounts"). The list indicated that the Cure Amount for the assumption and assignment of the Jamison Trust Lease was $0. (*Id.*). In a separate order also dated August 4, 2017, the Court approved the assignment of numerous unexpired leases to Boa Vida (the "Boa Vida Assignment Order") (Dkt. 2216), including the Jamison Trust Lease (Dkt. 2216 at 7). Consistent with the Sale Order, the Boa Vida Assignment Order provides, in pertinent part, that "[t]here are no monetary or non-monetary defaults with respect to the non-residential real estate leases that need to be cured prior to the assumption and then the assignment thereof." (Dkt. 2216 at 4). On December 15, 2017, PHS filed the Report of Sale of Substantially All of the Assets of Pioneer Health Services of Monroe County, Inc. (Dkt. 2715), notifying the Court of the sale of Aberdeen Hospital had closed on October 1, 2017. (*Id.* at 4).

On March 30, 2018, the Debtors and the Committee (the "Plan Proponents") filed the Plan.

(Dkt. 2919; Debtors Ex. 1).  The Plan is a liquidating plan for all Debtors.  To that end, the Plan establishes liquidation "Trusts" for each of the Debtors and a "Liquidating Trustee" to collect all estate assets of the various affiliated Debtors, investigate, file, and settle claims and claim objections, establish the reserve accounts contemplated under the Plan, disburse each of the Debtors' assets to creditors consistent with the Plan, and otherwise manage, supervise, and protect the assets of the estates after confirmation of the Plan.  (Dkt. 2919; Debtors Ex. 1).  Although the Plan constitutes a plan of liquidation for all Debtors and the Liquidating Trustee for all liquidation Trusts is a single person, the Plan does not effectuate a substantive consolidation of the Debtors' bankruptcy estates.  Each of the liquidation Trusts are separate.

Section 8.7 of the Plan, entitled "Estimation," permits the Court to estimate any Disputed Claim pursuant to § 502(c) and further provides that the amount estimated by the Court may constitute either the allowed amount of the disputed claim or a maximum limitation on the claim. (Dkt. 2919 § 8.7; Debtors Ex. 1 § 8.7).  Section 8.3 of the Plan, entitled "Establishment of Accounts and Reserve Accounts," requires the Liquidating Trustee to establish several reserve accounts, including the "Disputed APS Claims Reserve," for each respective Debtor.  (Dkt. 2919 § 8.3; Debtors Ex. 1 § 8.3).  A "Disputed APS Claims Reserve" is defined in the Plan as "the interest bearing reserve account established by the Liquidating Trustee for each respective Debtor pursuant to Section 8.3 of this Plan."  (Dkt. 2919 § 1.2.56; Debtors Ex. 1 § 1.2.56).  On the effective date of the Plan, the Liquidating Trustee must fund the Disputed APS Claims Reserve "with Cash in an amount sufficient to pay the full amount of all Disputed Administrative Expense Claims," all Disputed Priority Tax Claims, all Disputed Priority Claims, all Disputed Secured Claims and all estimated unpaid Professional Claims (subject to the Professional Fee Cap) for the applicable Debtor."  (Dkt. 2919 § 8.3; Debtors Ex. 1 § 8.3).

The Plan includes a waterfall provision that estimates projected cash distributions to holders of allowed claims (the "Initial Waterfall") (Dkt. 2919 at 55-57; Debtors Ex. 1 at 55-57). The Initial Waterfall does not reserve any amount for payment of Jamison Trust's alleged administrative expense claim. (Dkt. 2919 at 55; Debtors Ex. 1 at 55).

On May 1, 2018, the deadline established by the Court for filing requests for payment of administrative expense claims under § 503(b) (Dkt. 2910), Jamison Trust filed the Motion of Jamison Trust for Entry of an Order Allowing an Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and § 507(a)(2) (the "Administrative Expense Request") (Dkt. 3007) and the Complaint (the "Complaint") (Adv. Dkt. 1) initiating adversary proceeding 18-00026-NPO (the "Jamison Trust Adversary" or, together with the Administrative Expense Request, the "Jamison Trust Litigation"). The Administrative Expense Request and the Complaint contain substantively identical allegations. In the Administrative Expense Request, Jamison Trust alleged that it is entitled to an administrative expense claim against the Debtors pursuant to § 503(b)(1)(A), and that its claim is entitled to priority under § 507(a)(2). In both the Administrative Expense Request and the Complaint, Jamison Trust maintained that PHS of Monroe assumed the Jamison Trust Lease pursuant to § 365 and breached it by failing to pay the Cure Amounts. (Dkt. 3007 at 4-5; Adv. Dkt. 1 at 6). Likewise, Jamison Trust contended that when Boa Vida purchased Aberdeen Hospital and became the lessee of the Building, Boa Vida agreed to pay the Cure Amounts but likewise breached the Jamison Trust Lease by failing to do so. Moreover, according to Jamison Trust, neither PHS of Monroe nor Boa Vida has made any "status quo" rent payments since October 1, 2017, the closing date of the sale of the Aberdeen Hospital. (Dkt. 3007 at 5; Adv. Dkt. 1 at 5). In Count I of the Complaint, Jamison Trust asserted that the Debtors and Boa Vida are jointly and severally liable for breach of the Jamison Trust Lease, and in Count II of the

Complaint, Jamison Trust alleged a claim for unjust enrichment. According to Jamison Trust, PHS of Monroe and Boa Vida are liable for liquidated damages of $245,314.29 and additional unliquidated damages, as follows:

| | |
|---|---|
| 2013 ad valorem taxes | $82,076.39 |
| 2014 ad valorem taxes | $82,795.20 |
| 2015 ad valorem taxes | $80,442.70 |
| Interest on $164,871.59 paid by Jamison Trust to redeem the Building from the 2013 & 2014 ad valorem tax sales | No amount stated |
| Late fees | No amount stated |
| Difference between fair market value rent and amount paid from August 1, 2015 to the present | No amount stated |
| Attorneys' fees and other costs of collection | No amount stated |
| TOTAL | $245,314.29 |

(Dkt. 3007 at 5-6; Adv. Dkt. 1 at 5-6). On May 4, 2018, the Court entered an order consolidating the Administrative Expense Request with the Jamison Trust Adversary for discovery and trial purposes. (Dkt. 3032).

On May 29, 2018, the Committee, acting pursuant to § 9.3.5 of the Plan, filed a notice selecting Marshall Glade ("Glade") of GlassRatner Advisory & Capital Group LLC ("GlassRatner") to serve as the Liquidating Trustee. (Dkt. 3192; Comm. Ex. 3). On June 6, 2018, Jamison Trust filed the Objection of Jamison Trust to Confirmation of Plan for Pioneer Health Services of Monroe County, Inc. Without Payment of its Administrative Expenses (the "Initial Jamison Trust Plan Objection") (Dkt. 3232) alleging that PHS of Monroe and Boa Vida are liable for certain taxes, unspecified interest, penalties, rent, late fees, attorneys' fees, and other costs of collection. Jamison Trust "supports the Debtor's Plan, but not to the extent that the Plan does not pay the administrative expense admittedly due the Jamison Trust." (Dkt. 3232 at 7). Jamison Trust asks the Court to condition confirmation of the Plan "on the Jamison Trust's administrative claim being paid in cash . . . or to carve out any and all causes of action possessed by the Jamison

Trust against non-bankruptcy persons and entities." (Dkt. 3232 at 8). In the alternative, Jamison Trust asks the Court to deny confirmation of the Plan.

On June 8, 2018, PHS of Monroe filed the Objection to the Motion of Jamison Trust for Entry of an Order Allowing an Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and § 507(a)(2) (the "Objection to Administrative Expense Request") (Dkt. 3251), which was joined by CONA (Dkt. 3252) and the Committee (Dkt. 3258). Also, on June 8, 2018, PHS and PHS of Monroe filed the Answer and Defenses of Pioneer Health Services, Inc. and Pioneer Health Services of Monroe County, Inc. (the "Answer to Complaint") (Adv. Dkt. 15) to the Complaint filed in the Jamison Trust Adversary.

In both the Objection to Administrative Expense Request and the Answer to Complaint, PHS and PHS of Monroe denied that Jamison Trust is entitled to any Cure Amount. According to PHS and PHS of Monroe, neither the Omnibus Assumption Order, the Sale Order, nor the Boa Vida Assignment Order (the "Lease Orders") approved any Cure Amount for Jamison Trust. For that reason, PHS and PHS of Monroe viewed the Administrative Expense Request as a collateral attack on the Lease Orders outside the purview of Rule 60 of the Federal Rules of Civil Procedure ("Rule 60"), as made applicable to bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure. In short, PHS and PHS of Monroe contended that Jamison Trust waived any right it may have had to payment of a Cure Amount by failing to respond to the earlier motions underlying the Lease Orders. Further, even if the Court were to determine there is liability for a Cure Amount, PHS and PHS of Monroe asserted that Boa Vida is solely responsible pursuant to § 2.5 of the Boa Vida APA. (Dkt. 2211 § 2.5; Debtors Ex. 24 at § 2.5). Section 2.5 provides, in pertinent part:

> [A]t the Closing and pursuant to section 365 of the Bankruptcy Code or applicable law, Seller shall assume and assign to Purchaser, and Purchaser shall assume from

Seller, the Purchased Contracts.  The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from any defaults on the part of the Seller under the Purchased Contracts (the "Cure Amounts") shall be paid, in addition to the Purchase Price, by Purchaser . . . at or before the Closing, such that all Purchased Contracts may be assumed by Seller and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code, and Seller shall have no liability for any such Cure Amounts.

(*Id.*).

On June 8, 2018, Boa Vida filed the Boa Vida Answers and Defenses (Adv. Dkt. 13) in the Jamison Trust Adversary, denying that Jamison Trust was entitled to any relief.  Boa Vida expressly denied that it agreed to pay any cure amounts under the Jamison Trust Lease.  Boa Vida maintained that the orders entered in the Lead Bankruptcy Case, as well as the closing documents for the sale of the Aberdeen Hospital to Boa Vida, expressly stated that there were no Cure Amounts to be paid or assumed by Boa Vida in connection with the assignment of the Jamison Trust Lease.  (Adv. Dkt. 13 ¶ 17).

On June 11, 2018, the Plan Proponents filed their Joint Consolidated Response of the Committee and the Debtors to (i) United States Trustee's Objection to Joint Liquidating Plan Chapter 11 Plan; and (ii) Limited Objection to Confirmation of Liquidating Plan Filed by First Guaranty Bank (Dkt. 3269) in which they asserted that they (and CONA and the Internal Revenue Service) were "prepared to consent to the funding of specific reserves to address" the Jamison Trust Plan Objection and reserved all rights consistent with § 8.7 of the Plan in connection therewith.  (Dkt. 3269 ¶ 4 n.2).  Also, on June 11, 2018, the Plan Proponents filed the First Plan Modification, which amended § 8.3 of the Plan. (Dkt. 3273; Debtors Ex. 8).  Pursuant to the amended version, the Liquidating Trustee must fund on the effective date of the Plan a "Disputed APS Claims Reserve" for each respective Debtor "with Cash in an amount sufficient to pay the Disputed Claims based upon the lesser of (a) the amount claimed in the filed claim by the holder

of such Disputed Claim, or (b) the estimated amount of such Claim, as determined by an Order of the Bankruptcy Court, for the Applicable Debtor." (Dkt. 3273 at 2; Debtors Ex. 8 at 2). Previously, § 8.3 required the Liquidating Trustee to fund the Disputed APS Claims Reserve in an amount sufficient to pay the full amount of all Disputed Administrative Expense Claims. (Dkt. 2919 § 8.3; Debtors Ex. 1 § 8.3). On June 12, 2018, Jamison Trust filed the Jamison Trust Plan Objection, the only change from the Initial Jamison Trust Plan Objection being the appearance of Anderson's signature in the signature block.

On August 29, 2018, the Plan Proponents filed the Third Plan Modification, consisting of an updated version of the Initial Waterfall, projecting scheduled assets and anticipated disbursements for each Debtor (the "Updated Waterfall") (Dkt. 3564; Debtors Ex. 20). With respect to Jamison Trust, the Updated Waterfall contemplated a reserve of $245,314.00, the amount of liquidated damages sought by Jamison Trust in the Jamison Trust Plan Objection, the Administrative Expense Request, and the Complaint in the Jamison Trust Adversary.

The Plan Proponents along with CONA then filed the Joint Reply in response to the Jamison Trust Plan Objection on September 5, 2018, one day before the Confirmation Hearing. (Dkt. 3587). They asked the Court to set the reserve for Jamison Trust's administrative expense claim in the amount of $370,863.00, which is more than the reserve of $245,314.00 contemplated in the Third Plan Modification. According to the Joint Reply, counsel for Jamison Trust sent a letter to counsel for the Committee dated August 21, 2018, for the first time asserting an administrative expense claim based on "fair market rent" of $28,421.88 per month during the renewal term and a rate of interest of eight percent (8%), as shown below:

| | |
|---|---|
| Pre-petition rent (Jan.-Mar. 2016) at $28,421.88/month | $85,265.64 |
| 8% interest on prepetition rent (Jan.-Mar. 2016) | $18,189.99 |
| Post-petition rent (Apr. 2016-Sept. 2017) at $28,421.88/month | $511,593.84 |
| Post-petition rent paid (Apr. 2016-Sept. 2017) at $16,667.67/month | ($300,018.06) |
| 8% interest on post-petition rent (Apr. 2016-Sept. 2018) at $11,754.21/mo. | $29,777.56 |
| 2013 & 2014 ad valorem taxes | $164,204.87 |
| 2015 & 2016 ad valorem taxes | $156,657.31 |
| 8% interest on 2013 taxes redeemed 9/1/2016 | $13,073.84 |
| 8% interest on 2014 taxes redeemed 9/1/2017 | $6,599.47 |
| | $528,843.81[7] |

(Dkt. 3587 at 5). The Plan Proponents and CONA deny that Jamison Trust is entitled to any Cure

Amount and declined to reserve the full amount of $685,344.46[8] but agreed to reserve $370,863.00

based on the following figures:

| | |
|---|---|
| Prepetition rent (Jan.-Mar. 2016) at $16,667.00 per month | $50,001.00 |
| 2013 & 2014 ad valorem taxes | $164,204.87 |
| 2015 & 2016 ad valorem taxes | $157,657.31 |
| | $370,863.18 |

(Dkt. 3587 at 8). Thus, the Plan Proponents and CONA ask the Court to estimate the maximum

amount of Jamison Trust's administrative expense claim as the sum of the pre-petition rent at

$16,667.00 per month from January 1, 2016, to March 1, 2016, and the ad valorem taxes assessed

against the Building from 2013-2016. This total amount does not include any rent increase,

interest, or rent owed after the sale of Aberdeen Hospital to Boa Vida on October 1, 2017. At the

Confirmation Hearing, counsel for the Committee provided an updated waterfall (the

---

[7] According to the Committee, this total was provided by counsel for Jamison Trust in the August 21, 2018, letter, a copy of which was not attached to the Joint Reply. (Dkt. 3587 at 4-5). The sum of the amounts listed by Jamison Trust actually computes to $685,344.46. When its miscalculation was pointed out at the Confirmation Hearing, Jamison Trust readily agreed to substitute the higher figure of $685,344.46 for the lower amount of $528,843.81 demanded in its letter to the Committee.

[8] *See id.*

"Confirmation Waterfall") (Comm. Ex. 2) that included the increased reserve amount of $370,863.00, consistent with the Joint Reply.

The Debtors called three witnesses in support of confirmation of the Plan at the Confirmation Hearing, including: PHS's vice-president of finance, Julie Gieger ("Gieger"); PHS's chief restructuring officer ("CRO"), H. Kenneth Lefoldt, Jr. ("Lefoldt"); and the Liquidating Trustee selected by the Committee, Marshall Glade ("Glade"). These are the individuals who will work together to implement the provisions of the Plan upon confirmation.

Gieger, a certified public accountant, began working for PHS in 1987 and became its chief financial officer in 2003. She began her testimony by stating how proud she was that the Critical Access Hospitals previously owned by PHS had been able to maintain quality patient care and that PHS had been able to save as many jobs as possible throughout the liquidating process. She provided a summary of the extensive history of the Lead Bankruptcy Case, including the sale of Aberdeen Hospital. A majority of her direct testimony concerned an issue raised in other pleadings regarding the storage and/or disposal of patient records.

Lefoldt, a certified public accountant, testified that he replaced the previous CRO in December 2017 and by then, the Debtors had sold substantially all assets, including Aberdeen Hospital. He provided the Court a general outline of the treatment of allowed and disputed claims in the Plan. He concluded his direct testimony by stating his opinion that the Plan is feasible. On cross-examination by counsel for Jamison Trust, he described the Initial Waterfall, which established no reserve amount for payment of Jamison Trust's purported administrative expense claim, as a work already in progress when he became CRO. The Updated Waterfall established a reserve amount of $245,314.00, and the Confirmation Waterfall proposed a reserve amount of $370,863.00. He explained that his role with respect to the Confirmation Waterfall was to ensure

that the reserve accounts contained sufficient funds to pay Jamison Trust its administrative expense claim should it prevail in the Jamison Trust Litigation but understood that PHS and PHS of Monroe denied that any Cure Amount was owed to Jamison Trust.  He was not the CRO until after the assignment of the Jamison Trust Lease to Boa Vida.  He further testified that no interest was being paid on any administrative expense claims under the Plan.

Glade, a certified public accountant, testified that he is the managing director of GlassRatner and is willing to perform the duties of the Liquidating Trustee.  He discussed the provisions in the Plan to pay the additional costs for the storage and disposal of patient records and the amount of the reserves established for priority claims, including the reserve of $370,863.00 established in the Confirmation Waterfall for Jamison Trust's administrative expense claim.  He summarized the amounts payable under the Plan to the two largest secured creditors, approximately $2.3 million to CONA and $3.5 million to the Internal Revenue Service.  The payment to CONA under the Plan is in addition to a previous disbursement to CONA of approximately $1.6 million, consisting of the proceeds from the sale of a medical office building by PHS of Stokes.  (Dkt. 3436).  He discussed an anticipated distribution of $2.6 million to unsecured creditors and testified that without the agreement of CONA and the Internal Revenue Service, the unsecured creditors likely would have received no distribution.

Jamison Trust did not call any witnesses of its own and introduced only one exhibit into evidence at the Confirmation Hearing, the Jamison Trust Lease.  Specifically, Jamison Trust did not present any witnesses or introduce any documentary or other evidence supporting its position that fair market rent for the Building, as of January 1, 2016, is $28,421.88, that PHS of Monroe failed to pay three months of rent due from January through March, 2016, that PHS of Monroe

failed to pay ad valorem taxes from 2013 through 2016, or that PHS of Monroe owed eight percent (8%) interest on any of these purportedly delinquent payments.[9]

After the Confirmation Hearing, Jamison Trust filed the Motion to Clarify, or in the Alternative, Amend Complaint (the "Motion to Clarify") (Adv. Dkt. 30) in the Jamison Trust Adversary.  In the Motion to Clarify, Jamison Trust asserted that it seeks monetary judgments against PHS of Monroe and Boa Vida for amounts due under the Jamison Trust Lease and that it preserves its remedies against Boa Vida, including Boa Vida's eviction from the Building.

### Striking of Scandalous Material from the Jamison Trust Plan Objection

Before reaching the merits of the parties' dispute, the Court pauses here to address the allegations in the Initial Jamison Trust Plan Objection suggesting that Geno, counsel for the Debtors, engaged in unethical or actionable conduct.  In the Objection to Administrative Expense Request, Geno acknowledged that, over the course of the Lead Bankruptcy Case, Geno communicated with representatives of Jamison Trust about "matters concerning the Lease and the Leased Premises . . . [but] did not undertake to pay the Disputed Cure Amount and . . . advised the Trust . . . that any disposition of the Lease would necessarily take place in a court proceeding with notice to the Trust and other parties in interest." (Dkt. 3251 at n.2).  Additionally, Geno "suggested to the Trust that the Trust instruct its counsel to file an appearance in the Debtor's case so that the Trust's counsel would receive notice of all matters in such case."  (*Id.*).

On June 11, 2018, the Court held a telephonic status conference in the Lead Bankruptcy Case for purposes of scheduling the Confirmation Hearing and at that time expressed its concern about the allegations against Geno contained in the Initial Jamison Trust Plan Objection.  The

---

[9] In the Jamison Trust Plan Objection, Jamison Trust alleged that the Debtors and Boa Vida were liable for attorneys' fees and other costs of collection but abandoned that claim at the Confirmation Hearing.

Court instructed counsel for the Committee, rather than Geno, to represent the interests of the estates with respect to the Initial Jamison Trust Plan Objection.[10]   Additionally, the Court asked who prepared the pleading.  In response, Henderson stated that Anderson, lead counsel for Jamison Trust who is admitted to practice before this Court *pro hac vice*, prepared the Initial Jamison Trust Plan Objection although Henderson was the only attorney who signed it.  Henderson stated that he was unsure why Anderson did not sign the pleading.

The next day, Jamison Trust filed the Jamison Trust Plan Objection, exhibiting the signatures of both Henderson and Anderson.  In the Jamison Trust Plan Objection, Jamison Trust reasserted the following allegations that are in issue:

> 3.    While the Jamison Trust and the Debtor were discussing cure amounts (on which they agreed) and a fair market value rental rate adjustment, the Debtor commenced the captioned Chapter 11 Bankruptcy Cases.  Mr. Craig Geno, counsel for the Debtor, had previously represented Mr. Jamison's interests in connection with a prior bankruptcy case and related litigation in Mississippi.  Mr. Geno spoke with Mr. Jamison as representative of the Jamison Trust and requested the Trust's cooperation in connection with the Debtor's efforts to formulate and consummate a Chapter 11 plan for the Debtor.  Mr. Geno represented that Pioneer Monroe was profitable and that all amounts due under the Lease would be paid.  On April 12, 2016, Mr. Geno confirmed in writing the Debtor's decision to assume the Trust's Lease and to make the payments required by 11 U.S.C. § 365:
>
> "Thank you—please tell John I asked about him.  We intend to keep the property and pay."[11]
>
> 4.    In reliance upon the Debtor's representations, the Trust did not oppose the Debtor's requested extensions of the time for assuming or rejecting unexpired leases and executory contracts and for the filing of plans and disclosure statements.  Mr. Geno further represented that the secured creditor would not allow the Debtor to propose plans for the separate Pioneer entities until the Debtor had formulated a plan or plans for all Pioneer entities.  The Debtor agreed to all required cure amounts and proposed a fair market value escalated rent amount, and the Debtor

---

[10] As a result, counsel for Jamison Trust had knowledge of the Court's concern regarding the allegations against Geno.

[11] Jamison Trust did not attach to the Jamison Trust Plan Objection Geno's "written confirmation" that PHS and PHS of Monroe had agreed to pay any Cure Amount.

requested that it be allowed to preserve the status quo by paying the unescalated monthly rent under the Lease of $16,666.67.

(Dkt. 3290 at 2-3).  The Court finds Jamison Trust's allegations against Geno concerning.  In two paragraphs, and with no exhibits or testimony to support its assertions, Jamison Trust accused Geno of unethical or actionable conduct by suggesting that he made false statements, used his relationship with Jamison Trust to its detriment, and otherwise engaged in improper conduct.[12]

Rule 12(f) of the Federal Rules of Civil Procedure ("Rule 12(f)"), as made applicable to bankruptcy proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, provides that "[t]he court [on its own] may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f); *see Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 178 (5th Cir. 2007).  "Scandalous" matter refers to "that which improperly casts a derogatory light on someone, most typically on a party to the action."  5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1382 (3d ed.).  Courts largely disfavor striking material from pleadings unless "the allegations attacked have no possible relation to the controversy and may prejudice the other party."  *Gilbert v. Eli Lilly & Co.*, 56 F.R.D. 116, 120-21 (D.P.R. 1972).  Despite the foregoing, however, "the disfavored character of Rule 12(f) is relaxed somewhat in the context of scandalous allegations[,] and matter of this type often will be stricken from the pleadings in order to purge the court's files and protect the person who is the subject of the allegations."  5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1382 (3d ed.).

Because counsel for Jamison Trust has been admitted to appear in the Lead Bankruptcy Case in connection with his representation of Jamison Trust *pro hac vice*, counsel is subject to the

---

[12] At the Confirmation Hearing, counsel for Jamison Trust referred to the conduct of Geno as part of its fraud-on-the-court claim.

Mississippi Rules of Professional Conduct.  (Dkt. 3152, 3557).  "The legal profession is largely self-governing . . . Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of the responsibility compromises the independence of the profession and the public interest which it serves."  MISS. RULES OF PROF'L CONDUCT, Preamble ¶¶ 9 & 12.  Indeed, Rule 8.3(a) requires an attorney to report the professional misconduct of another attorney.  *See* MISS. RULES OF PROF'L CONDUCT 8.3(a) ("A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.").  While the Court is unaware whether counsel for Jamison Trust reported Geno to a professional authority, Jamison Trust certainly did not produce to the Court any evidence in support of its allegations against Geno at the Confirmation Hearing.  When asked by the Court if Jamison Trust had any witnesses to corroborate the allegations set forth in the Jamison Trust Plan Objection, counsel for Jamison Trust stated that "other than the evidence that is in the record as of now . . . we do not feel like we need to offer any additional evidence or testimony in order to support [the Jamison Trust Plan Objection]." (Tr. at 4:48:49-4:49:05).[13]  In short, Jamison Trust only cross-examined the Debtors' witnesses and did not call Geno as a witness or provide any witnesses on behalf of Jamison Trust to support the allegations it asserted against Geno in the Jamison Trust Plan Objection.

Accordingly, the Court finds that the allegations set forth in paragraphs three and four of the Jamison Trust Plan Objection regarding Geno are unsubstantiated and unsupported.  The Court further finds that the allegations against Geno fall within the type of matters that may be stricken

---

[13] The Confirmation Hearing was not transcribed.  Citations are to the time stamp of the audio recording.

*sua sponte* under Rule 12(f), as they are scandalous and improperly cast a derogatory light on Geno and his professional reputation and, consequently, should be stricken from the Jamison Trust Plan Objection.  Finally, the Court reminds counsel for Jamison Trust that *pro hac vice* status is a privilege, not a right, and is subject to the Court's discretion to revoke.  *See, e.g.*, *Needler v. Casamatta (In re Miller Auto. Grp. Inc.)*, 536 B.R. 828, 837 (B.A.P. 8th Cir. 2015).

### Discussion

The Plan Proponents must demonstrate that the Plan satisfies all provisions of § 1129(a) to obtain confirmation of the Plan; and they bear the burden of proving that the Plan meets the confirmation requirements of § 1129(a) by a preponderance of the evidence.  *See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1164-65 (5th Cir. 1993).  The Court agrees with the preliminary statements made by counsel for the Debtors and counsel for the Committee at the Confirmation Hearing that the Lead Bankruptcy Case has been difficult and complex for reasons other than the amount of assets and liabilities in the bankruptcy estates or the nature of the health-care industry.  Yet the Lead Bankruptcy Case has culminated in a way that the Bankruptcy Code intended, with the consensual resolution of many contested matters, including the dispute between CONA and the Internal Revenue Service as to the validity, extent, priority, and amount of their respective liens against the Debtors, that has resulted in a carve out for an anticipated multi-million-dollar disbursement to unsecured creditors.[14]

---

[14] Additionally, the Court is satisfied with the proposed storage and disposal of patient records.  *See* 11 U.S.C. § 351; FED. R. BANKR. P. 6011.  In that regard, the Committee, Hospital Management Associates, LLC, and CHSPSC, LLC announced at the Confirmation Hearing the settlement of *Hospital Management Associates, LLC v. Pioneer Health Services, Inc.*, Adv. Proc. 18-00032-NPO, regarding patient records and PHS of Oneida.  (Comm. Ex. 1).

Several objections to confirmation of the Plan were filed, including objections by Prime Alliance Bank (Dkt. 3229), the United States Trustee (Dkt. 3231), the Mississippi Department of Revenue (Dkt. 3233), First Guaranty Bank (Dkt. 3249), and 3M Company (Dkt. 3235).  Those objections have been resolved by agreement of the parties.  The only issues that remain before the Court are those raised in the Jamison Trust Plan Objection.  Specifically, Jamison Trust asserts that the Plan fails to satisfy § 1129(a)(2), (a)(3), and (a)(9)(A)[15] for reasons related to its alleged administrative expense claim.  Jamison Trust also contends that the Plan fails to satisfy § 1129(a)(4) because of the allocation of the payment of professional fees among the Debtors.  The Court considers first the treatment of Jamison Trust's administrative expense claim in the Plan.

**A.    Does the proposed treatment of Jamison Trust's administrative expense claim in the Plan satisfy the confirmation requirements of § 1129(a)(2), (a)(3), and (a)(9)(A)?**

Jamison Trust contends that the Plan Proponents failed to comply with § 365 when PHS and PHS of Monroe assumed the Jamison Trust Lease and, thus, the Plan is not confirmable because § 1129(a)(2) requires that the Plan Proponents comply with all applicable provisions of the Bankruptcy Code.  Section 365(b)(1) allows a debtor to "continue in a beneficial [lease] provided, however, that the other party is made whole at the time of the debtor's assumption of said [lease]."  *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Tr. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 506 (5th Cir. 2000) (internal quotations omitted).   If the debtor is in default in its past performance, the debtor can only assume the lease if the debtor (1) cures or provides adequate assurance that it will cure the default, (2) compensates or provides adequate assurance that it will compensate the lessor for any losses related to the default, and (3) provides adequate assurance of future performance.  11 U.S.C. § 365(b)(1).  According to Jamison Trust, the Plan is not

---

[15] The Jamison Trust Plan Objection cites § 1129(a)(8)(A) but describes the provisions of § 1129(a)(9)(A).  Based on the arguments at the Confirmation Hearing, the Court is convinced the citation to § 1129(a)(8)(A) is a typographical error.

confirmable because PHS of Monroe failed to pay the Cure Amount when it assumed the Jamison Trust Lease pursuant to the Omnibus Assumption Order.  For that same reason, Jamison Trust also contends that the Plan Proponents proposed the Plan in bad faith, and the Plan is not confirmable under § 1129(a)(3).  Additionally, Jamison Trust contends that its claim for payments due under § 365 constitutes an administrative expense claim under § 503(b).  *See CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 238 (5th Cir. 2005).  Thus, according to Jamison Trust, the Plan is not confirmable because § 1129(a)(9)(A) requires that its administrative expense claim be paid in full by the Plan's effective date.  Section 1129(a)(9) provides, in pertinent part:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) . . . of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).  Jamison Trust's arguments center mostly on § 1129(a)(9)(A).

If a § 503(b) claim has not yet been allowed or is disputed as of a plan's effective date, a chapter 11 debtor may fulfill the allowance requirement of § 1129(a)(9) by establishing a "disputed claims reserve" for the claim.  *See, e.g.*, *In re Camp Arrowhead, Ltd.*, No. 09-54693, 2010 WL 4922637, at *11 (Bankr. W.D. Tex. May 21, 2010) (setting aside $250,000.00 for administrative expense claims).  The Plan, as modified by the Confirmation Waterfall, proposes to satisfy § 1129(a)(9) by establishing a reserve of $370,863.00 for payment of Jamison Trust's administrative expense claim.  Jamison Trust insists that confirmation of the Plan requires PHS of Monroe to fund the Disputed APS Claims Reserve in the full amount of its "undisputed" administrative expense claim of $685,344.46.  The failure of the parties to agree to the reserve amount requires the Court to consider whether estimation of Jamison Trust's claim is appropriate

and, if so, to estimate the allowed amount of its claim.  The Court cannot evaluate the feasibility of the Plan without determining the allowed amount of Jamison Trust's claim for that purpose. *See* 11 U.S.C. § 1129(a)(11) ("Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor.").

Under § 502(c), a bankruptcy court may estimate "for purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay administration of the case."  11 U.S.C. § 502(c)(1).  Section 502(c) was designed to give creditors an opportunity to show the amount of their contingent claims.  *In re Fricker*, 116 B.R. 431, 439 (Bankr. E.D. Pa. 1990) ("We note that bankruptcy courts are authorized to go forward with confirmation, for the benefit of the debtor and all other creditors, even when final liquidation of a claim of a particular creditor is impossible, by allowing the estimation of claims.").  By its terms, § 502(c) applies only to estimating claims for purpose of allowance under § 502.  11 U.S.C. 502(c) (estimation is "for purpose of allowance <u>under this section</u>") (emphasis added).  Many courts, however, have approved the use of the § 502(c) procedure for estimating administrative expenses under § 503(b).  *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003).

The Court finds that the liquidation of Jamison Trust's administrative expense claim in the Jamison Trust Litigation would unduly delay the administration of the Lead Bankruptcy Case.  In the Jamison Trust Adversary, the deadline for discovery did not expire until after the Confirmation Hearing on September 10, 2018, and no trial date has been set.  Indeed, counsel for Jamison Trust repeatedly stated at the Confirmation Hearing, "We want the Plan to be confirmed."[16]  (Tr. at 5:26:17-5:26:30; *see also* 12:02:20-12:02:30; 6:00:10-6:00:25).  The Court is satisfied that it

---

[16] Yet in the Jamison Trust Plan Objection, Jamison Trust also requests that the Court deny confirmation of the Plan unless it receives the full amount of its administrative expense claim.

would substantially delay the administration of the Lead Bankruptcy Case if Jamison Trust's claim were not estimated for the purpose of determining the Plan's feasibility. *In re Enron Corp.*, No. 01-16034, 2006 WL 544463, at *7 (Bankr. S.D.N.Y. Jan. 17, 2006) ("[I]t has been noted that because a deferral of a distribution affects the efficient administration of a case, the possibility of such deferral provides a justification for estimation of a claim."); *In re N.Y. Med. Grp., P.C.*, 265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001) (finding estimation appropriate when "liquidation will take too long and unduly delay the distribution of the estate's assets").

The Court also finds that Jamison Trust's claim is unliquidated and, therefore, subject to estimation. A debt is liquidated if the amount due is fixed or otherwise ascertainable by simple computation. Here, Jamison Trust's claim is not readily ascertainable by reference to the Jamison Trust Lease or by a simple computation. Indeed, the bulk of Jamison Trust's purported claim rests on "fair market rent" and an interest rate of eight percent (8%), neither of which are mentioned in the Jamison Trust Lease. In addition, the Plan Proponents contest that any amount is due because of the prior orders of this Court and doctrines of "law of the case," estoppel, and res judicata.[17] The Court next considers the reasonableness of the Plan's estimation of Jamison Trust's claim.

In establishing a reserve for the payment of a disputed administrative claim in the context of assessing the feasibility of a plan, the debtor is permitted to consider the likelihood that such a claim actually will need to be paid. *Adelphia*, 341 B.R. at 429; *see In re TransAmerican Nat. Gas Corp.*, 79 B.R. 663, 667 (Bankr. S.D. Tex. 1987) (estimating unliquidated claim at $10,569,105.74 when claimant sought $38,271,067.65 and debtor estimated claim at $0). In *Adelphia*, the bankruptcy court endorsed the plan proponent's contention that, for purposes of establishing reserves under its plan, the proponent could reduce its anticipated exposure with respect to a

---

[17] These same defenses have been raised by PHS, PHS of Monroe, and Boa Vida in the Jamison Trust Adversary.

disputed administrative claim based on defenses against the administrative claimant.  *Adelphia*, 341 B.R. at 426-29.

> After considering the merits of the dispute between the parties, the Court finds that $370,863.00 is a reasonable estimate of Jamison Trust's claim for the reasons explained in more detail later in this Opinion.  Based on the testimony of Lefoldt and Glade, payment by Monroe of PHS of $370,863.00 into the Disputed APS Claims Reserve account would not render the Plan not feasible. The Court, therefore, further finds that the Plan satisfies the requirements of § 1129(a)(9) and (a)(11).  Likewise, the Court finds that the Plan satisfies § 1129(a)(2) and (a)(3).

> Because the reserve amount is for the allowance of an administrative expense claim rather than a pre-petition claim, however, the Court's estimation will not necessarily have a preclusive effect upon the ultimate disposition of the Jamison Trust Litigation.  The extent to which Jamison Trust is the holder of an administrative expense claim will be determined in the yet to be tried Jamison Trust Adversary, and the allowance of that claim will turn on the "equities of the case" under § 502(j).  *In re McDonald*, 128 B.R. 161, 168 & n.10 (Bankr. W.D. Tex. 1991).  For the above reasons, the Court finds that the Jamison Trust Plan Objection should be overruled to the extent Jamison Trust opposes the Plan based on the treatment of its administrative expense claim.

> Jamison Trust's counsel presented numerous arguments at the Confirmation Hearing in opposition to the Plan while at the same time stating repeatedly that Jamison Trust supported confirmation of the Plan.  The nature of Jamison Trust's opposition to the Plan was confusing.  For example, in the "wherefore" paragraph at the end of the Jamison Trust Plan Objection, Jamison Trust requests that the Court condition confirmation of the Plan either on full cash payment of its administrative expense claim or on a carve out of "any and all causes of action possessed by the Jamison Trust against non-bankruptcy persons and entities."  (Dkt. 3232 at 8).  The Plan satisfies

the alternative relief requested, yet Jamison Trust continued to oppose confirmation of the Plan at the Confirmation Hearing unless the Plan Proponents agreed to increase the reserve amount to $685,344.46 <u>and</u> reserve Jamison Trust's claims against third parties.

At the Confirmation Hearing, the Court asked numerous questions to determine the scope of Jamison Trust's opposition to the Plan but yielded after it became apparent that no clear responses would be forthcoming.  At the end of the Confirmation Hearing, the Court instructed the parties that no briefs, pleadings, or further argument in any form would be welcomed or considered because of the prejudicial delays that would result and took the matter under advisement.  On its own, the Court has done its best to understand Jamison Trust's position on this contested matter and has narrowed Jamison Trust's opposition to confirmation of the Plan into four general categories, each of which the Court has considered and rejected with one exception, which the Court has adopted in its ruling for the reasons explained below.  The four general categories of Jamison Trust's opposition to the Plan are that: (1) the Court's estimation of its administrative expense claim for feasibility purposes denies Jamison Trust procedural due process; (2) Jamison Trust's administrative expense claim is undisputed and, therefore, not subject to estimation by the Court; (3) the Debtors have failed to satisfy their burden of proof on all issues; and (4) none of the prior final orders of the Court relating to the sale of the Aberdeen Hospital is binding on Jamison Trust.

**1.    Does the estimation of Jamison Trust's administrative expense claim at the Confirmation Hearing deprive Jamison Trust of procedural due process?**

**a.    Notice of the estimation of Jamison Trust's administrative expense claim was procedurally proper.**

According to Jamison Trust, the notice of the Confirmation Hearing was procedurally deficient because it did not notify Jamison Trust of the Plan Proponents' intent to request a claims

estimation hearing.  Jamison Trust argued that it first received notice that the Court might estimate its administrative expense claim in the Joint Reply, filed one day before the Confirmation Hearing.

Section 502(c) makes no mention of the procedure to be followed in estimating claims. The Fifth Circuit Court of Appeals has held that "the bankruptcy court should use whatever method is best suited to the circumstances." *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984) (internal quotations omitted).  Rule 3018(a) provides that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." FED. R. BANKR. P. 3018(a). It is undisputed that Jamison Trust received timely notice of the Confirmation Hearing (Dkt. 3021, 3438).  It should have known then that the Plan Proponents had the right to modify the Plan at any time prior to the Confirmation Hearing.  *See* 11 U.S.C. § 1127(a).  The First Plan Modification, filed on June 11, 2018, warned Jamison Trust of the Plan Proponents' intent to fund the Disputed APS Claims Reserve in the lesser amount of either the amount claimed by Jamison Trust or an amount estimated by the Court. The Third Plan Modification, filed on August 29, 2018, notified Jamison Trust that the Plan Proponents had set a reserve of $245,314.00, for payment of Jamison Trust's administrative expense claim, the same amount as the amount of damages sought by Jamison Trust in the Jamison Trust Litigation.  Next, the Joint Reply, filed on September 5, 2018, notified Jamison Trust that the Plan Proponents intended to increase the amount of the reserve to $370,863.18.  As set forth in the Joint Reply, the Committee was prompted to increase the reserve amount because of a letter dated August 21, 2018, from counsel for Jamison Trust in which Jamison Trust asserted for the first time damages in an amount in excess of $245,314.00, the only amount of liquidated damages

stated in any Court filing.[18]  It was thus Jamison Trust's own delay in including in the letter to the Committee the allegedly full amount of its claim that led to the filing of the Joint Reply only one day before the Confirmation Hearing.

Jamison Trust cannot contend that it did not have at least constructive notice of what was at stake since at least June 8, 2018, or that it was deprived of the opportunity to appear and be heard concerning the estimated amount of its administrative expense claim.  Regardless, the Joint Reply, albeit filed one day before the Confirmation Hearing, changed the treatment of Jamison Trust's administrative expense claim in Jamison Trust's favor by <u>increasing</u> the proposed reserve amount by $125,549.00 and, therefore, was not prejudicial.

Counsel for Jamison Trust made no mention of any evidence, either in the form of documents or live testimony, that it would have provided the Court if it had more notice of the claims estimation hearing.  Indeed, counsel for Jamison Trust repeatedly stated that it had no duty to present any evidence of its own given the Debtors' burden of proof under § 1129(a).  Counsel for the Committee pointed out that Jamison Trust propounded no discovery in preparation for the Confirmation Hearing.  Likewise, in the Jamison Trust Adversary, Jamison Trust served no written discovery requests on any of the defendants before expiration of the discovery deadline.  Jamison Trust's apparent lack of interest in pursuing the Jamison Trust Litigation, according to the Committee, supports the view that Jamison Trust would not have vigorously litigated its administrative expense claim at the claims estimation hearing regardless of the amount of advance notice provided.

_____

[18] The August 21, 2018, letter was not attached as an exhibit to the Joint Reply and was not introduced into evidence.  Moreover, Jamison Trust has never amended either the Administrative Expense Request or the Jamison Trust Plan Objection to include liquidated damages in an amount in excess of $245,314.00.  Accordingly, there was no formal pleading to which the Plan Proponents could respond.

The Due Process Clause requires that a claimant be given "an opportunity . . . granted at a meaningful time and in a meaningful manner, for [a] hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) (quotation & citations omitted); *see Burciaga v. Deutsche Bank Nat'l Tr. Co.*, 871 F.3d 380, 390 (5th Cir. 2017) (noting that the fundamental requirement of due process is the opportunity to be heard at a meaningful time in a meaningful manner).   The Court finds that the Confirmation Hearing satisfied general due process standards.  Jamison Trust received notice and an opportunity to be heard by submitting the Jamison Trust Plan Objection and arguing its objection at the Confirmation Hearing.   Moreover, and perhaps more important, the Court has ruled that the reserve amount will not limit the damages sought by Jamison Trust in the Jamison Trust Litigation, and, thus, its claim is not being finally resolved through Plan confirmation, a matter more fully addressed in the immediately following section.  The Court rejects Jamison Trust's due process contentions concerning the adequacy of the notice provided by the Plan Proponents of the Court's estimation of its claim at the Confirmation Hearing.

> **b.**  **The estimation process does not impermissibly cap Jamison Trust's recovery in the Jamison Trust Litigation.**

Jamison Trust argues that the estimation process deprives it of due process to the extent it limits the allowance of its administrative expense claim in the Jamison Trust Litigation in an amount less than $685,344.46.  The Committee and the Debtors deny any deprivation of due process but insist that its proposed reserve of $370,863.00 does set a limit on Jamison Trust's recovery regardless of the ultimate outcome of the Jamison Trust Litigation.

The Court already has determined that its estimation of Jamison Trust's administrative expense claim will not necessarily have a preclusive effect upon the ultimate disposition of the Jamison Trust Litigation. The Court reached this conclusion based largely on the decision of the

bankruptcy court in *MacDonald*, 128 B.R. at 168.  As noted previously, this Court is using the process under § 502(c) to estimate Jamison Trust's administrative expense claim because waiting until the litigation of the Jamison Trust Adversary would unduly delay the administration of the estates.  The estimation process under § 502(c) applies only to pre-petition claims, but the allowance of post-petition claims like the one asserted by Jamison Trust is governed by § 503.  Under similar circumstances, the bankruptcy court in *McDonald* acknowledged that § 1141(d) could be read as discharging any amount in excess of the amount estimated under § 502(c) but declined to hold that § 1141(d) had this effect on the estimated amount of an administrative expense claim, as opposed to the estimated amount of a pre-petition claim.  Instead, the bankruptcy court in *McDonald* ruled that the estimated amount of an administrative expense claim would be subject to § 502(j), which permits reconsideration of the allowance or disallowance of claims under appropriate circumstances.  This Court's adoption of the holding in *McDonald* eliminates the due process concerns raised by Jamison Trust.

### 2. Is Jamison Trust's administrative expense claim "undisputed," and, therefore, not subject to the claims estimation process?

Jamison Trust insists that the full amount of its administrative expense claim, $685,344.46, is undisputed.  The difference between the Court's estimate of $370,863.00 and Jamison Trust's claim of $685,344.46 (stated for the first time by Jamison Trust at the Confirmation Hearing) is the amount of escalated rent and interest at the rate of eight percent (8%) on both the escalated rent payments and ad valorem taxes.  Prior to the Monroe Bankruptcy Case, PHS of Monroe made monthly payments of $16,667.67 in accordance with the Jamison Trust Lease.  The initial term of the Jamison Trust Lease expired on December 31, 2015, and was subject to two consecutive terms of five years each "at a price to be negotiated."  (J.T. Ex. § 2).  The parties were negotiating a new monthly rental payment for the renewal term and payment of ad valorem taxes when PHS of

Monroe commenced the Monroe Bankruptcy Case.  (Adv. Dkt. 1 ¶ 8; Dkt. 3007 ¶ 8).  Having reached no agreement, the Debtors continued to pay Jamison Trust $16,667.67 per month, which Jamison Trust accepted without objection.  (Adv. Dkt. 1 ¶ 10; Dkt. 3007 ¶ 10).

The Court's orders and other documents filed in the Lead Bankruptcy Case reveal the existence of a genuine dispute between the parties as to whether Jamison Trust is entitled to recover any Cure Amount because of its failure to assert its claim earlier in the Lead Bankruptcy Case.  In addition, it is questionable whether Jamison Trust is entitled to recover the additional amounts it seeks under Mississippi law even if it had asserted its claim earlier.

### a.  Court orders and court filings demonstrate the existence of a genuine dispute regarding the existence and amount of Jamison Trust's administrative expense claim.

The existence of a material dispute regarding the existence and amount of the Cure Amount is demonstrated by the Omnibus Assumption Order, Sale Order, and Boa Vida Assignment Order, as well as by certain documents filed by the parties in the Lead Bankruptcy Case.

### (1.)  Court Orders

The Court entered the Omnibus Assumption Order, Sale Order, and Boa Vida Assignment Order in the Lead Bankruptcy Case without any response or objection by Jamison Trust to the underlying motions in which PHS and/or PHS of Monroe denied owing Jamison Trust any Cure Amount.  In paragraph eight of the Omnibus Assumption Motion, PHS asserted the following with respect to any Cure Amounts:

> The Debtor does not believe that any defaults exist in connection with the above described Leases, but in the event defaults exist, non-debtor parties will have the opportunity to point those out to the Court, and the parties will then have the opportunity to present their respective positions as to the existence of defaults at a hearing on the Motion.  In the event the Court determines there are defaults, the Debtor will propose appropriate cures of the existing defaults and adequate assurance of future performance.

(Dkt. 1190 at 5).  After a hearing, the Court entered the Omnibus Assumption Order approving the assumption by PHS of Monroe of the Jamison Trust Lease.  Attached to the Sale Order is an exhibit listing all unexpired leases to be assigned and assumed to Boa Vida and the Cure Amounts of the leases being purchased. (Dkt. 2211 at 67).  In the list, the Cure Amount for the assumption and assignment of the Jamison Trust Lease is $0.  (*Id.*).  Paragraph ten of the Boa Vida Assignment Motion provides:

> Upon information and belief, the Debtor asserts that there are no monetary or nonmonetary defaults with respect to the non-residential real estate leases that need to be cured prior to the assumption and then the assignment thereof.  However, if Debtor is mistaken in this belief, its lessors will respond to the Motion with those alleged cures (monetary and non-monetary), so as to allow the Debtor and Boa Vida Aberdeen to either negotiate and resolve the alleged cures, or in the event of a failure of negotiations to reach a resolution, then the Debtor, the lessors and Boa Vida Aberdeen can present those issues to the Court for resolution.

(Dkt. 2011 ¶ 10).  The Boa Vida Assignment Order approving the assumption and assignment of the Jamison Lease to Boa Vida, provides, in pertinent part that "[t]here are no monetary or non-monetary defaults with respect to the non-residential real estate leases that need to be cured prior to the assumption and then the assignment thereof."  (Dkt. 2216 at 4).  Jamison Trust did not appeal the Omnibus Assumption Order, Sale Order, or Boa Vida Assignment Order, and they became final orders of the Court.  *Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 739-40 (5th Cir. 1993).  Given the prior adjudications of this Court that no Cure Amount was owed Jamison Trust, it cannot be said that the existence and/or amount of Jamison Trust's claim is "undisputed."

### (2.)    Court Filings

The Jamison Trust Litigation generated numerous filings in opposition to payment of any Cure Amount in both the Lead Bankruptcy Case and the Jamison Trust Adversary.  PHS of Monroe filed the Objection to Administrative Expense Request in the Lead Bankruptcy Case, PHS and PHS of Monroe filed the Answer to Complaint in the Jamison Trust Adversary, the Plan

Proponents filed the Third Plan Modification in the Lead Bankruptcy Case, and the Plan Proponents and CONA filed the Joint Reply in the Lead Bankruptcy Case. Each of these Court filings expressly disputes the payment of any Cure Amount to Jamison Trust. That Jamison Trust may disagree with the arguments of the Plan Proponents does not render its claim undisputed.

### b.    Jamison Trust's entitlement to damages is questionable under Mississippi law.

#### (1.)    Renewal Rent

Jamison Trust asserted for the first time to the Committee in a letter dated August 21, 2018, and for the first time to the Court at the Confirmation Hearing that the renewal rent should be calculated at the "fair market value" of $28,421.88 per month. This figure does not appear in any of the documents filed by Jamison Trust in the Lead Bankruptcy Case, the Monroe Bankruptcy Case, or in the Jamison Trust Adversary. The basis for Jamison Trust's total rent claim of $294,807.97 is the difference between "fair market rent" of $28,421.88 and monthly "status quo" rent of $16,667.67, plus interest at the rate of eight percent (8%) on those amounts. (Dkt. 3587 at 7 n.8).

The renewal terms in the Jamison Trust Lease provide only that rent will be "at a price to be negotiated." (J.T. Ex. § 2). The Jamison Trust Lease does not adopt "fair market rental value" as the methodology for determining the amount of new rent. The absence of any objective criteria for determining new rent is problematic.

In Mississippi, rental amount is considered an essential and basic requirement of any lease, and a lease without either a definite amount of rent or a definite method for determining the amount of rent generally has been held to be unenforceable. *Intrepid, Inc. v. Bennett*, 176 So. 3d 775, 778 (Miss. 2015). A renewal clause like the one in the Jamison Trust Lease that provides for rent "at a price to be negotiated" appears to be merely an agreement to reach an agreement in the future,

which is no agreement at all under Mississippi law.  *Etheridge v. Ramzy*, 276 So. 2d 451, 455 (Miss. 1973).  There is thus a question as to whether § 365 even applies.

There are other issues as well.  Even if the Jamison Trust Lease could be read as setting new rent at "fair market value," there is no evidentiary support for Jamison Trust's position that $28,421.88 accurately reflects "fair market value."  Also, Jamison Trust accepted "status quo" rent without objection which may constitute a waiver as to those payments for which the "status quo" rent was accepted when due.  Given these issues, the amount of new rent is clearly in dispute.

### (2.)    Eight Percent (8%) Interest

Jamison Trust includes interest at the rate of eight percent (8%) in its calculation of amounts owed for rent and ad valorem taxes.  The Jamison Trust Lease does not provide for payment of any interest, and Jamison Trust has not cited any Mississippi law that would allow it to charge such interest.  The Plan Proponents speculated at the Confirmation Hearing that Jamison Trust was relying on the maximum rate of interest allowed under Mississippi law on contracts that lack a rate of interest.  MISS. CODE ANN. § 75-17-1.  Ordinarily, however, pre-judgment interest is not recoverable on an unliquidated claim for breach of contract.  *New Bellum Homes, Inc v. Swain*, 806 So. 2d 301, 305 (Miss. Ct. App. 2001).  Jamison Trust's entitlement to interest is disputed.

### c.    Analysis

Jamison Trust itself sought to recover an amount at the Confirmation Hearing that it did not request either in the Complaint or Administrative Expense Request.  In fact, no pleading or paper of any kind filed or presented by Jamison Trust includes this amount.  The assertion that its $685,344.46 administrative expense claim is undisputed is unsupported by the record.

3.     **Who has the burden of proving the estimated amount of Jamison Trust's administrative expense claim?**

After the Plan Proponents rested their case in support of confirmation of the Plan, the Court provided Jamison Trust an opportunity to present its case.  Counsel for Jamison Trust stated, "[o]ther than the evidence that is in the record as of now . . . we do not feel like we need to offer any additional evidence or testimony." (Tr. at 4:48:49-4:49:05).  According to counsel for Jamison Trust, the reason it chose not to offer any evidence was because the Debtors had the burden of proving that the Plan met the requirements of § 1129(a).  Even so, the burden of persuasion and of going forward with the estimation of its administrative expense was with Jamison Trust as the party asserting the claim.  "[T]he party with the strongest vested interest in an accurate estimate of such a claim is the claimant, so that party must bear primary responsibility for furnishing the court with the kind of information needed to make an accurate estimate—and must suffer the consequences if the estimate proves to be less than accurate."  *McDonald*, 128 B.R. at 166.

Jamison Trust pointed to Gieger's testimony on cross examination as proof of the amount of its claim.  Gieger testified that she was aware that PHS of Monroe had not paid ad valorem taxes for more than one year but could not recall which years. (Tr. at 11:46:30-11:47:00).  She further testified that she did not know if PHS of Monroe had paid the rent due during the three months immediately preceding the filing of the Monroe Bankruptcy Case.  Her testimony did not support the amount of damages sought by Jamison Trust.  Jamison Trust next suggested that the bankruptcy schedules of PHS of Monroe supports its claim, but the schedules showed only an unsecured claim of $50,001.00, consisting of three monthly rent payments of $16,667.00.  The Court finds that Jamison Trust failed to meet its burden of proving the estimation of its claim at any amount more than the proposed reserve amount of $370,863.00.

4.     Are the Omnibus Assumption Order, Sale Order, and Boa Vida Assignment
       Order binding on Jamison Trust?

The Administrative Expense Request constituted the first time during the two-year course
of the Lead Bankruptcy Case that Jamison Trust had ever asserted in any Court filing that it was
owed a Cure Amount because of the assumption and assignment of the Jamison Trust Lease.
During those two years, the Court entered the Omnibus Assumption Order, Sale Order, and Boa
Vida Assignment Order.  In the Omnibus Assumption Motion, filed on October 26, 2016, the
Debtor stated that it did not believe that any defaults existed in connection with the leases listed
therein, including the Jamison Trust Lease, but if any defaults existed, the non-debtor parties would
have an opportunity to present their claims to the Court.  Jamison Trust did not raise the Cure
Amount in response to the Omnibus Assumption Motion, and the Court entered the Omnibus
Assumption Order.  Then, in the Sale Motion, filed on April 26, 2017, the Debtors stated that the
APA would designate "any economic cures or other cures of default that the ultimate prevailing
purchaser may need, or desire, to submit to the Debtor in connection with the assumption and
assignment process" and that the Debtor would file an assignment motion with objections due by
June 16, 2017.  (Dkt. 1893).  In the Boa Vida Assignment Motion, filed on May 25, 2017, the
Debtors listed the Jamison Trust Lease as one of the non-residential real property leases designated
for assignment to Boa Vida.  In paragraph ten, the Debtors stated:

> [U]pon information and belief . . . there are no monetary or nonmonetary defaults
> with respect to the non-residential real estate leases that need to be cured prior to
> the assumption and then the assignment thereof.  However, if the Debtor is mistaken
> in this belief, its lessors will respond to the [Boa Vida Assignment] Motion with
> those alleged cures (monetary and non-monetary), so as to allow the Debtor and
> Boa Vida Aberdeen to either negotiate and resolve the alleged cures, or in the event
> of a failure of negotiations to reach a resolution, then the Debtor, the lessors and
> Boa Vida Aberdeen can present those issues to the Court for resolution.

(Dkt. 2011 at 4).  Jamison Trust did not raise the Cure Amount in response to the Boa Vida Assignment Motion.  On August 4, 2017, the Court entered the Boa Vida Assignment Order and the Sale Order.  The Boa Vida Assignment Order provides that "[t]here are no monetary or non-monetary defaults with respect to the non-residential real estate leases that need to be cured prior to the assumption and then the assignment thereof."  (Dkt. 2216 ¶ 10).  The Sale Order attached the Boa Vida APA, which provides that all Cure Amounts shall be paid by Boa Vida.  (Dkt. 2211).

No appeal was taken of the Omnibus Assumption Order, the Sale Order, or the Boa Vida Assignment Order, and they became final orders of this Court.  *See Baudoin*, 981 F.2d at 740 ("restraining litigious plaintiffs from taking more than 'one bite of the apple' has been our avowed purpose since the common law doctrine of res judicata first evolved") (citations & quotations omitted).  Since then, Jamison Trust has not sought to set aside the Omnibus Assumption Order, Sale Order, or the Boa Vida Assignment Order.  *See* FED. R. CIV. P. 60(b) (setting one-year limitation on motions for relief from a final judgment or order when the reason for the relief sought is fraud, misrepresentation, or misconduct by an opposing party).

Jamison Trust's insistence that it filed the Administrative Expense Request on May 1, 2018, suggests a belief, wrongfully held, that the filing of its request by the bar date preserved its claim.  By identifying purported Cure Amounts for the first time sixteen months after entry of the Omnibus Assumption Order and seven months after the closing of the sale of Aberdeen Hospital to Boa Vida, Jamison Trust essentially has collaterally attacked the orders of this Court.  Indeed, Jamison Trust argued at the Confirmation Hearing that the Court's orders are not binding because: (1) the Debtors committed fraud on the Court and (2) the Debtors did not serve properly the underlying motions on Jamison Trust.

### a.  There was no evidence of any fraud on the Court presented at the Confirmation Hearing.

Jamison Trust argued that the Debtors and/or their attorney committed fraud on the Court by obtaining entry of the Omnibus Assumption Order, Sale Order, and Boa Vida Assignment Order when they knew about the existence of its administrative expense claim before the sale of the Aberdeen Hospital to Boa Vida.  Because these orders are based on fraud, they have no binding effect, according to Jamison Trust.  Although Jamison Trust has not sought relief from these orders under Rule 60, the Court notes that it has the inherent power to vacate judgments that are based on fraud.  *Thomas v. United States (In re Thomas)*, 223 F. App'x 310, 313 (5th Cir. 2007) ("Bankruptcy courts are courts of equity, and a court of equity is enabled to frustrate fraud and work complete justice.") (internal citations & quotations omitted).

As a preliminary matter, the Court finds that Jamison Trust did not present any evidence at the Confirmation Hearing supporting its assertions of fraud against the Debtors.  In both the Omnibus Assumption Motion and the Boa Vida Assignment Motion, PHS of Monroe alleged only that it did not believe any Cure Amount was owed Jamison Trust.  In the Sale Motion, PHS of Monroe alleged that any Cure Amount would be reflected in the APA.  That the subsequent orders were entered without including a Cure Amount for the assumption and assignment of the Jamison Trust Lease largely is a result of Jamison Trust's own failure to respond to these underlying motions.

The decision to vacate a final order for fraud is not a matter that should be taken lightly. The Fifth Circuit in *Browning v. Navarro*, 826 F.2d 335, 346 (5th Cir. 1987), defined "fraud upon the court" as "that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication."  *Id.* (citing 7

Moore, FEDERAL PRACTICE & PROCEDURE ¶ 60.33 at 515 (1971)).  To establish fraud on the court "it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (internal quotations omitted).  Thus, "[g]enerally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court."  *Fierro v. Johnson*, 197 F.3d 147, 154 (5th Cir. 1999) (citation omitted).  "Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court."  *Id.*  Applying these standards, the Court finds no support for Jamison Trust's argument that the Assumption Order, Sale Order, and Boa Vida Assignment Order were based on a fraud perpetrated by the Debtors.

> **b.    Jamison Trust's actual notice of the dispute between the parties precludes any relief for allegedly inadequate service of process.**

Jamison Trust next argued that it is not bound by the Omnibus Assumption Order, the Sale Order, or the Boa Vida Assignment Order because the Debtors failed to provide notice of the underlying motions on Jamison Trust by personal service, that is, by hand delivery.  Instead, the Debtors served process on Jamison Trust by mail, which Jamison Trust contends did not comply with Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Rule 9014").  According to Jamison Trust, Rule 9014 required that the Debtors serve the underlying motions in the manner provided for service of a summons and complaint by Rule 7004 of the Federal Rules of Bankruptcy Procedure ("Rule 7004").  Jamison Trust also alleged, but did not provide any evidence supporting its allegation, that the Debtors mailed each of the underlying motions to the physical address of the Building rather than its Post Office Box address in Birmingham, Alabama.  Jamison Trust, however, did not allege that it never actually received copies of the underlying motions.

The requirement of "[n]otice is the cornerstone underpinning Bankruptcy Code Procedure." *W. Auto Supply Co. v. Savage Arms, Inc (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994). The notice requirements of bankruptcy law are "founded in fundamental notions of procedural due process." *Id.* at 721. That the bankruptcy court may take action that affect parties' rights only "after notice and a hearing" appears throughout the Bankruptcy Code. *See* 11 U.S.C. § 1128 ("After notice, the court shall hold a hearing on confirmation of a plan."); 11 U.S.C. § 1109 ("A party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter."). As a general matter, any order entered in violation of a person's due process rights is void and subject to being set aside under Rule 60(b)(4). *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 208 (5th Cir. 2003); *see also City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) (stating in the bankruptcy context that "[t]he statutory command for notice embodies a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.").

Due process, however, does not require actual notice but "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Centr. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-15 (1950). "Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding." *Id.* at 313. Moreover, "under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties that their property rights are in jeopardy." *Weigner v. City of New York*, 852 F.2d 646, 650 (2d Cir. 1988). Here, Jamison Trust was served by first class mail, which appears to be permitted under Rule 7004(b)(3). Jamison Trust did not explain fully why service of process by mail was

improper per se.  Regardless, notice of the motions in accordance with Rule 7004 was not mandated by the Constitution.

The Supreme Court noted the important distinction between depriving a party of a right granted by a procedural rule and depriving that party of the constitutional right to due process in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010).  In *Espinosa*, the Supreme Court held that "failure to serve [a creditor with a] summons and complaint the Bankruptcy Rules require for the commencement of an adversary proceeding" did not violate due process requirements where the creditor had "*actual* notice of the filing and contents of [the debtor's] plan." *Id.* at 272. *Espinosa* makes clear the longstanding rule that a violation of a procedural rule does not always establish a due process violation.  Whether a party receives constitutional due process is instead determined by an analysis of all the applicable circumstances.  *Mullane*, 339 U.S. at 314-15.  In keeping with this flexible, circumstance-based approach, the Supreme Court found that actual notice or actual knowledge of proceedings can satisfy due process requirements.  *Espinosa*, 559 U.S. at 273.  Thus, regardless of whether notice was reasonably calculated to reach a party "[i]f a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."  *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995).

In *Christopher v. Kendavis Holding Co. (In re Kendavis Holding Co.)*, 249 F.3d 383 (5th Cir. 2001), for example, the Fifth Circuit addressed whether a creditor's actual knowledge was sufficient to satisfy due process where the creditor had no formal notice of the discharge of his claim.

> A potential litigant who knows about a legal proceeding usually has adequate notice
> that his rights could be jeopardized and should take steps to protect his rights.
> Nevertheless, an ordinarily valid form of notice may fail to satisfy due process
> concerns because of the circumstances of the defendant. . . .  We therefore assess

the sufficiency of notice against the backdrop of the factual circumstances in each case.

*Christopher*, 249 F.3d at 387 (internal citation & quotations omitted).  Here, Jamison Trust made known its general dissatisfaction with the manner of service of the underlying motions at the Confirmation Hearing but never alleged that it failed to receive actual notice of the assumption of the Jamison Trust Lease or the sale of Aberdeen Hospital to Boa Vida.  To the contrary, Jamison Trust admitted in the Jamison Trust Plan Objection that it discussed the sublease of the cafeteria in the Building with PHS of Monroe shortly after entry of the Omnibus Assumption Order, that it discussed the Jamison Trust Lease with the stalking horse bidder shortly after PHS of Monroe filed the Sale Motion, and that it discussed the Jamison Trust Lease with Boa Vida in August, 2017, before the closing of the sale of Aberdeen Hospital.  (Dkt. 3290 at 3-5).  In other words, although Jamison Trust chose not to file responses to the underlying motions, it was aware of the sale proceedings.  The Court finds no support for Jamison Trust's argument that the Omnibus Assumption Order, Sale Order, and Boa Vida Assignment should be declared void for inadequate service of process.

**B.     Does the proposed allocation of professional fees in the Plan satisfy § 1129(a)(4)?**

The Confirmation Waterfall includes a reserve of $1,392,422.00 for payment of all unpaid professional fees for work performed before the effective date of the Plan and allocates the payment of these fees equally among six of the Debtors with no professional fees being paid by PHS of Patrick, PHS of Choctaw, or PHS of Newton.  (Comm. Ex. 2).  Counsel for Jamison Trust argued at the Hearing that it was unreasonable to require PHS of Monroe to pay the administrative expenses of the separate estates of PHS of Patrick, PHS of Choctaw and PHS of Newton.  For this reason, Jamison Trust maintained at the Confirmation Hearing that the Plan violates § 1129(a)(4).

Under § 1129(a)(4), a bankruptcy court may not confirm a chapter 11 plan unless:

> Any payment made or to be made by the proponent, by the debtor . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). Consistent with this requirement, § 2.1.2. of the Plan provides that "all payments made or to be made by the Debtors or the Liquidating Trustee (as the case may be) for costs and expenses incurred in connection with the Bankruptcy Cases prior to the Effective Date, shall be subject to approval of the Bankruptcy Court as reasonable, following application and the opportunity for notice and a hearing." (Dkt. 2919 § 2.1.2).

Only a few months after the commencement of the Lead Bankruptcy Case, the Court established procedures for compensation of professionals in the estates. (Dkt. 550). Pursuant to those interim procedures, professionals have filed applications for interim approval and allowance, pursuant to §§ 331 and 503, of the compensation requested for the requisite time periods. In those interim applications, the professionals allocated fees based upon a fair allocation of the workload performed consistent with the budgets attached to the Final Order (I) Authorizing the Debtors to Use Cash Collateral of Certain Prepetition Secured Parties; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; and (III) Granting Related Relief (the "Final Cash Collateral Order") (Dkt. 543). (*See, e.g.*, Dkt. 3462). Jamison Trust never objected to the Final Cash Collateral Order or to any of the interim fee applications submitted pursuant to the allocation although it appears that none of these interim fee applications attempted to allocate time on a Debtor-by-Debtor basis.

Neither § 330 nor Rule 2016 of the Federal Rules of Bankruptcy Procedure requires an entry-by-entry allocation among debtors in a jointly-administered bankruptcy case. At least one other bankruptcy court has allowed the allocation of fees and expenses among jointly-administered

cases when the allocation otherwise was reasonable and had been used throughout the bankruptcy cases without objection.  *In re Burival*, No. BK07-42271-TLS, BK07-42273-TLS, 2009 WL 2501118 (Bankr. D. Neb. July 21, 2009).  In *Burival*, the bankruptcy court overruled the objection to the allocation of attorney's fees and costs between two jointly-administered cases, noting: "Throughout this case, Debtors have proposed an 80/20 allocation and no party has objected until now.  However, the objections do not propose a different allocation.  This Court is not inclined to change at this late date what has been an accepted practice in this case."  *Id.*, at *4.

The Fifth Circuit discussed the standard of "reasonableness" contained in § 1129(a)(4), observing:

> What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.  In the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender anything like the judicial scrutiny devoted to those that are payable out of the bankruptcy estate.  Where the bankruptcy court has determined that the payment at issue was for an expense that is routine in the confection and confirmation of a plan (e.g., for legal or accounting services, expert witness fees, printing, etc.) and that the payment has not been made from and will not be reimbursed by the bankruptcy estate, the court will ordinarily have little reason to inquire further with respect to the amount charged.  Bankruptcy courts in general . . . are sufficiently overburdened that they and we should be chary about succumbing to the exhortations of litigants to turn § 1129(a)(4) into a mandate for an expensive and unnecessary inquiry.

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998).  Here, payment of professional fees is being made from cash collateral pursuant to an agreement reached with CONA and the Internal Revenue Service regarding the allocation of administrative expenses among the Debtors.  According to the position taken by CONA and the Internal Revenue Service throughout the Lead Bankruptcy Case, absent their agreement to carve out these amounts, PHS of Monroe would not have any unencumbered assets available to pay any administrative expenses, including Jamison Trust's alleged claim.  Given these circumstances and

the fact that the interim fee applications are subject to the Court's final approval, the Court finds that the Plan satisfies the reasonableness standard under § 1129(a)(4) as set forth by the Fifth Circuit in *Cajun Elec. Power Coop., Inc.*

### Conclusion

For the above reasons, the Court finds that paragraphs three and four of the Jamison Trust Plan Objection regarding Geno should be stricken and that the Jamison Trust Plan Objection should be overruled. The Court estimates the amount of Jamison Trust's administrative expense at $370,863.00, the amount proposed in the Confirmation Waterfall.

With the estimation of Jamison Trust's administrative expense claim at $370,863.00, the Court may proceed to other matters concerning Plan confirmation. At the Confirmation Hearing, the Plan Proponents presented the Court with a proposed Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Proposed Confirmation Order") signed by counsel for the Committee and counsel for the Debtors but no one else. It appears that none of the parties whose objections are resolved in the Proposed Confirmation Order by agreement has had an opportunity to review and approve the form of the Proposed Confirmation Order. For that reason, the Court finds it necessary to hold an evidentiary hearing on the Proposed Confirmation Order. The date of the hearing and the deadline for filing any written response will be set by the Bankruptcy Clerk by separate notice, to which a copy of the Proposed Confirmation Order will be attached.

IT IS, THEREFORE, ORDERED that paragraphs three and four of the Jamison Trust Plan Objection are stricken under Rule 12(f).

IT IS FURTHER ORDERED that the Jamison Trust Objection is overruled.

IT IS FURTHER ORDERED that the Bankruptcy Clerk shall set an evidentiary hearing on the form of the Proposed Confirmation Order at the same time as the next regularly-scheduled hearing in the Lead Bankruptcy Case and shall set a date for filing written responses to the form. A copy of the Proposed Confirmation Order shall be attached to the hearing notice.

##END OF OPINION##