SO ORDERED,

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: February 28, 2020**

The Order of the Court is set forth below. The docket reflects the date entered.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**PIONEER HEALTH SERVICES, INC.**                    **CASE NO. 16-01119-NPO**
**ET AL.,**                                                          **JOINTLY ADMINISTERED**

**DEBTORS.**                                                       **CHAPTER 11**

### MEMORANDUM OPINION AND ORDER GRANTING
### THE LIQUIDATING TRUSTEE'S MOTION TO ENFORCE:
### (I) ASSET PURCHASE AGREEMENT BETWEEN PIONEER HEALTH
### SERVICES, INC., MEDICOMP, INC., AND ENDURACARE ACUTE CARE
### SERVICES, LLC; AND (II) ORDER CONFIRMING JOINT LIQUIDATING
### <u>CHAPTER 11 PLAN [DOCKET NO. 2919] AS AMENDED AND MODIFIED</u>

This matter came before the Court for a combined status conference and hearing on January 7, 2020 (the "Hearing") on The Liquidating Trustee's Motion to Enforce: (i) Asset Purchase Agreement Between Pioneer Health Services, Inc., Medicomp, Inc., and EnduraCare Acute Care Services, LLC; and (ii) Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Trustee Motion to Enforce") (Dkt. 3981) filed by Marshall Glade, in his capacity as Liquidating Trustee (the "Liquidating Trustee") for the Trusts of Pioneer Health Services, Inc. ("PHS") and Medicomp, Inc. ("Medicomp") and the Objection of EnduraCare Acute Care Services, LLC to Liquidating Trustee's Motion to Enforce: (I) Asset Purchase Agreement

Between Pioneer Health Services, Inc., Medicomp, Inc., and EnduraCare Acute Care Services, LLC; and (II) Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Objection") (Dkt. 3985) filed by EnduraCare Acute Care Services, LLC ("EnduraCare") in the above-referenced lead bankruptcy case commenced by PHS (the "Lead Bankruptcy Case").   At the Hearing, James A. McCullough, II represented the Liquidating Trustee and C. Kevin Kobbe represented EnduraCare.   After considering the arguments of counsel, the Court instructed the Liquidating Trustee and EnduraCare to file briefs on a legal issue arising out of the present dispute.   The Liquidating Trustee filed the Memorandum Brief in Support of the Liquidating Trustee's Motion to Enforce:   (i) Asset Purchase Agreement Between Pioneer Health Services, Inc., Medicomp, Inc., and EnduraCare Acute Care Services, LLC; and (ii) Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified [Dkt. No. 3981] (the "Liquidating Trustee's Brief") (Dkt. 3991) and EnduraCare filed the Supplemental Memorandum of EnduraCare Acute Care Services, LLC in Opposition to Liquidating Trustee's Motion to Enforce:   (I) Asset Purchase Agreement Between Pioneer Health Services, Inc., Medicomp, Inc., and EnduraCare Acute Care Services, LLC; and (II) Order Confirming Joint Liquidating Chapter 11 Plan as Amended and Modified (the "EnduraCare's Brief") (Dkt. 3992).   After considering the briefs filed by the parties, the Court finds as follows:[1]

### Jurisdiction

The Court has jurisdiction in this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.   This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (N) and (O).   The Court

---

[1] The following findings of facts and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

retained jurisdiction to resolve any controversies arising under or related to the agreement entered between Medicomp and EnduraCare.   (Dkt. 3991-1 § 13.3).   Notice of the Hearing was proper under the circumstances.

**Facts**

PHS filed on its own behalf and on behalf of its subsidiaries, Medicomp (Case No. 16-01126-NPO); Pioneer Health Services of Patrick County, Inc. (Case No. 16-01120-NPO); Pioneer Health Services of Newton County, LLC (Case No. 16-01121-NPO); Pioneer Health Services of Stokes County, Inc. (Case No. 16-01122-NPO); Pioneer Health Services of Choctaw County, LLC (Case No. 16-01123-NPO); Pioneer Health Services of Oneida, LLC (Case No. 16-01124-NPO); Pioneer Health Services of Monroe County, Inc. (Case No. 16-01125-NPO); and Pioneer Health Services of Early County, LLC (Case No. 16-01243-NPO) (collectively, the "Debtors"), voluntary petitions for relief under chapter 11 of the Bankruptcy Code in early 2016.   The goal of PHS in filing these chapter 11 bankruptcy cases was to liquidate its assets and the assets of its subsidiaries and to cease all business operations.   The Court ordered that these affiliated cases be consolidated into the Lead Bankruptcy Case of PHS and jointly administered for procedural purposes only. (Dkt. 44, 553).

When it commenced bankruptcy, Medicomp provided physical therapy and other rehabilitation services at twenty-six (26) facilities, most of which were in Mississippi.   (Dkt. 2920 at 19).   The remaining subsidiaries of PHS operated "critical access hospitals" in Mississippi and in four other states.   PHS provided management, billing, and collection services to Medicomp and its other subsidiaries.   (Dkt. 2920 at 8).   The parties' dispute arises out of the Court-approved sale of substantially all of Medicomp's assets to EnduraCare.   The resolution of this dispute

requires the Court to determine which entity owns Medicomp's historical patient records.

**Sale of Medicomp**

With the Court's approval, the Debtors retained SOLIC Capital Advisors, LLC ("SOLIC") in September of 2016 to market the assets of the Debtors. (Dkt. 985). Medicomp's assets included real and personal property leases, furniture, fixtures, equipment, cash, business records, patient records, and accounts receivable. As a result of SOLIC's marketing efforts, California Rehabilitation Services, Inc. d/b/a Interstate Rehabilitation Services ("Interstate Rehab") submitted a proposed asset purchase agreement (the "Interstate Rehab APA") dated August 23, 2017 for the purchase of Medicomp. As contemplated by the Interstate Rehab APA, the Debtors filed a motion seeking the Court's approval pursuant to 11 U.S.C. § 363 to sell substantially all of Medicomp's business assets at an auction. (Dkt. 2275). In October of 2017, the Court entered an order (Dkt. 2431) designating Interstate Rehab as the "stalking horse bidder," establishing the Interstate Rehab APA as a template for other potential purchasers, approving bidding procedures, and scheduling a date for the auction and a sales hearing.

At the auction on November 21, 2017, EnduraCare and 2083 Therapy, LLC presented competing bids in excess of Interstate Rehab's "stalking horse bid." (Dkt. 2639 ¶ 12). In connection with its offer, EnduraCare submitted a proposed asset purchase agreement substantially in the form of the Interstate Rehab APA (the "EnduraCare APA") (Dkt. 3991-1). At the conclusion of the auction, the Debtors determined that EnduraCare's total bid of $1,045,500.00 was the highest and best offer. (Dkt. 2639 ¶ 13). EnduraCare's bid consisted of the following components: (a) $700,000.00 in cash at the time of closing; (b) $230,000.00 in cash by December 31, 2017; (c) assumption of Medicomp's post-petition paid time off obligations to its employees

(estimated to be $115,500.00).   (Dkt. 2639 ¶ 13).   At a hearing held that afternoon, the Court approved the sale in accordance with the EnduraCare APA and entered the Agreed Order Authorizing Sale of Medicomp Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests (the "Sale Order") (Dkt. 2639) on December 1, 2017.

On December 29, 2017, PHS filed the Report of Sale of Substantially All of the Assets of Medicomp, Inc. (the "Report of Sale") (Dkt. 2754).   When EnduraCare failed to pay the final installment of $230,000.00 by December 31, 2017, the Court set the Sale Order and the Report of Sale for a status conference on February 28, 2018.   (Dkt. 2815).   After EnduraCare paid the remaining installment of the purchase price, PHS filed the Supplemental Report of Sale of Substantially All of the Assets of Medicomp, Inc. (Dkt. 2824) informing the Court of its receipt of the final installment on January 30, 2018.

**EnduraCare APA**

EnduraCare purchased Medicomp as a going-concern business but did not acquire all of its assets in the sale.   The EnduraCare APA itemizes the specific categories of assets that were included in the sale, defined as "Purchased Assets" (Dkt. 3991-1 § 2.1), as well as the specific categories of assets that were excluded from the sale, defined as "Excluded Assets" (Dkt. 3991-1 § 2.2).   In fourteen (14) separate paragraphs, section 2.1 lists the Purchased Assets conveyed by Medicomp to EnduraCare in the following categories:   real property leases, hospital contracts, furniture, equipment, personal property leases, intellectual property, provider agreements, documents, permits, employee agreements, warranties, patient records, goodwill, customer deposits, proposals for acquisition of the business, and other tangible and intangible assets used in

connection with the business.  (Dkt. 3991-1 § 2.1(a)-(o)). [2]   The dispute before the Court concerns the purchase by EnduraCare of "all Patient Records" pursuant to section 2.1(j).  (Dkt. 3991-1 § 2.1(j)).

The EnduraCare APA defines "Patient Records" as "any Documents containing information concerning medical or behavioral health services provided to, or the medical or behavioral health of any individual, or that are otherwise subject to regulation under HIPAA."[3] (Dkt. 3991-1 § 1.1).  Section 2.1(j) provides the following with respect to the sale of Patient Records:

> 2.1   <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser (the "Contemplated Transactions"), all of Seller's respective right, title and interest in, to and under the Purchased Assets, free and clear of any and all Liens or adverse claims.  "Purchased Assets" shall mean the following assets of Seller and/or PHS as the case may be (but excluding Excluded Assets) existing as of the Closing:
>
> * * *
>
> (j)   all Patients Records; provided, however, that to the extent that Purchaser requires that the Patient Records be transferred from the Raintree system currently used by Seller to hold the Patient Records to another information system, Purchaser shall bear the costs and expenses associated with the transfer of said Patient Records to another system;

(Dkt. 3991-1 § 2.1 at 7-8).  In short, section 2.1(j) conveys "all Patient Records" to EnduraCare and contemplates that EnduraCare either would maintain those Patient Records on the electronic

---

[2] Subsection 2.1(m) of the EnduraCare APA is intentionally left blank.

[3] The EnduraCare APA defines HIPAA as "the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164."  (Dkt. 3991-1 at 3).

medical records software licensed from Raintree Systems, Inc. ("Raintree") or would pay to transfer them to another electronic system.

A separate subdivision of section 2.1 provides for the purchase of certain "Documents," as follows:

> (f)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the Business, the marketing of the Business's services (including advertising and promotional materials), *Purchased Intellectual Property*, personnel files for Transferred Employees and files including credit information and supplier lists, to the extent physically located on any of the premises used pursuant to the Purchased Real Property Leases, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files (if any) as may not be provided to Purchaser hereunder in compliance with applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, (provided, however, that Seller discloses to Purchase in writing, subject to Purchaser's confidentiality obligations hereunder, the existence of said Documents and such terms and conditions with respect thereto as permitted thereunder not less than five (5) business days prior to the closing Date), and (iv) any documents primarily related to or required to realize the benefits of any Excluded Assets.

(Dkt. 3991-1 § 2.1(f)) (emphasis added).   Section 2.1(f) defines the documents purchased by EnduraCare as "all Documents that are used in, held for use in or intended to be used, or that arise primarily out of, the Business"[4] and describes the categories of documents included within this definition.   (Dkt. 3991-1 § 2.1(f)).   One such category is "Purchased Intellectual Property," defined in schedule 5.7(a) as including "Intellectual Property Licenses."   Schedule 5.7(a) lists the "Agreement between Medicomp and Raintree" as "Purchased Intellectual Property" (Dkt. 3991-1 Schedule 5.7(a)).   Thus, EnduraCare purchased Medicomp's contractual rights to access Patient

---

[4] "Business" is defined in the recitals as "the business that provides physical therapy and other rehabilitation services owned by Medicomp."   (Dkt. 3991-1 at 5).

Records through software licensed from Raintree under section 2.1(f) and schedule 5.7(a).

Section 2.1(f) excludes from the Documents sold to EnduraCare certain categories of documents, including "any documents primarily related to or required to realize the benefits of any Excluded Assets."   In that regard, section 2.2 of the EnduraCare APA defines "Excluded Assets" as all assets other than Purchased Assets and provides a non-exhaustive list of those assets excluded from the sale.   (Dkt. 3991-1 § 2.2).   The list of Excluded Assets includes "all accounts receivable and cash recoveries arising prior to the Closing" (Dkt. 3991-1 § 2.2(b)) and "[a]ll cash other than lease deposits" (Dkt. 3991-1 Schedule 2.2(n)).

**EnduraCare Motion to Enforce**

Months after the closing of the sale, EnduraCare filed the Motion of EnduraCare Acute Care Services, LLC to Enforce Medicomp Sale Order and to Compel Delivery of Electronically Stored Documents Relating to the Medicomp Business (the "EnduraCare Motion to Enforce") (Dkt. 2954).   The EnduraCare Motion to Enforce involved a dispute regarding the sale and transfer of Medicomp's business records pursuant to section 2.1(f).   Because the Liquidating Trustee argues that EnduraCare's prosecution of the EnduraCare Motion to Enforce demonstrates for purposes of collateral estoppel that EnduraCare is a party in interest in the Lead Bankruptcy, this dispute is discussed in some detail.   (Dkt. 3991 at 10 n.7).

As its owner and management company, PHS maintained Medicomp's business records until PHS sold, with the Court's approval, a substantial portion of its assets to Lackey Healthcare Management, LLC d/b/a Ascentium Healthcare Resources ("Ascentium").   (Dkt. 2737).   The assets sold to Ascentium included computer equipment and software used by PHS to store Medicomp's business records.   As part of the consideration for Ascentium's purchase of these

assets, Ascentium and PHS entered into a Transition Services Agreement under which PHS agreed to pay Ascentium for certain services provided to PHS and its subsidiaries.   At the closing of the sale of Medicomp, Ascentium transferred to EnduraCare Medicomp's business records except emails sent by former employees of Medicomp and/or PHS.   Ascentium refused to "migrate" the emails because of its concern that they might contain privileged information.[5]

After a hearing held on May 22, 2018, the Court entered the Order Granting Motion of EnduraCare Acute Care Services, LLC to Enforce Medicomp Sale Order and to Compel Delivery of Electronically Stored Documents Relating to the Medicomp Business (Dkt. 3250), in which the Court ordered the Debtors to direct Ascentium to deliver to EnduraCare all electronically stored documents relating to Medicomp's business.   The Court's order provided that the delivery of the emails would not constitute a waiver by the Debtors of any privilege that they may have under any applicable law and required EnduraCare to return to the Debtors any inadvertently produced emails protected by any such privilege.   (Dkt. 3250).

**Confirmation of the Joint Liquidating Chapter 11 Plan**

On March 30, 2018, the Debtors, including Medicomp, and the Official Committee of Unsecured Creditors of Pioneer Health Services (the "Committee") filed the Joint Liquidating Chapter 11 Plan (the "Initial Joint Plan") (Dkt. 2919).   A hearing on the Initial Joint Plan, as subsequently amended and modified (Dkt. 3273, 3560, 3564), was held on September 6, 2018 (the "Confirmation Hearing").   At the Confirmation Hearing, the Debtors presented testimony on the status of their remaining assets.   Much of that testimony concerned the financial ability of each

---

[5] Some of Ascentium's current employees were former employees of Medicomp and/or PHS.

Debtor to comply with applicable non-bankruptcy federal and state law regarding the storage and/or destruction of patient records.   Two Debtors, Pioneer Health Services of Patrick County, Inc. ("Patrick") and Pioneer Health Services of Oneida, LLC ("Oneida"), lacked the financial resources to store and dispose of patient records under non-bankruptcy law and, therefore, requested permission to invoke the provisions of 11 U.S.C. § 351 and Rule 6011 of the Federal Rules of Bankruptcy Procedure ("Rule 6011").

Section 351, enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, provides a mechanism for the disposal of patient records in a healthcare bankruptcy case when the debtor does not have enough funds to pay for the storage of patient records under applicable federal and state law.   11 U.S.C. § 351.   The process consists of three steps.   First, the debtor must publish a notice in one or more newspapers that it will destroy patient records if they are not claimed by the patient or the patient's insurer within 365 days.   11 U.S.C. § 351(1)(A).   Second, during the first six (6) months of that period, the debtor must attempt to notify each patient and the patient's insurer directly by mail regarding the claiming or disposing of patient records.   11 U.S.C. § 351(1)(B).   Third, if patient records remain unclaimed during the 365-day period, the debtor must request permission from each appropriate federal agency to deposit the records with such agency.   11 U.S.C. § 351(2).   If no federal agency accepts the records, the debtor may destroy them.   11 U.S.C. § 351(3).   Rule 6011 requires that the debtor file a report certifying the destruction of the patient records and detailing the destruction process. FED. R. BANKR. P. 6011(d).

At the Confirmation Hearing, the Debtors announced that the Liquidating Trustee had agreed to reserve on behalf of Patrick and Oneida $97,766.00 and $109,178.00, respectively, to

pay for the costs of completing the steps necessary under 11 U.S.C. § 351 to dispose of their patient records.   (Dkt. 3746 ¶ 23).   They announced that all other subsidiaries either had transferred their patient records to the purchaser of their assets or had disposed of them previously pursuant to applicable non-bankruptcy law.   The Court instructed the Debtors and the Committee to prepare a proposed confirmation order addressing, among other issues, the disposition of patient records and to provide notice of the proposed confirmation order to all parties in interest.

On October 2, 2018, the Bankruptcy Clerk issued the Notice of Hearing on Proposed Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Notice of Hearing") (Dkt. 3666), to which was attached the proposed Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Proposed Confirmation Order").   The Notice of Hearing set a response deadline of October 10, 2018, for any party in interest to object to the entry of the Proposed Confirmation Order and scheduled an evidentiary hearing on the Proposed Confirmation Order for October 12, 2018.   The Notice of Hearing and accompanying Proposed Confirmation Order were served by electronic mail on EnduraCare's counsel of record.   (Dkt. 3670).   Among its numerous provisions, the Proposed Confirmation Order contained a paragraph "[w]ith respect to the Debtors' handling of patient records pursuant to Section 351 of the Bankruptcy Code and Rule 6011 of the Bankruptcy Rules." (Dkt. 3666 ¶ 23).   This paragraph reflected the proposed treatment of the patient records as announced by the Debtors at the Confirmation Hearing.

With respect to the patient records of Medicomp, the Proposed Confirmation Order provided that "notice to former patients of . . . Medicomp regarding such patients' records is not required under Section 351 of the Bankruptcy Code and Rule 6011 of the Bankruptcy Rules

Page 11 of 25

because the patient records held and maintained by [Medicomp] after the Petition Date were sold to and assumed by the purchaser[] of [Medicomp's] healthcare facilities and operations during the course of the Bankruptcy Cases."   (Dkt. 3666 at 8-9).   EnduraCare did not file an objection to the Proposed Confirmation Order.   The Court entered the final Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (the "Confirmation Order") (Dkt. 3746) on October 15, 2018.   The Notice of Entry of Order Confirming Joint Liquidating Chapter 11 Plan [Docket No. 2919] as Amended and Modified (Dkt. 3757) was served on EnduraCare and its counsel.   There was no appeal of the Confirmation Order.

**Trustee Motion to Enforce & Objection**

In June of 2019, the Liquidating Trustee contacted EnduraCare to finalize the transfer of all patient records acquired by EnduraCare in the sale.   (Dkt. 3981 at 4).   EnduraCare, however, declined to take possession of "historical records relating to patients who were never served by EnduraCare" and suggested that the Liquidating Trustee follow the procedures in 11 U.S.C. § 351 for their storage and disposal.   (Dkt. 3985 at 2).   On December 5, 2019, the Liquidating Trustee filed the Trustee Motion to Enforce, asking the Court to compel EnduraCare to assume custody of, and accept responsibility for, all of Medicomp's patient records.   (Dkt. 3981 at 1).   According to the Liquidating Trustee, EnduraCare's refusal to take possession of historical patient records "has created a dilemma in the Medicomp bankruptcy as the Liquidating Trustee works to make final distributions and close the Medicomp trust."   (Dkt. 3991 at 2).   In its Objection filed on December 30, 2019, EnduraCare maintains that it purchased only the records of those patients who were being served by Medicomp as of the date of the closing of the sale and who continued being served by EnduraCare after the date of the sale.   (Dkt. 3985 at 1-2).

At the Hearing, the parties asked the Court to bifurcate their dispute into two stages. They asked the Court to determine first whether the EnduraCare APA is ambiguous as a matter of law. Second, if the Court found that the EnduraCare APA is ambiguous, they asked the Court to hold an evidentiary hearing to consider extrinsic evidence of the parties' intent. To promote efficiency and to avoid potentially unnecessary costs, the Court granted the parties' request but instructed the parties to file briefs clarifying which facts were undisputed and which facts would require an evidentiary hearing. *See Biddix v. McConnell*, 911 So. 2d 468, 471 (Miss. 2005) (holding that "[t]he initial question of whether a contract is ambiguous is a matter of law"). The Court noted that EnduraCare had attached the Declaration of Arthur M. Doloresco (the "Doloresco Affidavit") (Dkt. 3985-1) as an exhibit to the Objection and did not want the two stages to overlap. The Court informed the parties that if it determined from its review of the briefs that an evidentiary hearing was necessary, it would schedule the evidentiary hearing for a date that would allow enough time for the parties to engage in discovery. *See Tupelo Redev. Agency v. Abernathy*, 913 So. 2d 278, 283 (Miss. 2005) (holding that only if the court determines the contract is ambiguous does its "subsequent interpretation present[] a question of fact"). The briefs were filed on January 17, 2020 and January 27, 2020. (Dkt. 3991, 3992). Now, having reviewed the briefs, the Court has determined that the resolution of the parties' dispute does not require an evidentiary hearing.

## Discussion

In disputes regarding the sale of business assets, the purchaser usually asserts that the sale includes more assets, not less. EnduraCare, however, asserts that the sale of Medicomp includes less assets, not more. The obligations and potential liability imposed under non-bankruptcy law on the owner of patient records explains EnduraCare's unusual stance.

Page 13 of 25

Healthcare businesses generate and maintain hundreds of thousands of medical records. Such records are necessary to provide ongoing medical care to patients, to comply with healthcare regulations, and to collect and receive payment for medical services. A myriad of federal and state laws requires healthcare facilities to keep those records both private and available to the patient or an insurance provider for long periods.[6] Healthcare businesses in bankruptcy may not have the financial and human resources to store and/or destroy patients records pursuant to applicable non-bankruptcy law. Congress attempted to address this problem by creating an alternative mechanism under 11 U.S.C. § 351 for the disposal of patient records in a short period while also protecting the privacy of patients. Nevertheless, during the pendency of the Debtors' liquidating asset cases, the handling of patient records has been a persistent issue.

A.      **Liquidating Trustee's Contractual Interpretation**

According to the Liquidating Trustee, the EnduraCare APA is clear and unambiguous that EnduraCare purchased "all Patient Records" from Medicomp, including its historical patient records. The Liquidating Trustee points to subsection (j) of section 2.1 of the EnduraCare APA, which defines "Purchased Assets" as including "all Patient Records." (Dkt. 3991-1 § 2.1(j)). Even if the EnduraCare APA is ambiguous, the Liquidating Trustee contends that the doctrine of collateral estoppel precludes EnduraCare from relitigating the issue in light of the Court's adjudication in the Confirmation Order that it would be unnecessary for Medicomp to avail itself of the provisions of 11 U.S.C. § 351 and Rule 6011.

---

[6] Generally, federal law requires a healthcare provider to maintain all patient records for at least five (5) years. *See* Nancy A. Peterman, *Intensive Care: Protecting Patients' Rights in Healthcare Bankruptcies*, 17 AM. BANKR. INST. J. 10 (1998) (citing 42 U.S.C. § 1396cc(a)(1)(I)(ii); 42 C.F.R. § 482.24(b)(1)).

**B.     EnduraCare's Contractual Interpretation**

For its contention that it did not purchase any historical patient records, EnduraCare relies on a different subsection of section 2.1 and the definition of "Excluded Assets" in section 2.2. EnduraCare asserts that pursuant to subsection (f) of section 2.1, it did not purchase "any Documents primarily related to or required [by the Debtors] to realize the benefits of any Excluded Assets," including accounts receivable.  (Dkt. 3992 at 4).  Also, subsection (h) of section 2.2 defines "Excluded Assets" as any other records that the Debtors determined to be "necessary or advisable" to retain.  (Dkt. 3992 at 5).  EnduraCare reasons that Medicomp needed to retain ownership of its historical patient records to collect its accounts receivable.  (Dkt. 3992 at 5). EnduraCare's position, as summarized by the Liquidating Trustee, is that "because the pre-closing accounts receivable were Excluded Assets under the [EnduraCare] APA, then the pre-closing Patient Records were also automatically excluded because such records were necessary for Medicomp's collection of pre-closing receivables, rendering those records an Excluded Asset." (Dkt. 3991 at 6).

EnduraCare asserts that there was no reason for EnduraCare to receive the historical patients records to operate the business because they did not relate to patients who were being transitioned to EnduraCare.  (Dkt. 3992 at 2).  EnduraCare argues that the Liquidating Trustee's reliance on Section 2.1(j) is flawed because it fails to consider the language in section 2.1(f) that excludes from the sale "any Documents primarily related to or required [by the Debtors] to realize the benefits of any Excluded Assets," as well as the language in section 2.2(h) that excludes any records that the Debtors determine "are necessary or advisable to retain."   (Dkt. 3992 at 5).

To the extent that there is any ambiguity, EnduraCare asks the Court to consider extrinsic

evidence that the historical Patient Records were "primarily related to or required [by the Debtors] to realize the benefits" of Medicomp's accounts receivable and were determined by the Debtors to be "necessary or advisable" to retain.   (Dkt. 3992 at 7).   To that end, EnduraCare incorporates by reference the Doloresco Affidavit, attached as an exhibit to the Objection.   (Dkt. 3992 at 7).   Arthur M. Doloresco ("Doloresco") is EnduraCare's chief executive officer.   Doloresco participated in the negotiation and preparation of the EnduraCare APA and ancillary documents, attended both the auction on November 21, 2017 and the sale hearing held later that same afternoon, supervised the closing and implementation of the transaction, and acted as EnduraCare's primary point of contact in communications with the Debtors regarding the transfer of records.   If allowed, Doloresco would testify that EnduraCare never agreed to assume the burden or expense of storing Medicomp's historical patient records.   Doloresco also would recount a telephone conversation he had on October 25, 2019 with Richard Welty ("Welty"), Raintree's chief executive officer, in which Welty "confirmed that EnduraCare never has had access or right to the historical patient records and that such records always remain with the accounts receivable."   (Dk. 3985-1 at 5).

With respect to the Liquidating Trustee's collateral estoppel argument, EnduraCare contends that under 11 U.S.C. § 1141(a) the terms of a confirmed plan bind only certain stakeholders, creditors, and entities acquiring property under the plan.   EnduraCare insists that it does not fall within the purview of 11 U.S.C. § 1141(a).   (Dkt. 3992).   Even if it were bound by the Confirmation Order, EnduraCare argues that collateral estoppel does not apply because the Confirmation Order does not include a specific finding regarding the proper interpretation of the EnduraCare APA.   (Dkt. 3992 at 8).   Finally, EnduraCare maintains that the parties modified the

EnduraCare APA by their subsequent conduct.

## C.    Court's Analysis

Because the parties' dispute may be resolved based on an examination of the language contained within the "four corners" of the EnduraCare APA, the Court finds it unnecessary to consider extrinsic or parol evidence of the parties' intent.   For this same reason, the Court also finds it unnecessary to consider whether the doctrine of collateral estoppel precludes EnduraCare from denying that it purchased Medicomp's historical patient records.

### 1.    Contract Interpretation under Mississippi Law

State law principles govern the interpretation of a contract in bankruptcy cases.    *Butner v. United States*, 440 U.S. 48 (1979).   In Mississippi,[7] courts employ a three-step approach to contract interpretation.   First, courts must determine the intent of the parties by examining the language contained within the "four corners" of the contract.    *HeartSouth, PLLC v. Boyd*, 865 So. 2d 1095, 1105 (Miss. 2003).   Second, "[i]f examination solely of the language within the instrument's four corners does not yield a clear understanding of the parties' intent, the court will [implement] . . . applicable 'canons' of construction."    *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990); *see Universal Underwriters Ins. Co. v. Ford*, 734 So. 2d 173, 176 (Miss. 1999) (a contract is ambiguous "if it is reasonably subject to more than one interpretation").   Third, "if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic evidence or parol evidence."    *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 753 (Miss. 2003).   This three-step approach to contract interpretation is not rigid,

---

[7] The EnduraCare APA provides that it is governed by Mississippi law (Dkt. 3991-1 § 13.6).

and some steps may overlap.

For the first step, "[t]he general rule is the intention of the parties must be drawn from the words of the whole contract, and if, viewing the language used, it is clear and explicit, then the court must give effect to this contract unless it contravenes public policy." *HeartSouth*, 865 So. 2d at 1105 (quoting *Jones v. Miss. Farms Co.*, 76 So. 880, 884 (Miss. 1917)). "One should look to the 'four corners' of the contract whenever possible to determine how to interpret it." *Id.* (quoting *Warwick v. Gautier Util. Dist.*, 738 So. 2d 212, 214 (Miss. 1999)). "Therefore, when interpreting a contract, the court's concern is not nearly so much with what the parties may have intended but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.* (quoting *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42-43 (Miss. 1992)). Courts must also interpret contracts by objective standards. *Thornhill v. Sys. Fuels, Inc.*, 523 So. 2d 983, 1007 (Miss. 1988) ("I for one am not nearly so interested in what the parties intended as in what they said."). "Courts must ascertain the meaning of the language actually used, and not 'some possible but unexpressed intent of the parties.'" *Id.* (quoting *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So. 2d 96, 105 (Miss. 1998)); *see Jackson ex rel. Wrongful Death Heirs of Jackson v. Daley*, 739 So. 2d 1031, 1041 (Miss. 1999); *Lewis v. Progressive Gulf Ins. Co.*, 7 So. 3d 955, 959 (Miss. Ct. App. 2009).

### 2.    "Four Corners" of the EnduraCare APA

This dispute hinges on a proper interpretation of section 2.1 of the EnduraCare APA, which identifies the categories of assets purchased by EnduraCare in fourteen (14) paragraphs separated by semi-colons. Subsection (f) in section 2.1 identifies as a Purchased Asset any documents that generally relate to the services provided by the business. Included among these Documents are

advertising and promotional materials as well as the personnel files of "Transferred Employees." Subsection (f) excludes documents "primarily related to or required to realize the benefits of any Excluded Assets."   Subsection (j), which appears in a separate paragraph, identifies as a Purchased Asset "all Patient Records."   No other subsection in section 2.1 refers to patient records.

The list of Purchased Assets in section 2.1 treats Patient Records separately from all other categories of assets.   This separate placement indicates that the parties did not intend the language in subsection (f) excluding documents "primarily related to or required to realize the benefits of any Excluded Assets" to apply to Patient Records in subsection (j).   *See United States v. Republic Steel Corp.*, 362 U.S. 482, 486 (1960) (provisions found to be separate and distinct where separated by a semicolon).   If EnduraCare had desired that Medicomp retain historical patient records, then it would have been a simple matter to add language to section 2.1(j) limiting the definition of Patient Records.

The Court finds that section 2.1(j) of the EnduraCare APA is unequivocal in its reference to "all Patient Records" as a specific category of Purchased Assets and thus concludes that section 2.1(j) unambiguously transfers all patient records to EnduraCare, including historical patient records.   This reading of subsections (f) and (j) is consistent with the structure, punctuation, and language of section 2.1.

**3.    Reading the EnduraCare APA as a Whole**

Although EnduraCare appears to acknowledge that the plain text of section 2.1(j), at least when read in isolation, conveys Medicomp's historical patient records, EnduraCare urges the Court to view the EnduraCare APA "as a whole" and "to give effect to all words, clauses and

provisions" to find by implication that the parties intended to exclude historical patient records from the sale.  (Dkt. 3992 at 4) (citing *Paine v. Sanders*, 135 So. 2d 188, 191 (Miss. 1961)). EnduraCare maintains that Medicomp's retention of its accounts receivable in section 2.2 implies an intent to exclude historical patient records from the definition of Purchased Assets. EnduraCare's construction of section 2.1(j) assumes that a healthcare business must own patient records in order to collect accounts receivable.

There is support in Mississippi law for EnduraCare's contention that contracts must be read as a whole.  The Mississippi Supreme Court has admonished courts to avoid "ascertaining the meaning of a contract by resort to solitary or fragmentary parts of the instrument."  *Texaco, Inc. v. Kennedy*, 271 So. 2d 450, 452 (Miss. 1973); *see Holloman v. Holloman*, 691 So. 2d 897, 899 (Miss. 1996) ("It has long been the law in Mississippi that in constructing particular provisions in a contract, a court will look to the document as a whole."); *Kyle v. Wood*, 86 So. 2d 881, 886 (Miss. 1956) ("[I]ntention is to be collected . . . from a consideration of all provisions of the instrument and every part thereof, taken together, rather than from any particular clause, sentence or form of words.").  There is less support in Mississippi law for EnduraCare's argument that terms may be implied into a written agreement.  *See Williams v. Batson*, 187 So. 236, 239 (Miss. 1939) ("The court should not interpolate into . . . a written contract words of material legal consequence.").

Reading the EnduraCare APA as a whole, however, reveals that a plain-text interpretation of section 2.1(j) is consistent with Medicomp's retention of its accounts receivable.  The parties addressed Medicomp's need to access its historical patient records for collection purposes in section 8.2 of the EnduraCare APA and in the Transition Services Agreement (the "EnduraCare

Page 20 of 25

TSA")[8] (Dkt. 3991-4 at 1-7).   Section 8.2 of the EnduraCare APA obligates EnduraCare to grant

Medicomp access to records to facilitate "the collection of amounts owed to [Medicomp] with

respect to pre-Closing matters" for which Medicomp agreed to reimburse EnduraCare for its costs,

as follows:

> 8.2    Conduct of the Business Pending the Closing; Transition Services
> Post-Closing. . . . In addition, for a period of thirty (60) [sic] days after the Closing:
> . . . (b) Purchaser shall provide Seller and PHS with access to records and such other
> transition support as Seller and PHS may reasonably request in connection with the
> collection of amounts owed to Seller with respect to pre-Closing matters, and Seller
> and PHS shall promptly reimburse Purchase for any actual out of pocket expenses
> reasonably incurred by Purchaser in providing post-Closing support.

Consistent with section 8.2 of the EnduraCare APA, the parties entered into the EnduraCare TSA,

which provides: "[t]he Buyer shall provide (itself or through its Affiliates) Seller and PHS with

the services and support listed on Exhibit A attached hereto (the "Buyer Services") for a period

not to exceed sixty (60) days after Closing."   (Dkt. 3991-4 at 1).   The Buyer Services are

described in Exhibit A, as follows:

> Upon Seller's request, Buyer shall provide Seller with access to Buyer's personnel
> and patient records relating to pre-Closing time periods with respect to Seller's
> efforts to collect amounts due to Seller with respect to pre-Closing matters.

> Such Buyer Services shall be provided at no cost to the Seller other than
> reimbursement of any out of pocket costs incurred by Buyer in connection
> therewith.

---

[8] Section 13.5 of the EnduraCare APA contains a merger clause that allows the parties to
supplement the EnduraCare APA by a signed, written agreement that makes specific reference to
the EnduraCare APA.   In its opening paragraphs, the EnduraCare TSA explains that its purpose
is "to assist in the transition of the ownership and operation of the Business from Seller to Buyer
pursuant to the [EnduraCare APA]."   (Dkt. 3991-4 at 1); see United Miss. Bank v. GMAC Mortg.
Co., 615 So. 2d 1174, 1176 (Miss. 1993) (holding that instruments executed at the same time, for
the same purpose, and in the course of the same transaction should be considered and construed
together).

(Dkt. 3991-4 at 8).   Section 8.2 and the EnduraCare TSA demonstrate that the parties anticipated that Medicomp would require access to "patient records relating to pre-Closing time periods" for collection purposes.

EnduraCare contends that the language in section 8.2 applies only to pre-closing records transferred to EnduraCare that relate to patients whose care was in process at the time of the sale. (Dkt. 3992 at 6).   EnduraCare's argument, however, requires the Court to imply language in section 8.2 that excludes historical patient records.   Where the EnduraCare APA excludes specific documents related to Excluded Assets, however, it clearly and expressly does so.   For example, in section 2.1(f), purchased documents include "personnel files for Transferred Employees" but expressly exclude "personnel files for Employees who are not Transferred Employees."   (Dkt. 3991-1 § 2.1(j)).   Giving effect to all terms and provisions in the EnduraCare APA, the Court finds no ambiguity that the sale of assets includes historical patient records.

### 4.      Impermissible Extrinsic Evidence

In the absence of any ambiguity, the Court declines to consider the Deloresco Affidavit or any other extrinsic evidence.   (holding that "[t]he initial question of whether a contract is ambiguous is a matter of law").   In Mississippi "[o]ne of the fundamental principles of contract law is that parol evidence will not be received to vary or alter the terms of a written agreement that is intended to express the entire agreement of the parties on the subject matter at hand." *HeartSouth*, 865 So. 2d at 1107 (quoting *Housing Auth., City of Laurel v. Gatlin*, 738 So. 2d 249, 251 (Miss. Ct. App. 1998).   Even if the Court were to consider the Deloresco Affidavit, Doloresco's purported conversation after the closing of the sale with a non-party to the EnduraCare APA would not create ambiguity as to the parties' intent.

5.      **No Enforceable Modification of the EnduraCare APA**

As an alternative argument, EnduraCare contends that even if the EnduraCare APA conveys the historical patient records, the parties modified the EnduraCare APA by their subsequent conduct.  For this proposition, EnduraCare cites the Mississippi Supreme Court's holding in *Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355 (Miss. 1989), that "the subsequent actions of the parties pursuant to the contract may support a finding that the original contract has been modified to an extent consistent with the subsequent course of conduct."  *Id.* at 1359. Recognizing that the purported modification of the EnduraCare APA would require a similar modification of the Sale Order, EnduraCare also cites the following provision of the Sale Order: "[t]he Debtor and EnduraCare, in their discretion, shall have the authority to modify and/or supplement the EnduraCare APA and any ancillary documents, without the requirement of further approval of the Court, so long as any modification and/or supplement is not material and is not inconsistent with the terms of this [Sale] Order."  (Dkt. 2639 at 11).   EnduraCare alleges that the "subsequent conduct" that evidences a modification is Medicomp's failure to transfer the historical patient records in early 2018.   It is unknown whether the Liquidating Trustee disputes the factual basis for this allegation because the Liquidating Trustee did not respond to this argument in the Liquidating Trustee's Brief.   The provisions of the Confirmation Order regarding 11 U.S.C. § 351 and Rule 6011, however, indicate that at least one (1) year after the sale of Medicomp, the Debtors still intended to transfer historical patient records to EnduraCare, contrary to any modification by "subsequent conduct."

EnduraCare correctly points out that in Mississippi, parties may modify a written contract by their subsequent conduct even when the contract provides that any modification must be in

writing.  *Eastline Corp. v. Marion Apartments, Ltd.*, 524 So. 2d 582, 584 (Miss. 1988).   Under the Bankruptcy Code, however, a chapter 11 debtor's transactions other than those in the ordinary course of business must be authorized by the court after notice and a hearing.   11 U.S.C. § 363(b).   For this reason, the Sale Order permits only immaterial modifications to the EnduraCare APA without Court approval.   EnduraCare ignores this important limitation.   As noted previously, the handling of patient records is a well-known issue in healthcare bankruptcy cases and a persistent one in the Debtors' liquidating asset cases.   Any modification obligating Medicomp to retain historical patient records after the sale would constitute a material adverse change to the EnduraCare APA and would require advance notice and a hearing as well as the Court's approval under 11 U.S.C. § 363(b).   Because the parties did not present any such modification to the Court for its approval, it would be unenforceable under bankruptcy law notwithstanding its enforceability under Mississippi law.   Any extrinsic evidence related to the parties' subsequent conduct, therefore, is irrelevant.

## Conclusion

EnduraCare's refusal to assume responsibility for the historical patient records is its second attempt in the Lead Bankruptcy Case to avoid its financial obligations under the EnduraCare APA.  EnduraCare refused to pay the final installment of the purchase price and now attempts to engraft more favorable terms into the EnduraCare APA.   For the reasons discussed above, the Court finds that the EnduraCare APA unambiguously conveys all patient records, including historical patient records, to EnduraCare.   Accordingly, the Court finds that the Trustee Motion to Enforce should be granted.

IT IS, THEREFORE, ORDERED that the Trustee Motion to Enforce is hereby granted.

IT IS FURTHER ORDERED that EnduraCare is hereby compelled to assume custody of, and accept responsibility for, all patient records, including historical patient records at the earliest practicable time.   If there is any undue delay in the transfer of these patient records, the Liquidating Trustee may seek enforcement of this Order and the assessment of reasonable attorneys' fees and costs.

##END OF ORDER##